IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

*# 33592·°°7*

FREDERICK HINES, a resident of
the District of Columbia, currently
incarcerated at
Rivers Correctional Institution
145 Parker's Fishery Road
Winton, NC 27986

Plaintiff

v.

THE GEO GROUP, INC., a Florida
for-profit corporation
c/o Corporation Service Company
1090 Vermont Avenue, N.W.
Washington, D.C. 20005

UNITED STATES OF AMERICA, through its
department, the FEDERAL BUREAU OF PRISONS,
320 First Street, N.W.
Washington, D.C. 20534

and

HARLEY LAPPIN, in his official capacity as
Director of the Federal Bureau of Prisons,
320 First Street, N.W.
Washington, D.C. 20534,

Defendants.

FILED

SEP 2 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Case: 1:07-cv-01664
Assigned To : Bates, John D.
Assign. Date : 9/20/2007
Description: PRO SE GEN.CIVIL

## CIVIL ACTION COMPLAINT FOR DECLARATORY
## AND INJUNCTIVE RELIEF AND FOR DAMAGES

This is a Civil Action authorized by 28 U.S.C. §§§

1331, 1332, & 1343, for damages suffered by plaintiff for past

and future causes; to redress the deprivation under color of

federal law, statute, ordinance, regulation, custom or usage,

of any right, privilege or immunity secured by the United States

Constitution. This Civil Action is also brought pursuant to

RECEIVED

SEP - 4 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

"The Americans with Disabilities Act (ADA) 1990," § 204(a),"
42 U.S.C.A. § 12134(a).  Plaintiff also seeks declaratory and
injunctive relief pursuant to 28 U.S.C. §§ 2201 & 2202.

## VENUE

Venue of this action properly lies in the District of
Columbia pursuant to 28 U.S.C. §§ 1391(b), (c) and (e).

## PRELIMINARY STATEMENT

1.  The named plaintiff, Frederick Hines, brings this "Civil
Action Lawsuit" to remedy the grossly inadequate and inhumane
level of medical care at the Rivers Correctional Institution
("Rivers"), where the named plaintiff is held as a prisoner
by Defendants.  The system of delivering health care at Rivers
has placed plaintiff at substantial and ongoing risk of serious
injury or premature death, and has caused permanent physical
damage and profound mental and physical pain to plaintiff.

2.  Rivers is a private, for-profit correctional facility that
is owned and operated by Defendant GEO GROUP, INC. ("GEO").
GEO houses approximately 900 residents to the District of
Columbia at Rivers pursuant to a contract with Defendant Federal
Bureau of Prisons (the "BOP").

3.  The health care system at Rivers is fatally broken.
Medical professional staffing levels at Rivers are grossly
inadequate.  Defendants have routinely refused to provide
plaintiff here at Rivers with treatment for his serious chronic

medical condition.  Defendants have arbitrarily switched and discontinued drug treatment that was carefully developed and calibrated by medical professionals at D.C. Jail, and by my private medical doctors without consultation with plaintiff and the therapeutic consequences.  Defendants force plaintiff to stand outside sometimes for hours in all sorts of inclement weather, sometimes requiring plaintiff to choose between receiving his medication or eating.  Defendants have failed to provide plaintiff with a wheel-chair or physical therapy, even though it had been prescribed by private physician.

4.  By allowing this broken medical system to continue as is detailed in this Complaint, Defendants have permanently harmed laintiff here at Rivers, have precipitated numerous and otherwise avoidable acute medical crises; have caused plaintiff to experience chronic and debilitating pain and suffering and have contributed to the continued needless serious physical and mental injury to plaintiff.

## PARTIES

### A.  Plaintiff

5.  Plaintiff, Frederick Hines is a 58 year old D.C. resident incarcerated at Rivers Correctional (hereinafter "RCI"), located at 145 Parker's Fishery Road, Winton, North Carolina 27986. Plaintiff arrived at Rivers Correctional Institution in the year 2004.

-3-

## B. **Defendants**

6. Defendant GEO Group, Inc. is a for-profit corporation formed
and existing under the laws of the State of florida, and having
its principal place of business in the State of Florida.  GEO
is in the business of building, owning, operating, and managing
correctional, detention, mental health, and residential treat-
ment facilities in the United States and around the world.  One
of the correctional facilities built, owned, operated, and managed
by GEO, pursuant to a written contract with the BOP, is Rivers
Correctional Institution.  At all times relevant to this Complaint,
Defendant GEO had undertaken the duty to provide Constitutionally
adequate medical care owed to plaintiff by Defendant **UNITED STATES
OF AMERICA** acting through the BOP.

7.  Defendant **UNITED STATES OF AMERICA,** pursuant to federal law,
has mandated that its department, the BOP, has the responsibility
for over-seeing, controlling, managing, and supervisinng the
federal prison system, including Rivers, and those persons
incarcerated therein.

8.  Defendant **HARLEY LAPPIN,** is employed by the BOP as its
Director.  As the director of the BOP, Defendant Lappin is charged
with the custody and care of plaintiff while incarcerated at
Rivers.  Defendant Lappin is responsible for overseeing the admini-
stration of the BOP and approving all BOP policies relating to
the treatment of persons under its care, including those persons,

-4-

such as plaintiff, incarcerated at Rivers.  At all times relevant
to this Complaint, Defendant Lappin was acting as an employee
and agent of Defendant United States of America.

**A.**   **AUTHORITY AND FUNCTIONS OF DEFENDANTS WITH RESPECT TO THE
      DISTRICT OF COLUMBIA CODE OFFENDERS HOUSED AT RIVERS.**

9.   Until 2001, persons convicted of a felony violation of the
District of Columbia Code (the "D.C. Code") were generally in-
carcerated at prison facilities operated by or for the District
of Columbia, and located in or near the District of Columbia.

10. In 1997, as part of the Balanced Budget Act of 1997, Pub.
L. No. 105-33, 11 Stat. 251, the United States Congress enacted
Title XI, the National Capital Revitalization and Self-Government
Improvement Act of 1997, 111 stat. 712 (the "Revitalization Act").
Now codified in part at D.C. Code § 24-101, the Revitalization
Act requires that any person who is sentenced in the District of
Columbia to incarceration as a consequence of a D.C. felony
conviction, or as a consequence of a violation of the conditions
of parole or supervised release relating to a D.C. felony con-
viction, be committed to the custody of the BOP and housed in a
BOP institution.  Plaintiff is a resident of the District of
Columbia.

11. Pursuant to federal law, the BOP has assumed responsibility
for housing and incarcerating plaintiff and all other D.C. Code
Offenders pursuant to the "National Capital Revitalization &
Self Government Act of 1997, Public Law § 105-33 in which the
United States Congress mandated that all D.C. felons be trans-

-5-

ferred to the custody of the Federal Bureau of Prisons and placed
in prisons "contracted for or operated by the Federal Bureau of
Prisons. See Crawford v. Jackson, 323 F.3d 123 (D.C. Cir. 2003).

12.    On March 7, 2000, the Federal Bureau of Prisons (hereinafter
"FBOP") entered into a contractual agreement with the Wachenhut
Corrections Corporation (now "GEO Group, Inc.") to house plaintiff
along with similarly situated D.C. Code Offenders pursuant to
"contract #J1PCc-005 (March 7, 2000)." Under the contract, the
GEO Group, Inc. and its employees agreed to comply with all fed-
eral, state or local laws, statute, ordiance, regulations,
Executive Orders and theDistrict of Columbia "National Capital
Revitalization & Self-Government Act of 1997, as well as all
consent decrees, court orders and the United States Constitution.

13.    The GEO contract provides for the involuntary relocation
of D.C. residents from the District of Columbia to Rivers, thereby
rendering plaintiff dependent on GEO for his medical, dental,
and mental health care and related services.  By entering into
the GEO Contract, GEO, under BOP supervision and control, assumed
responsibility for the medical treatment of plaintiff while in-
carcerted at Rivers, and voluntarily submitted to long-term
regulation and oversight by the BOP in the District of Columbia.

**B.    GEO's Obligation to Provide Medical, Dental, and Mental
       Health Care under the Supervision and Control of the BOP.**

14.    The GEO Contract spells out in great detail the services that
GEO is required to provide to, and for the benefit of, Rivers
prisoners.  Pursuant to the GEO Contract:

-6-

a.  GEO is required to provide all essential health services and to adhere to "the U.S. Constitution," and all applicable Federal, state and local laws and regulations governing the delivery of health services and establish the necessary quality controls to ensure all policies and procedures are designed and implemented in a manner to promote orderly and efficient delivery and management of health services to the inmate population."

b.  GEO is required to have written plans and procedures for "providing urgent medical, health, mental health and dental services . . . including but not limited to, the following: (1) 24 hour-a-day, seven day a week emeergency medical, health, mental health and dental care; (2) initial health screening; (3) health appraisal examination; (4) daily triaging of complaints; (5) sick call procedures; (6) special medical programs and services for, but not limited to, inmates with chronic needs or requiring convalescent care; (7) mental health and substance abuse services; (8) staffing/health care specialist; (9) ancillary services-- radiology, laboratory, etc.; (10) dental services--routine and emergency; (11) pharmaceutical services and supplies; (12) optometric services; (13) health education; (14) medical diets; (15) infectious diseases; and (16) quality control/peer reviews."

c.  GEO isrequired to submit "all plans, policies, and procedures" at Rivers, including but not limited to training materials, to the BOP for "review and concurrence."  GEO is prohibited from making modificaitons to those plans, policies and procedures without BOP acknowlegement.

-7-

d.   GEO is required to submit all proposed hirings of personnel at Rivers to the BOP.  The BOP alone may grant approval for the employment of any personnel at Rivers.  The BOP is "the final approval authority for all [GEO] staff who work with D.C. & Federal inmates . . . "

e.   "[E]ach phase of the services rendered under the Rivers Contract is subject to BOP inspection both during [GEO's] operations and after completion of the tasks."  The contract provides for on-site BOP personnel to "Monitor contract performance by GEO."

f.   The Rivers Contract provides that an on-site represent-ative, known as the "Contracting Officer's Representative," act as the "contract monitor" and be "responsible for technical direction of the performance of all work under [Rivers Contract]."

15.   The Rivers Contract is a fixed price contract for a set payment to GEO per time period, irrespective of GEO's cost of providing the services, including health care services, required by the BOP.  Thus, to the extent that GEO is able to reduce the costs of the medical, dental, and mental health services offered here at Rivers, GEO's profits are increased.

## C.   DEFENDANTS'S UNCONSTITUTIONAL AND ILLEGAL ORGANIZATIONS, SYSTEMS, PATTERNS AND PRACTICES AT RIVERS.

16.   It is well known to Defendants that the population of persons incarcerated in federal prison suffer from the full spectrum of routine medical problems found in the general population, such

-8-

as fractures, abdominal pains, and infectins, as well as chronic
diseases such as asthma, hypertension, epilepsy, diabetes,
tuberculosis, lung cancer, and HIV.  It is also well known to
Defendants that prisoners suffer from a higher rate of serious
medical, dental, and mental health problems, chronic conditions,
and injuries than does the American population as a whole.
Defendants are also aware that the population at Rivers is of
greater average age than typical prison populations, and suffers
from a higher incident of health problems than the general
American prison population.

17.  Defendants are deliberately indifferent to plaintiff's
serious medical needs.  Defendants' indifference has produced
and perpetuates today a health care delivery system at Rivers
that is so grossly inadequate as to violate the legal rights
of plaintiff.

## FACTUAL ALLEGATIONS

18.  In the year 2002, plaintiff had a severe **"Stroke"** which
caused plaintiff to be paralyzed on the complete left side of
his body.  Plaintiff was not incarcerated at the time of **"Stroke.**
Because of this **"Stroke,"** plaintiff required **"Physical Therapy"**
on a regular basis, which was performed by a **"Licensed Physical
Therapist."**

19.  Prior to having this **"Stroke,"** plaintiff had other medical
ailments which required plaintiff to receive various medications

-9-

and to be seen by his private outside doctor.  The following are
a list of plaintiff's medical ailments:

    a.  Hypertension
    b.  History of Seizure Disorder, Old Left Side Cerebral
        Vascular Accident
    c.  Depressive Disorder
    d.  Hypercholesterolemia
    e.  Gastro Esophagus Reflux Disease
    f.  Lumbar Strain
    g.  Scoliosis
    h.  COPD with Bullous Disease in the right upper Lobe
        and in the Base of the right lung
    i.  Lung Cancer

20.  Plaintiff asserts that before being incarcerated at Rivers,
which was in 2004, plaintiff was being seen by an outside **"Licensed
Physical Therapist,"** who had been employed by plaintiff's outside
doctor.

21.  When plaintiff arrived at Rivers in 2004, the Rivers "Medical
Staff" was made aware of all of plaintiff's various medical pro-
blems by plaintiff as well as plaintiff's "medical file" which
had been forwrded with him from the "Central Detention Facility"
in the District of Columbia, as well as being informed by plain-
tiff's "court appointed attorney, Brian Robers of the Public
Defenders Service in the District of Columbia" (See Exhibit A),
who discussed plaintiff's medical condition with Warden George
E. Snyder, who assured plaintiff's attorney that plaintiff's
medical problems would be taken care of and that plaintiff would
see a **"specialist,"** and receive a pair of "orthopedic shoes.
The only promise kept by Warden Snyder was plaintiff was issued
a **"cheap pair of orthopedic shoes"** that do not last longer than
three (3) months.  No other promises to date have been kept.

22.    Plaintiff asserts that no curative treatment for his medical
problems have been established by the defendants even though
plaintiff has repeatedly complained to Rivers "Medical Staff"
about the lack of treatment for his medical ailments.  For example,
(see Exhibit A-1) plaintiff has been diagnosed with **"lung cancer,"**
and defendants have failed to prescribe any medication or curative
treatment for plaintiff's **"lung cancer."**

23.    In 2006, plaintiff was sent to Roanoke Chowan Hospital,
was seen by a Dr. Stewart, who x-rayed plaintiff's lungs and
noticed **"white spots"** on plaintiff's lung.  Dr. Stewart called
Dr. Lassiter, the only doctor at Rivers, and requested permission
to perform a **"biospy"** to determine the seriousness of these **"white
spots"** and to find out how far gone the **"lung cancer"** has spread.
Dr. Lassiter informed Dr. Stewart not to perform a **"biospy"** on
plaintiff, which prevented finding out just how far plaintiff's
**"lung cancer"** has spread.

24.    Another example is that on May 11, 2006 (See Exhibit A-2),
plaintiff requested the use of a "wheelchair and physical therapy."
Rivers Health Service Administrator, Jeanne Keel denied plaint-
iff's request without ever seeing plaintiff or conducting a
physical examination on plaintiff.  In denying plaintiff's
request, HSA Keel stated the following:

> **"According to your medical record your condition does not
> indicate a need for physical therapy nor a wheelchair at
> this time."    (See Exhibit A-3)**

Contrary to what HSA Keel stated in her denial, plaintiff's
medical record does not support what she stated, especially where

-11-

plaintiff was receiving **"physical therapy"** before being in-
carcerated, which had been ordered by a **"Licensed doctor;"**
not a "Registered Nurse," as is HSA Jeanne Keel.  Because
HSA Keel denied plaintiff the use of a wheelchair and physical
therapy, plaintiff has fallen approxmiately six (6) times in the
view of officers, injuring himself on all occasions, andwas not
treated once for these falls even though plaintiff informed
defendants that he had fallen and injured his left hand, leg,
bruised his head, and bloddied his mouth.  Plaintiff still
suffers pain from these falls and defendants have not and will
not do anything to assist in relieving the pain and suffering
that plaintiff is going through.  Everytime that plaintiff had
went to "Rivers Medical Dept., or the Inhouse Nurse" to inform
them of these falls, all they would ever do, would be to note
them in plaintiff's medical file, but on one occasion, when
Dr. Lassiter learned about plaintiff's falling, Dr. Lassiter
threaten to lock plaintiff in the back of the "prison infirmary"
where no one ever comes around to check upon you on a regular
basis, and if you ever have a serious **"seizure, stroke, heart
attack, etc.** while you are back there, press the buzzer in the
room you are in, you are totally ignored, and you will likely
die right there.

25.  To date, plaintiff has not been treated for his **"lung
cancer,** for constant chest pains, pinched nerve in his back,
paralyzed left foot from the **"stroke,"** bruised left hand, seen
a **"Podiatrist"** or received any **"Physical Therapy"** from the
defendants.

-12-

## D. VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990

26. On February 11, 2002, plaintiff had a severe **"Stroke"** which hospitalized plaintiff for three (3) months. Two of these months, plaintiff was under convalescense care, receiving physical therapy for his left side which was paralyzed, and to this date, is still partially paralyzed.

27. Plaintiff was employed by the Federal Reserve Board in Washington D.C. for approximately thirty (30) years, and after plaintiff had the **"stroke"** in February of 2002, plaintiff was declared by his private doctor, Dr. Pudshod, and federal govern-ment doctors, as being **"totally disabled,"** and plaintiff still is disabled. Therefore, plaintiff is covered under the **Americans with Disabilities Act of 1990, 42 U.S.C.A. § 12101 et. seq.,"** and plaintiff is entitled to the benefits of this **"Act."** Plaintiff has not received any of these benefits while here at Rivers, and quite frankly, plaintiff is being discriminated against by the defendants, and the defendants employees, officers, agents, etc.

28. To ascertain whether plaintiff is disabled pursuant to the **"American with Disabilities Act of 1990,"** the defendants were to employ three (3) steps: (1) decide whether plaintiff is afflicted witha physical mor mental impairment; (2) name and identify the life activity upon which plaintiff is relying and confirm whether it isa major life activity under the **"Americans with Disabilities Act of 1990;** and (3) determine whether plaintiff's impairment substantially limits the major life activity relied on.

-13-

Plaintiff is still unable to walk properly. I walk the **"Hunch Back Of Notre Dame,"** because I drag my left foot as I walk which is very painful and difficult in walking; my mobility is not very good, which is the main reason I have been falling, which is attributable to plaintiff not receiving any **"physical therapy"** to help my condition improve.

## ARGUMENT

29. It is undisputed that the treatment a prisoner receives in prison and the condition under which he is confined are subject to scrutiny under the Eighth Amendment. As the United States Supreme Court stated in DeShaney v. Winnebago County Dept. of Social Services, 489 S.Ct. 189, 199, 200 (1989):

> "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a acorresponding duty to assume some responsibility for his safety and general well being . . . The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs--e.g., food, clothing, shelter, medical care, and reasonable safety--it transgresses the substantive limits on state action set by the Eighth Amendment. . . "

Contemporary standards of decency require no less. Estelle v. Gamble, 429 U.S. at 103.

30. Plaintiff alleges that the defendants have denied him any treatment for his **"lung cancer, physical therapy"** that will help improve his condition from the **"stroke"** he suffered in February of 2002; nor have the defendants been forthcoming

-14-

in any medical decisions or care regarding plaintiff's many
medical ailments.  Defendants actions against plaintiff are
a showing of "deliberate indifference" by their knowing of
the obvious substantial risks to plaintiff's health and doing
absolutely nothing medically sound to correct the deficiencies
in plaintiff's medical condition.

31.  The Constitution "does not mandate comfortable prisons,
Rhodes v. Chapman, 452 U.S. 337, 349, 101 S.Ct. 2392, 2400,
69 L.Ed.2d 59 (1981), but neither does it permit inhumane ones,
and it is now settled that "the treatment a prisoner receives
in prison and the conditions under which he is confined are
subject to scrutiny under the Eighth Amendment.  Helling v.
McKinney, 509 U.S. 25, 113 S.Ct. 2475.  In its prohibition
of "cruel and unusual punishment," the Eighth Amendment places
restraints on prison officials, who may not, for example, use
excessive physical force against prisoners.

32.  With deliberate indifference lying somewhere between the
poles of neglience at one end and purpose and knowledge at
the other, the U.S. Courts of Appeals have routinely equated
deliberate indifference with recklessness.  See LaMarca v.
Turner, 995 F.2d 1526, 1535 (CA11 1993); Manarite v. Springfield,
957 F.2d 953, 957 (CA1 1992); McGill v. Duckworth, 944 F.2d
at 347.  It is, indeed, fair to say that acting or failing
to act with deliberate indifference to a substantial risk of
serious harm to a prisoner is the equivalent of recklessly

-15-

disregarding that risk.  The civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.  See Proser and Keeton § 34, pp. 213-214; **Restatement (Second) of Torts § 500 (1965).**  Deliberate indifference describes a state of mind more blameworthy than negligence.  Deliberate indifference entails something more than mere negligence, the cases are also clear that omissions for the very purpose of causing harm or with knowledge that harm will result.

33.  Plaintiff asserts that defendants deliberate indifference stems from the fact that defendant GEO is a private for-profit corporation, which instructs its employees to maximize profits, which these employees have acted in part, out of a desire to maintain the profitability of the corporation for whom they labor, thereby ensuring their own job security.  Accordingly, private corporations running correctional facilities such as defendant GEO have a greater incentive to cut costs by infringing upon the constitutional rights of prisoners in order to ensure the profitability of the enterprise.

34.  Plaintiff asserts that defendant GEO is maximizing its profitability by their deliberate indifference in denying plaintiff **"physical therapy;** denying plaintiff to see a **"Podiatrist;"** denying Dr. Stewart to perform a **"biopsy"** to determine just how far plaintiff's **"lung cancer"** has spread;

-16-

denying plaintiff any curative medication or treatment for
his **"lung cancer,"** knowing that if plaintiff's **"lung cancer"**
is not treated in a timely fashion by giving plaintiff treatment
which attempts to terminate or slow the disease with some combin-
ation of surgery, radiation therapy, chemotherapy, and possibly
hormone therapy or immunotherapy, plaintiff's chances of
survival are slim to none. Defendant GEO has refused to give
plaintiff a good **"sturdy"** pair of **"orthopedic shoes"** that will
last and give plaintiff support in walking, not causing
plaintiff excurciating pain everytime plaintiff walks.

35.    Courts use the Eighth Amendment to scrutinize conditions
of  prisoner's confinement. See Youngberg v. Romeo, 457 U.S.
307, 315-316, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)(noting that
it is cruel and unusual punishment to hold convicted criminals
[in] unsafe conditions.    In Helling v. Mckinney, 509 U.S.
25 , 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993), the Supreme Court
concluded that an inmate can state a cause of action under
the Eighth Amendment for present injuries as well as future
damages resulting from exposure to ETS. Helling, 509 U.S.
at 33, 113 S.Ct. 2475 (declaring that "[i]t would be odd to
deny [relief] to inmates who plainly prove unsafe, life-
threatening conditions in their prison on the ground that nothing
yet had happened to them). Estelle v. Gamble, 429 U.S. 97,
97 S.Ct. 285, 50 L.Ed.2d 251 (1976)(analyzing claims of present
harms for potential Eighth Amendment violations). Thus, the

-17-

Eighth Amendment not only protects inmates suffering from current unconstitutional prison conditions, but also protects inmates against prison conditions which threaten to cause future health problems.

36.  In regards to future injuries, an inmate "states a cause of action under the Eighth Amendment by alleging that [prison officials] have, with deliberate indifference, denied him medical treatment which poses an unreasonable risk of serious damage to his future health.

37.  A prison official may be held liable under the "Eighth Amendment" for acting with "deliberate indifference" to an inmate's health and safety if he knows that the inmate faces a substantial risk of serious harm and disregards that risk [as defendants have done in the present case] by failing to take reasonable measures to abate plaintiff's chronic and acute physical ailments.  Prison officials have a duty under the "Eighth Amendment" to provide humane conditions of confinement, and in the present case, the named defendants have failed miserably with providing plaintiff with any adequate medical treatment and care.  Jackson v. Pearson, 316 F.Supp.2d 307 (E.D. Va. 2004).

WHEREFORE, in light of the aforementioned, plaintiff prays that this honorable court enters an order declaring that the defendants have: (1) acted with deliberate indifference to plaintiff's medical treatment and care, exposing plaintiff

-18-

to serious damage to his future health by not taking any curative
steps to abate plaintiff's serious medical problems; (2) that
defendants have deprived plaintiff of a right, privilege or
immunity secured by the Constitution of the United States
or by any Act of Congress; and (3) that these named defendants
have failed to prevent or to aid in the prevention of any
wrongs that have been mentioned in this complaint which they
had knowledge.

In light of the above, plaintiff seeks to recover punitive
and compensatory damages for injuries suffered from defendant
GEO, past and future sufferings in the amount of 5 million
dollars ($5,000,000.00).  Plaintiff further seeks declaratory
and injunctive relief which enjoins the named defendants,
their officers, agents and employees from their continued
"deliberate indifference" in providing plaintiff with curative
treatment for his **"lung cancer, all of his medical conditions,**
and providing plaintiff with **"a licensed physical therapist,"**
and further allowing plaintiff to see a **"Podiatrist,"** and any
other relief which this court deems appropriate and just.

Respectfully Submitted,

*Frederick Hines*

Frederick Hines
Reg. No. 33592-007
Rivers Correctional Institution
P.O. Box 630
Winton, NC 27986

-19-

_Frederick Hines_
Frederick Hines

Subscribed to and sworn before me on this _____28th_____ day of

_August_____ 2007.

_Rita C. Williams_
Notary Public

Exhibit A



# THE PUBLIC DEFENDER SERVICE
*for the District of Columbia*

CHAMPIONS OF LIBERTY

Avis E. Buchanan
*Director*

Peter A. Krauthamer
*Deputy Director*

BOARD OF TRUSTEES

Cynthia D. Robbins
*Chairperson*

Jo-Ann Wallace
*Vice Chairperson*

Thomas L. Bowen

Emilio W. Cividanes

Claire M. Johnson

Hannah Jopling

Karl A. Racine

Jeffrey D. Robinson

Joan Strand

Donald R. Vereen, Jr.

Robert L. Wilkins

633 Indiana Avenue NW
Washington, DC 20004
Tel (202) 628-1200
   (800) 341-2582
TTY (202) 824-2531
Fax (202) 824-2784
www.pdsdc.org

August 29, 2005

**BY FAX**
(252) 358-5050

Mr. George Snyder, Warden
Rivers Correctional Institution
P.O. Box 630
Winton, North Carolina 27986

Dear Warden Snyder,

I wanted to follow-up on my telephone conversation regarding Frederick Hines. I did appreciate your follow-up telephone message informing me that Mr. Hines would receive new boots and has a scheduled appointment to see a specialist.

With regard to the boots, it is my understanding that the institution's standard issue boots cause Mr. Hines severe discomfort. Prior to his incarceration at Rivers CI, Mr. Hines suffered a debilitating stroke. After the stroke, he received very little, if any, physical therapy at DC Jail or Rivers CI. As a result, he drags his foot when he walks. He also has constant pain in his legs and cannot move his toes on one foot. I would appreciate your having Mr. Hines' feet examined by a podiatrist or appropriate medical specialist to determine if he requires orthopedic boots or shoes.

In addition, after we spoke in January, a seat was placed in the medical unit shower for Mr. Hines; however, the seat is apparently placed too far from the shower head which makes it difficult for Mr. Hines to receive enough water to properly bathe or shower. Consequently, Mr. Hines has had to bathe in a makeshift tub in his cell. Recently, he has developed severe sores on his body. I would kindly appreciate your investigating this situation so that Mr. Hines can have access to suitable facilities to bathe or shower.

Thank you in advance for your time and consideration. If you have any questions, please feel free to contact me at 202-824-2801.

This been taken care of.



Exhibit A-1

The GEO Group, Inc.

September 13, 2006

Frederi E Hines, #55592-007
Rivers Correctional Institution
P. O. Box 630
Winton, NC 27986

Dear Mr. Hines:

This is in response to the correspondence dated July 10, 2006 sent to Dr. Zoley in our Corporate office in regards to your concerns with your medical treatment at Rivers Correctional Institution. The correspondence was forwarded to me and I am in the best position to respond.

According to your medical record, you have been at Rivers Correctional Institution in February of 2004. You stated to the facility physician that you had a stroke in 2001. The physician evaluated you at that time for your medical complications. He also instructed you to increase your activity and complete exercise on a regular basis. There are many activities that are available that would benefit you greatly on the compound, if you chose to participate in them. You are able to function very well and independently on the compound. The facility is an approved facility with all of the required handicap accessories.

Your medical record does indicate that you have been assessed for lung cancer. You have had the recommended CT of your lung and the follow-up x-rays as indicated. It is documented in your medical record that the physician has discussed this with you at length. Your medical record indicates that the medical department reviews with you on an ongoing basis your medical problems and ongoing medical needs. There is no indication that you have been denied any medical attention since your arrival at the facility.

I trust this addresses your concerns.

Sincerely,

George Snyder
Warden

**ORIGINAL**

Exhibit A-2

Administrative Remedy
Step 1 – Response

Date Filed: 05-16-06                    Remedy ID No. 06-100

Hines, Frederick
Reg# 33592-007

This is in response to your step 1 Administrative Remedy dated May 11, 2006 as to your request for a wheelchair and physical therapy.

According to your medical record your condition does not indicate a need for physicial therapy nor a wheelchair at this time. You have been scheduled and appointment on May 23 with the physician to discuss these issues with him.

After a thorough review of the circumstances pertaining to your requested Administrative Remedy, we find that there is no evidence to support your grievance.

Based on the above information your request for Administrative Remedy is denied.

If you are not satisfied with this response, you may obtain a Step 2 from your Counselor.  As per RCI policy 12.006, Administrative Remedies, "Step 2 forms must be completed and submitted within five (5) days of the date of the Step 1 response.

5-19-06
_____
Date

_____
J. Keel
Health Services Administrator

Exhibit 3

MEDICAL RECORD

CHRONOLOGICAL RECORD OF MEDICAL CARE

AUTHORIZED FOR LOCAL REPROX

| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT TREATING ORGANIZATION (Sign each entry) |
|---|---|
| 10/2/06 2030 | (S) Inmate in for callus shavings (O) 5cm hardened area under (R) foot & hardened area on (R) at toe (A) Calluses (P) Paring of calluses Hydrocortisore cream 1% bid to stomach x 14 days (rash); keep on person |

Penny Brown, F.N.P.

| 10/3/06 1025 | Compliance with exercises - pt has been shown multiple exercises to improve gait/ankle/low Back musculature and function He can not perform any of those exercises as shown and has not be performing them as requested. Exercises - all exercises re-demonstrated |

PATIENT'S IDENTIFICATION (Use this space for Mechanical Imprint)

RIVERS CORRECTIONAL INSTITUTE
HEALTH SERVICES UNIT

Dr. Gaddy M. Lassiter

| RECORDS MAINTAINED AT: | RIVERS CORRECTIONAL INSTITUTION |
|---|---|
| PATIENT'S NAME (Last, First, Middle Initial) | | SEX M |
| RELATIONSHIP TO SPONSOR | STATUS | RANK/GRADE |
| SPONSOR'S NAME | | ORGANIZATION |
| DEPART/SERVICE | SSN/IDENTIFICATION NO. | DATE OF BIRTH |

CHRONOLOGICAL RECORD OF CARE - STANDARD FORM 600 (REV. 5-84)
Prescribed by GSA and ICMR

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1  for review and concurrence prior to issuance of the NTP.  Once
2  concurrence has been granted, these plans, policies and
3  procedures shall not be modified without the prior written
4  acknowledgment of the CO.

5  If the BOP determines the contractor is capable of accepting
6  inmates, the NTP will be issued.  The contractor shall begin
7  accepting inmates within 30 days after issuance of the NTP.

8  It is anticipated that the BOP will predominantly designate
9  individuals committed as DC sentenced felons to the institution.
10 However, the BOP may designate any inmate within its custody
11 utilizing the same designation criteria as used at other BOP
12 facilities.  P.S. 5100.06, Security Designation and Custody
13 Classification Manual, outlines the procedures for designating
14 inmates.

15 Designations to the institution are anticipated to occur at an
16 estimated rate of 40 inmates per week.  The estimated weekly
17 designation of 40 inmates to the institution will result in the
18 population meeting the 1,200 bed requirement in 30 weeks.  The
19 institution designation schedule of 40 inmates per week is an
20 estimate only.  Actual designations will depend upon many
21 factors, including but not limited to, the contractor's ability
22 to provide services in accordance with the SOW; the sentencing of
23 offenders by the DC and Federal Courts; the designation of
24 offenders by the BOP.

25 Unless otherwise indicated, the contractor shall furnish all
26 personnel, management, equipment, supplies and services necessary
27 for performance of all aspects of the contract.

28 Unless explicitly stated otherwise, the contractor is responsible
29 for all costs associated with and incurred as part of providing
30 the services outlined in this contract.

31 B.  Contract Compliance

32 All services and programs shall comply with the SOW; the U.S.
33 Constitution; all applicable Federal, state and local laws and
34 regulations; applicable Presidential Executive Orders (E.O.); all
35 applicable case law, consent decrees, and Court Orders.  Should a
36 conflict exist between any of the aforementioned standards, the
37 most stringent shall apply.  When a conflict exists and a
38 conclusion cannot be made as to which standard is more stringent,

1  the CO shall determine the appropriate standard.  The contractor
2  shall comply with and implement any applicable changes to BOP
3  policy, DOJ regulations, Congressional mandate, Federal law, or
4  law, or E.O.  Should the Government invoke such changes the
5  contractor retains its rights and remedies under the terms and
6  conditions of the contract.

7  The BOP reserves the rights to conduct announced and unannounced
8  inspections of any aspect of contract performance at any time and
9  by any method in order to assess contract compliance.

10  C.  General Administration

11  Unless otherwise specified by the CO, the contractor is required
12  to perform in accordance with the most current edition of the ACA
13  Standards for Adult Correctional Institutions and Standards
14  Supplement.

15  The contractor shall obtain ACA accreditation within 24 months of
16  NTP and shall maintain continual compliance with the above
17  referenced ACA standards and supplements during performance of
18  the contract, unless otherwise specified by the BOP.  Once full
19  accreditation has been obtained, the contractor shall maintain
20  this accreditation throughout the life of the contract, inclusive
21  of any option year exercised.  Failure to perform in accordance
22  with contract requirements and to obtain ACA accreditation within
23  24 months of NTP will, at a minimum, result in a reduction of the
24  contract price.

25  Accomplishment of some ACA standards is augmented by BOP policy
26  and/or procedure.  In these instances, the SOW identifies and
27  provides direction for the enhanced requirements.

28  The contractor is responsible for a Quality Control Program (QCP)
29  which ensures all requirements of this SOW are achieved.  The
30  specific requirements for the QCP are detailed in Section J,
31  Attachments 2, 3, and 4 of the contract.

32  Several sections of this SOW require the contractor to maintain a
33  system of records identical to the BOP's.  The contractor shall
34  not establish a separate system of records without prior written
35  concurrence by the CO.  This requirement is necessary to maintain
36  consistency of inmate records as inmates transfer throughout the
37  BOP.

Exhibit B-1                     7

Exhibit B-2

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1   O.   Classification

2   The contractor shall ensure classification and program review of
3   inmates in accordance with the requirements contained in P.S.
4   5322.10, <u>Classification and Program Review of Inmates</u>, P.S.
5   5100.06, <u>Security Designation and Custody Classification Manual</u>
6   and 28 CFR 524 are accomplished.  In addition, the contractor
7   shall enter and keep current all required BOP SENTRY transactions
8   and written documentation related to the classification and
9   program review of inmates, progress reports and central inmate
10  monitoring system.  A system of records and review to ensure
11  compliance with P.S. 5100.06, <u>Security Designation and Custody</u>
12  <u>Classification Manual,</u> and related transactions shall be
13  developed and maintained.

14  The contractor shall follow all applicable provisions related to
15  the <u>Violent Crime Control and Law Enforcement Act of 1994</u> (P.L.
16  103-322), ensuring all notification requirements are
17  accomplished.

18  A financial responsibility system mandating inmates establish a
19  financial plan to meet legitimate financial obligations in
20  accordance with 28 CFR 505 (P.L. 102-395) and 545.10 shall be
21  developed and maintained.

22  The contractor shall develop policy and procedures concerning
23  victim and/or witness notification which meet the requirements
24  outlined in 28 CFR 551 and the <u>Victim and Witness Protection Act</u>
25  <u>of 1982</u>.

26  P.   Health/Mental Health Care

27  The contractor shall provide all essential health services while
28  meeting the applicable standards and levels of quality
29  established by the ACA and the designated BOP ambulatory health
30  care accreditation provider, JCAHO.  In addition, the contractor
31  shall adhere to all applicable Federal, state and local laws and
32  regulations governing the delivery of health services and
33  establish the necessary quality controls to ensure all policies
34  and procedures are designed and implemented in a manner to
35  promote orderly and efficient delivery and management of health
36  services to the inmate population.

32

Exhibit B-3

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1  The contractor shall obtain full accreditation by JCAHO for the
2  institution within 24 months of NTP and shall maintain continual
3  compliance with applicable JCAHO standards during performance of
4  the contract.  Once full accreditation has been obtained, the
5  contractor shall maintain this accreditation throughout the life
6  of the contract, inclusive of any option year exercised.  The
7  contractor shall be responsible for all costs associated with
8  obtaining and maintaining full accreditation by JCAHO.

9  The provision of medical services commensurate to the level of
10  care available in the community is an essential component of
11  successful performance under the contract.  The contractor is
12  referred to the following list of P.S's and TRM's as guides to
13  the BOP's standard of health care delivery:

14          P.S. 6000.05        "Health Services Manual (HSM)"
15          P.S. 6010.01        "Psychiatric Treatment and Medication,
16                               Administration Safeguards For"
17          P.S. 6080.01        "Autopsies, Authority to Order"
18          P.S. 6100.01        "Health Promotion and Disease Prevention
19                               for Inmates"
20          P.S. 6190.02        "Infectious Disease Management"
21          TRM  011-01         "Pharmacy Technical Reference Manual"
22          TRM  008.02         "Sentry Medical SMD/MDS Technical
23                               Reference Manual"
24          P.S. 5310.12        "Psychology Services Manual"
25          P.S. 5324.03        "Suicide Prevention Program Statement"
26          P.S. 5310.13        "Management of Mentally Ill inmates"
27          P.S. 5324.04        "Sexual Assault Prevention/Intervention
28                               Program"

29  Administration - Prior to issuance of NTP, the contractor shall
30  designate a health services Point of Contact (POC) who shall be
31  responsible for the delivery of health services under the
32  contract.  The POC shall have full authority to act on behalf of
33  the contractor on all matters relating to the operation of the
34  health services portion of the contract.  An alternate may be
35  designated; however, the contractor shall identify those times
36  when the alternate shall be the primary POC.

37  All health care services shall be provided within the HSU.  For
38  cases of emergency and other medically necessary situations,
39  arrangements (i.e., subcontracts) shall be made with local health

33

Exhibit B-4

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1  care providers to obtain essential health services.

2  Services - The contractor shall have written plans and procedures
3  for providing urgent medical, health, mental health and dental
4  services.  The plan shall include, but is not limited to, the
5  following: (1) 24 hour a day, seven day a week emergency medical,
6  health, mental health and dental care; (2) initial health
7  screening; (3) health appraisal examination; (4) daily triaging
8  of complaints; (5) sick call procedures; (6) special medical
9  programs and services for, but not limited to, inmates with
10  chronic needs or requiring convalescent care; (7) mental health
11  and substance abuse services; (8) staffing/health care
12  specialists; (9) ancillary services - radiology, laboratory,
13  etc.; (10) dental services - routine and emergency; (11)
14  pharmaceutical services and supplies; (12) optometric services;
15  (13) health education; (14) medical diets; (15) infectious
16  diseases; and (16) quality control/peer reviews.

17  Infectious Disease - The contractor shall comply with all OSHA
18  regulations and BOP infectious disease requirements in the
19  delivery of health care services.  All inmates shall be screened
20  for Tuberculosis within 48 hours of intake and annually
21  thereafter.  Screening shall consist of either a PPD (Mantoux
22  method) or PA chest x-ray as clinically indicated.

23  Inmate Death - In the event an inmate death occurs, the
24  contractor shall immediately notify the CO and submit a written
25  report within 24 hours.  The contractor shall fingerprint (right
26  thumb or right index) the deceased and staff performing the
27  fingerprinting shall date and sign the fingerprint card to ensure
28  that positive identification has been made.  The fingerprint card
29  shall then be hand delivered to the CO.

30  Personal property of a deceased inmate shall be inventoried and
31  forwarded to the designated family member, the nearest of kin or
32  the Consular Officer of the inmate's country of birth.

33  If death is due to violence, an accident surrounded by unusual or
34  questionable circumstances, or is sudden and the deceased has not
35  been under immediate medical supervision, the contractor shall
36  notify the coroner of the local jurisdiction to request review of
37  the case, and if necessary, examination of the body.  The
38  contractor shall establish coroner notification procedures
39  outlining such issues as performance of an autopsy, who will

34

Exhibit B-5

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

perform the autopsy, obtaining state-approved death certificates and local transportation of the body. In the event an autopsy is conducted, the contractor shall ensure the body is turned over to the designated family member, the nearest of kin or the Consular Officer of the offender's country of birth.

In the event the deceased inmate is indigent, the Government will reimburse the contractor for reasonable burial costs as approved in advance by the CO.

Medical Records - Consistency in content and format of medical records of inmates transferring between the institution and other Government facilities is a critical component of care for inmates.

The contractor shall adhere to the HSM, Chapter 5, Sections 1 through 17 - Health Records, in preparing, formatting, documenting, maintaining, releasing and all medicolegal aspects of an inmate's medical record. The contractor is responsible for supplying medical record folders, consistent with the specification provided by the BOP, only for those inmates who are new designations into the institution or in cases where transferred medical records cannot be located. The Government shall provide to the contractor all applicable Government forms necessary to document an inmate's medical record.

The contractor shall adhere to HSM, Chapter 2, Section 3 - Sensitive Medical Data\Medical Duty Status Reporting for the reporting and accountability of medical data on all inmates assigned to the institution. This includes utilizing the SMD/MDS TRM on BOPDOCS.

Medical Transfers - Prior to admitting an inmate to an outside medical facility for inpatient care, with the exception of emergency cases, the contractor shall obtain pre-certification approval of the BOP's Office of Medical Designations and Transportation (OMDT). The contractor shall submit this request for approval to OMDT via the BOP's SENTRY computer system using the request procedures established in accordance with HSM, Chapter 7. A copy shall also be sent to the CO.

In emergency cases, the contractor shall submit the above mentioned request to OMDT within 24 hours of the inmate's admission for inpatient care to an outside medical facility.

35

Exhibit B-6

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

The contractor shall adhere to Chapter 7, Section 2 of the HSM regarding transfers and medical designations of inmates assigned to the institution. Medical designation to BOP Medical Referral Centers or other Government facilities will be at the sole discretion of the BOP. In order to transport an inmate, the patient must be in stable condition.

Other - The contractor shall furnish prescription eyeglasses to any inmate who requires them.

Q.  Social Services

Written procedures ensuring all inmates are considered for release to community-based programs consistent with 18 U.S.C. 3624 and P.S. 7310.03, <u>Community Corrections Center Utilization and Transfer</u> shall be established.

The contractor shall develop and administer a furlough program for eligible inmates consistent with the following statutory provisions: 18 U.S.C. 4082 and 3622 and 28 CFR 570.

<u>Written procedures</u> shall be developed which ensure that prior to release, inmates have adequate clothing, transportation to their release destination and are provided an appropriate gratuity.

<u>No later than eleven months</u> prior to projected release a final and specific release plan which includes a community-based program shall be formulated for each inmate.

R.  Work and Correctional Industries

Inmate labor shall be used in accordance with the inmate work plan developed by the contractor. The inmate work plan may include work or program assignments for industrial, maintenance, custodial, service or other jobs. The inmate work program shall not conflict with any other requirement of the contract and must comply with all applicable laws and regulations.

A contractor operated and managed industrial program providing productive opportunities for the inmate population to improve work habits and vocational skills is encouraged.

36

F
07-1664
JDB

JS-44
(Rev.1/05 DC)

**CIVIL COVER SHEET**

## I (a) PLAINTIFFS

Frederick Hines

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  88888
(EXCEPT IN U.S. PLAINTIFF CASES)

PRO SE (PR)

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
# 33592-007

## DEFENDANTS

The GEO Group, Inc, et al.

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE
TRA

ATT

Case: 1:07-cv-01664
Assigned To : Bates, John D.
Assign. Date : 9/20/2007
Description: PRO SE GEN.CIVIL

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☑ 3 Federal Question (U.S. Government Not a Party)

☐ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

### ☐ A. Antitrust

☐ 410 Antitrust

### ☐ B. Personal Injury/ Malpractice

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

### ☐ C. Administrative Agency Review

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ☐ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### ☐ E. General Civil (Other) OR ☑ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☑ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (If not administrative agency review or Privacy Act

O

| ☐ G. *Habeas Corpus/* *2255* | ☐ H. *Employment* *Discrimination* | ☐ I. *FOIA/PRIVACY* *ACT* | ☐ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General ☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) *(If pro se, select this deck)* | ☐ 895 Freedom of Information Act ☐ 890 Other Statutory Actions (if Privacy Act) *(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ☐ K. *Labor/ERISA (non-employment)* | ☐ L. *Other Civil Rights (non-employment)* | ☐ M. *Contract* | ☐ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act ☐ 720 Labor/Mgmt. Relations ☐ 730 Labor/Mgmt. Reporting & Disclosure Act ☐ 740 Labor Railway Act ☐ 790 Other Labor Litigation ☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act) ☐ 443 Housing/Accommodations ☐ 444 Welfare ☐ 440 Other Civil Rights ☐ 445 American w/Disabilities-Employment ☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance ☐ 120 Marine ☐ 130 Miller Act ☐ 140 Negotiable Instrument ☐ 150 Recovery of Overpayment & Enforcement of Judgment ☐ 153 Recovery of Overpayment of Veteran's Benefits ☐ 160 Stockholder's Suits ☐ 190 Other Contracts ☐ 195 Contract Product Liability ☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

---

**V. ORIGIN**

☑1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ Multi district Litigation   ☐ 7 Appeal to District Judge from Mag. Judge

---

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

42 USC 1983

---

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23   **DEMAND $** $5 million   Check YES only if demanded in complaint **JURY DEMAND:** ☐ YES ☑NO

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   ☐ YES ☑NO   If yes, please complete related case form.

DATE 9/20/07   SIGNATURE OF ATTORNEY OF RECORD   NCD

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

N:\forms\js-44.wpd