UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**RECEIVED**

DEC 3 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

FREDERICK HINES,            :
                           :
        Plaintiff,          :
                           :
                           :
                           :
    v.                      :    Case No. 1:07-cv-01664(JDB)
                           :
                           :
                           :
THE GEO GROUP, INC.,       :
et. al.,                    :
                           :
                           :
        Defendants.         :
                           :
. . . . . . . . . . . . . . . . . . . . . :

**PLAINTIFF'S MOTION IN OPPOSITION TO DEFENDANT GEO
GROUP'S MOTION TO DISMISS AND ALTERNATIVE MOTION TO
TRANSFER AND PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT**

**PLEASE TAKE NOTICE,** that plaintiff, Frederick Hines, pro se, hereby "Opposes" defendant GEO Group's "Motion To Dismiss and Alternative  To Transfer," and moves this honorable court to deny their motion for the following reasons.

Plaintiff has sued the GEO Group, Inc. ("GEO"), the United States of America, through its department, the Federal Bureau of Prisons ("BOP"), and BOP Director, Harley Lappin, for failing to provide him with adequate health care at the Rivers Correctional Institution in Winton, North Carolina. Defendant GEO operates Rivers Correctional Institution pursuant to a contract with defendant BOP. Plaintiff alleges that the broken health care delivery system at Rivers is grossly inadequate

and violates teh Fifth, and Eighth Amendments to the Constitution; violates the "Americans With Disabilities Act of 1990, 42 U.S.C.A. § 12101 et. seq.; violates the Rehabilitation Act, 29 U.S.C. § 794(a); constitutes common-law negligence; and breaches GEO's contract with the BOP to operate Rivers ("GEO Contract #PCc-005") of which plaintiff is an intended third party beneficiary.

Plaintiff chose as his forum the judicial district where he has resided as a citizen; where he was sentenced as a D.C. Code offender; where the federal Defendants reside; and where the GEO Group has benefited for many years from transacting business.  Yet GEO now seeks to avoid this Court's jurisdiction and adjudicate in a foreign forum injuries suffered by D.C. Code offenders and residents, all of which arose out of GEO's conduct that occurred in material part in the District of Columbia.

The Court should deny GEO's motion to dismiss for want of personal jurisdiction because the complaint contains detailed allegations demonstrating that plaintiff's claims arise from GEO's contacts with this forum.  Those allegations include a description of GEO's extensive business activities in and directed at the District, and the links between those business activities and the claims in this lawsuit.  Having accepted the benefits of transacting business in the District, and having profited from those business activities for many years, GEO cannot now avoid the corresponding obligation of answering

-2-

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FREDERICK HINES,                :
                                :
        Plaintiff,              :
                                :
                                :
                                :
        v.                      :
                                :
                                :
THE GEO GROUP, INC.,            :   Case No. 1:07-cv-01664(JDB)
et. al.,                        :
                                :
        Defendants              :
. . . . . . . . . . . . . . . . . . . . :


**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO THE GEO GROUP'S MOTION TO DISMISS AND MOTION TO TRANSFER**

    Plaintiff, Frederick Hines, submits this "Memorandum" in
opposition to Defendant GEO's Motion To Dismiss and Motion
to Transfer.


**ARGUMENT**

**I.  THIS COURT HAS PERSONAL JURISDICTION OVER GEO BASED ON
    GEO'S PURPOSEFUL AND SUBSTANTIAL CONTACTS WITH THIS FORUM
    THAT GIVE RISE TO THIS LAWSUIT.**

    Plaintiff's burden of establishing personal jurisdiction
is far from onerous at this early stage of the litigation.
Plaintiff needs only to make a **prima facie case for personal
jurisdiction** to survive a "Motion To Dismiss" on personal
jurisdiction grounds. Fletcher v. D.C., 481 F.Supp.2d
156, 168 (D.D.C. 2007); see also Mwani v. Bin Laden, 417

claims in the District of Columbia that arise out of this came conduct. Because this court has personal jurisdiction over GEO with respect to the general and specific claims asserted in plaintiff's lawsuit, GEO's motion to dismiss this case for lack of personal jurisdiction should be denied.

GEO's alternative motion to transfer venue should also be denied and rejected. Plaintiff's residence is in the District of Columbia, and much of the evidence and all of plaintiff's witnesses reside in the District of Columbia. Moreover, the federal courts in the District of Columbia have a special interest in safeguarding the Constitutional rights of D.C. residents who have been sentenced to imprisonment under D.C. law. Plaintiff's choice of forum should not be thwarted by GEO's effort to move this suit to a foreign forum that will inconvenient all of plaintiff's witnesses which has no comparable "public interest" in the well-being plaintiff, a D.C. resident. Because both the private and public interest factors weigh heavily in favor of this forum, GEO's venue transfer motion should also be denied.

WHEREFORE, in light of the aforementioned and for the reasons set forth in the accompanying Memorandum In Support" of this motion, plaintiff moves this honorable court to deny defendant GEO's Motion to Dismiss Or, In the Alternative, to Transfer."

-3-

Respectfully Submitted,

*Frederick Hines*

Frederick Hines, Pro Se
Reg. No. 33592-007
Rivers Correctional Institution
P.O. Box 630
Winton, NC 27986


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing "Motion In Opposition to Defendant GEO's Motion To Dismiss," and Plaintiff's "Motion For Summary Judgment" has been mailed to:


1.  Deborah J. Israel, Counsel for
    Defendant GEO Group, Inc.
    Womble Carlyle Sandridge & Rice, PLLC
    1401 eye Street, NW, 7th Floor
    Washington, D.C. 20005

2.  Federal Bureau of Prisons
    320 First Street, NW
    Washington, D.C. 20534

3.  Harley Lappin, Director
    Federal Bureau of Prisons
    320 First Street, NW
    Washington, D.C. 20534


this _29th_ day of _November_ 2007.


*Frederick Hines*

Frederick Hines


–4–

F.3d 1, 7 (D.C. Cir. 2005)(plaintiff can satisfy [his] burden with a **prima facie** showing).

In determining whether personal jurisdiction exists, "plaintiff's assertions of fact are presumed true" where, as here, they have not been contradicted by affidavit, or other evidence. AGS Int'l Serv. S.A. v. Newmont USA, 346 F.Supp.2d 64, 73 (D.D.C. 2004); see also Crane v. New York Zoological Soc'y, 894 F.2d 454, 456 (D.C. Cir. 1990)("[F]actual discrepancies appearing in the record must be resolved in favor of plaintiff"). Moreover, plaintiff is not limited to "evidence that meets the standard of admissibility required by the district court," but instead may rely on his "pleadings bolstered by such affidavits and other written materials as [he] can otherwise obtain." Mwani, 417 F.3d at 7.

Here, the allegations in plaintiff's complaint easily establishes a **prima facie** case for personal jurisdiction over GEO. Moreover, GEO's **sole** defense to personal jurisdiction the so-called "government contacts" exceptions -- is patently frivolous and without merit.

**A.  This Court Has Personal Jurisdiction Over GEO**

In order for this court to constitutionally exercise personal jurisdiction in this case, GEO must have minimum contacts within [this forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substanital justice. International Show Co. v. Washington,

-2-

326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1940).
GEO must have established these contacts by purposefully availing
itself of the privilege of doing business in the District of
Columbia . Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475,
105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985).  The purposeful
availment requirement is designed to prevent defendants from
being hailed into court solely as a result of "random,"
"fortuitous," or "attenuated" contacts with the forum state.

   The District of Columbia can exercise two types of
personal jurisdiction over a non-resident defendant, general
and specific.  General jurisdiction is proper when a defendant
has "continuous and systemic business contacts" (such as GEO)
with a state and it allows a defendant to be sued in that state
regardless of the subject matter of the lawsuit.  Helicopteros
Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416, 104
S.Ct. 1868, 1873 (1984).  On the other hand, a state may
exercise specific jurisdiction when the defendant has a lesser
degree of contact with the state, but litigation arises out
of or is related to those contacts.  Id. at 414 n. 8, 104 S.Ct.
at 1872 n. 8.

   Defendant GEO has had extensive contact with the United
States for years through its department, the Federal Bureau of
Prisons relating to the contract at issue.  The GEO Group, Inc.
entered into the current with the Bureau of Prisons on February
22, 2000 (See Exhibit C), and the contract stated on pages 6 & 7

-3-

(See Plaintiff's Exhibits B & B-1) that the contract was to be governed by District of Columbia law. By entering into the contract, GEO also expressly agreed to comply with and implement any new requirements that might arise, including those required by **"DC Law"**. GEO Contract, Statement of Work at page 7 (emphasis added). By submitting to the law of the District of Columbia, GEO has also agreed to permit inspections of its facilities by government authorities, including officials of the District of Columbia. See D.C. Code § 24-101(h)(4) (describing the duties of the District of Columbia Corrections Information Council, which include conducting unannounced inspections of correctional facilities housing D.C. sentenced felons and reviewing "inmate files and records . . . [and] administrative and policy directives of the facility . . .").

The GEO Group, Inc. representatives (employees of GEO) travelled to the District of Columbia (See Plaintiff's Exhibit C-1, Declaration of GEO employee, Louis Carrillo, Vice President Corporate Counsel) to meet with members of Congress and representatives of other federal and District of Columbia government agencies to discuss issues relevant to GEO. The GEO Group has continuously communicated by mail and telephone with United States parties, Federal Bureau of Prisons, U.S. Marshal Services, and Immigrations and Customs Enforcement; sent all of these government agencies invoices, and has received large payments from them (See Plaintiff's Exhibit C-2, Declaration of GEO employee, Amber Martin, Vice President

-4-

Contract Administration).

Finally, in addition to its many contacts with the District of Columbia that pertain directly to the GEO contract, GEO also maintains other systematic and continuous contacts with the District of Columbia, causing it to engage a registered agent in the District of Columbia since 1996.

Because GEO is a nonresident party, this Court looks to D.C. law to determine whether GEO is subject to federal jurisdiction. See Fed.R.Civ.P. 4(k)(1)(A). The D.C. long-arm statute confers specific jurisdiction over a nonresident defendant for a claim "arising from" the defendant's "transacting any business in the District of Columbia." D.C. Code § 13-423(a)(1). Courts in this Circuit have held that this provisions "is to be given 'an expansive interpretation that is coexistent with the due process lause."' Fletcher, 481 F.Supp.2d at 169 (emphasis added), citing Helmer v. Doletskaya, 393 F.3d 201, 205 (D.C. Cir. 2004). This effectively "collapse[s]" the statutory long-arm and constitutional due process analyses. See Kroger v. LEGALBILL.COM LLC, No. 04-2189 (ESH), 2005 WL 4908968, at *6 (D.D.C. April 7, 2005).

In applying this rule, "courts in this jurisdiction have consistently held that the only nexus required by . . . § 13-423(a)(1) . . . between the District of Columbia and the non-resident defendant is some affirmative act by which the defendant

-5-

brings itself within the jurisdiction and establishes minimum contacts." <u>Islamic Am. Relief Agency</u> v. <u>Unidentified FBI Agents</u>, 394 F.Supp.2d 34, 57 (D.D.C. 2005)(citation and quotation marks omitted). This Court accordingly has personal jurisdiction over defendant GEO where--as here--(1) defendant GEO voluntarily and deliberately undertook a business activity in the District of Columbia, and (2) the claims at issue arise out of or relate to that business activity. See <u>Shoppers Food Warehouse</u> v. <u>Moreno</u>, 746 A.2d 320, 329 (D.C. 2000); accord <u>Jacobsen</u> v. <u>Oliver</u>, 201 F.Supp.2d 93, 104-05 (D.D.C. 2002).

Once minimum contacts have been established, GEO can only escape jurisdiction by making a "compelling case" that forcing it to litigate in the District of Columbia would violate the traditional notions of fair play and substantial justice. <u>Burger King</u>, 471 U.S. at 477, 105 S.Ct. at 2184-85.

1.   **"Transacting business": GEO has voluntarily and deliberately undertaken business activity in the District of Columbia.**

Courts in this Circuit have adopted a broad reading of the "transacting business" prong of D.C. Code § 13-423(a)(1). See <u>Sheikh</u> v. <u>Mr. K's Restuarant, Inc.</u>, No. 04-00515, 2005 WL 1387591, at 3 (D.D.C. June 10, 2005)(citation omitted)(holding that even "a single act alone may be sufficient" to meet the "minimum contacts" required under the long-arm statute and due process).

-6-

A nonresident defendant's conduct and connection with the forum state" NEED ONLY BE "such [that] he should reasonably anticipate being hailed into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980); see also Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985)(Referring to this as a "fair warning" requirement). Accordingly, federal and state courts in the District of Columbia have held that transactions need not be extensive in number, duration or scope in order to give a defendant "fair warning." For example, contacts with the District of Columbia consisting of phone conversations, letters, and isolated business trips can be sufficient. See, e.g., Sheikh, No. 04-00515, 2005 WL 1387591, at *5 (mail and telephone); Kroger, 2005 WL 4908968, at *5 (contacts included phone, mail, and "at least one business trip to the District"); Dooley v. United Techs. Corp., 786 F. supp. 65, 74 (D.D.C. 1992)(phone calls and mailings directed at D.C.); Unidex Sys. Corp. v. Butz Eng'g Corp., 406 F. Supp. 899, 902 (D.D.C. 1976)(one lunch, a several-hour tour of a work facility, an office meeting, and a proposal submitted in D.C.); Mouzavires v. Baxter, 434 A.2d 988, 995 (D.C. 1981)(mail and telephone); cf. Fletcher v. D.C., 481 F. Supp.2d at 170 (DEFENDANTS who "supervise[]D.C. prisoners" transact business in D.C. ).

GEO has maintained **"extensive"** contacts with the District of Columbia. These contacts far exceed the "minimum contacts" necessary to assert jurisdiction over an out-of-state defendant.

-7-

GEO maintains a continuing business presence in the District
of Columbia; has competed for and won more than a dozen contracts
from the BOP, the U.S. Marshals Service, and U.S. Immigration
and Customs Enforcement; and maintains a registered agent in
the District.  Several years ago, GEO sought, competed for,
and won the contract to operate the Rivers Correctional facility
by purposefully taking advantage of extensive commercial contacts
with the District of Columbia.  The Rivers Request for Proposal
specificially sought a private contractor to house and care
for persons convicted of D.C. violations.  The vast majority
of those D.C. Code offenders are District residents.  GEO
negotiated the terms of and executed the GEO contract in the
District of Columbia.  Under the terms of this contract, GEO
submitted to a long-term oversight and management in the District
of Columbia, and agreed to perform substantial and material
obligations in the District related to the care and treatment
of D.C. residents transferred to the Rivers facility.  GEO
also agreed to "comply with and implement . . . D.C. law" as
part of its contract for this facility.  GEO contract, Statement
of Work at 7.

Plaintiff asserts that on similar facts as in this case,
another district court held that it had jurisdiction over an
out-of-state prison operator that contracted to provide prison
services to Missouri prisoners.  See In Re Texas Prison Litig.,
98-7110-TX-C-5, 41 F. Supp.2d 960 (W.D. Mo. Feb. 12, 1999).
The court determined that the Missouri long-arm statute, which

-8-

like the D.C.'s is co-extensive to the due process clause,
authorized the distirct court to exercise personal jurisdiction
over a county in Texas housing Missouri prisoners where "[t]he
[prison] contract required the [defendant] to notify Missouri,
in writing, and to obtain advance authorization for nonemergency
medical, dental or psychiatric care not covered under enumerated
routine services"; report such events as inmate deaths and
escapes to Missouri; and "receive[]continuing payments from
Missouri for the housing and supervision of Missouri prisoners."
Id. at 964.  The GEO contract contains similar reporting require-
ments, and more.  See GEO Contract, Exhibit C, Statement of
Work at 34-35 (GEO is required to report all medical policies
and procedures, deaths, and emergency care outside the facility),
28-29 (GEO required to report "significant incidents" such
as escapes); GEO Contract, Sectin B ("The Schedule") at 2-4
(pricing schedule for contract performance).  GEO therefore
plainly "received fair notice from the contract documents and
the course of dealing that [it] might be subject to suit" in
the District.  Burger King, 471 U.S. at 487.

GEO's contacts with this forum, as alleged in the complaint,
are "voluntary, purposefully, and deliberate" and not "random,
fortuitous, tenuous and accidental."  Shoppers Food Warehouse,
746 A.2d at 329.  As a result, GEO has transacted business
in the District within the meaning of the District's long-arm
statute.

2. **"Arising From": The Claims In This Suit Arise From And/Or Relate To GEO's Business Dealings In The District of Columbia.**

In order for the Court to assert jurisdiction over GEO under Section 13-423(a)(1), the plaintiff's claims also must arise from GEO's contacts with the District. Plaintiff easily meets this requirement as well.

D.C. Courts have emphasized that the "arising from" requirement in the D.C. long-arm statute must be read broadly. In a leading decision construing the long-arm statute, the D.C. Court of Appeals held that the "arising from" language "bars only claims <u>unrelated to</u> the acts forming the basis for personal jurisdiction. "<u>Shoppers Food Warehouse</u>, 746 A.2d at 333 (emphasis added)." Because courts require only a "discernible relationship" between the claim and the business transacted, the "arising from" requirement should be interpreted "flexibly and synonymously with 'relate to; or having a 'substantial connection with.'" Id. at 329, 335; accord <u>Kroger</u> 2005 WL 4908968, at *7 (noting that there is a "discernable relationship" if minimum contacts exist). Courts must focus on the relationship among the defendant, the forum, and the litigation, not on whether a defendant's conduct was directed toward a particular plaintiff. <u>Shoppers Food Warehouse</u>, 746 A.2d at 329.

The claims alleged in this complaint are related directly to GEO's contacts with the District. All of plaintiff's claims against GEO are based on GEO's conduct towards plaintiff, a

-10-

D.C. Code offender who is incarcerated at Rivers pursuant to
a contract that GEO solicited, negotiated, and performs, in
part, in the District of Columbia.  The inadequate systems,
policies, andd practices that are condoned or affirmatively
authorized by GEO are crafted and maintained in consultation
with, and approved by, the BOP in the District of Columbia.
The GEO contract expressly requires GEO to comply with District
of Columbia law, [See GEO Contract, Statement of Work at 7,]
including all laws and regulations "governing the delivery
of health services."  That contract also requires GEO to have
written plans and procedures for medical, mental health, and
dental services, and to submit those plans and procedures
to the BOP in the District of Columbia for "review and
concurrence" in order to facilitate the proper care and
treatment of District of Columbia inmates housed at Rivers.
**GEO Contract, Statement of Work at 5-6, 34.**

In the alternative, GEO has moved to transfer this case
to the Eastern District of North Carolina.  GEO's alternative
motion fares no better.

On a motion to transfer venue under 28 U.S.C. § 1404(a),
the moving party bears the burden of showing that the transferee
forum is clearly more convenient.  Air Line Pilots Ass'n v.
Eastern Air Lines, 672 F.Supp. 525, 526 (D.D.C. 1987).  GEO
has not met its burden.  Proper evaluation of the factors that
this Court has emphasized in the context of prisoner litigation,
demonstrates that the District Court for the District of
Columbia is the proper venue for this case.

-11-

Finally, because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived.  In McDonald v. Mabee, 243 U.S. 90, 37 S.Ct. 343 (1917), the U.S. Supreme Court indicated that regardless of the power of the State to serve process, an individual may submit to the jurisdiction of the court by appearance.  A variety of legal arrangements have been taken to represent express or implied consent to the personal jurisdiction of the court.  In National Equipment Rental, Ltd., v. Szukhent, 375 U.S. 311, 316, 84 S.Ct. 411, 414 (1964), the Supreme Court stated that **["parties to a contract may agree in advance to submit to the jurisdiction of a given court,"]**; and in Petrowski v. Hawkeye-Security Co., 350 U.S. 495, 76 S.Ct. 490 (1956), the Court upheld the personal jurisdiction of a District Court on the basis of a stipulation entered into by the defendant.

GEO has stipulated in the "Contract" with the BOP, See Statement of Work at 7, in advance to submit to the jurisdiction of the District of Columbia, and it agreed to be subject to the laws of the District of Columbia, as well as be sued in the District, therefore, GEO's argument now, requesting to have this case transferred to North Carolina is contrary to what GEO had agreed upon in its original "contract" with the Bureau of Prisons, regarding Rivers.  GEO voluntarily consented in the "contract" to the personal jurisdiction of this Court, and has intentionally waived its argument of transferring this

-12-

case to North Carolina, and therefore is estopped from raising
the issue based on its advance consent in the "contract" to
subject to the laws of the District of Columbia.  GEO's actions
amount to a legal submission  to the jurisdiction of this
court.


II.   **BECAUSE THE PUBLIC AND PRIVATE INTEREST WEIGH IN FAVOR
      OF THIS FORUM, THE CASE SHOULD NOT BE TRANSFERRED TO NORTH
      CAROLINA.**

   A.   **Private Interest Factors**

        1.   **The Plaintiff's Choice of Forum**

    Courts in this District place substantial emphasis on
a plaintiff's choice of forum in prisoners' rights litigation.
This Court has held that "it is almost a truism that a plaintiff's
choice of a forum will **rarely be disturbed. . . unless the
balance of convenience is strongly in favor of the defendant."**
Jackson v. District of Columbia, 89 F. Supp.2d 48, 52-53 (D.D.C.
2000)(emphasis added), vacated on other grounds, 254 F.3d 262
(D.C. Cir. 2001); see also Shakur v. Federal Bureau of Prisons,
950 F. Supp. 3, 4 (D.D.C. 1997).  This well-settled rule places
a heavy burden on GEO to show why plaintiff's choice of forum
should not be respected.


    GEO asserts that 28 U.S.C. § 1404(a) requires that prisoner
petitions should be transferred to the judicial district in
which the plaintiff's prison facility is located "absent
extraordinary circumstances."  See Def.'s Mem. at 12; see also

-13-

id. at 10 (arguing that "actions brought by inmates against
The GEO Group, and its predecessor Wackenhut Correctional
Corporation" should be transferred to the judicial district
in which the "facility in question is located").  There is
no such rule.  See Shakur v. Federal Bureau of Prisons, 950
F.Supp. at 4 (D.D.C.  1997)(rejecting a similar argument that
the statute "requires transfer of a prisoner's case to the
site of incarceration").

The three cases that GEO cites to support its assertion
are inapposite.  GEO first cites two unpublished decisions
in which the Court transferred cases brought by individual
pro se plaintiffs.  See Def.'s Mem. at 10 (citing Jackson v.
Federal Bureau of Prisons, No.06-592(GK), 2006 WL 2434938
(D.D.C. Aug. 22, 2006) and McCullough v. Federal Bureau of
Prisons, No.-05-374(HHK), 2006 WL 667166 (D.D.C. Mar. 15, 2006).
The plaintiffs in both cases brought claims arising out of
discrete acts that occurred outside of the District of Columbia,
and the Court transferred those cases to other judicial districts
after concluding that personal jurisdiction was lacking in
the District of Columbia.

Here, by contrast, this Court has personal jurisdiction
over GEO, because plaintiff's complaint alleges that the acts
giving rise to his claims occurred in the District of Columbia,
as well as in North Carolina.  Moreover, unlike plaintiffs
Jackson and McCullough, much of the evidence and all of

-14-

plaintiff's prospective witnesses with knowledge relevant to
plaintiff's claims are also located in the District of Columbia.
Therefore, these two cases lend no support for GEO's position.

The other cases GEO cites also fail to support its argument.
GEO offers Rogers v. Federal Bureau of Prisons, 357 F.Supp.2d
147 (D.D.C. 2003)(transferring an action to the Eastern District
of California), for the proposition that "when an inmate not
incarcerated in the District of Columbia brings a petition
for mandamus or declaratory judgment seeking resolution of
issues not related to the District of Columbia, the court should
absent extraordinary circumstances, transfer the action as
a matter of course to the district of confinement."  In the
Rogers case, the court granted the motion to transfer only
after concluding that the District of Columbia had little or
no interest in the cases because plaintiff was neither
incarcerated nor sentenced in the District of Columbia.

Because plaintiff's choice of forum is presumptively
entitled to great respect, and because GEO fails to meet its
heavy burden to overcome that presumption, this factor weighs
heavily against transfer.

2.    The Defendant's Desire for an Alternative Forum

By definition, any defendant that moves to transfer venue
has expressed its preference for another forum, but this factor
has little if any significance here.  GEO's preference must

-15-

be weighed against the fact that plaintiff was a D.C. resident when sentenced as a District of Columbia Code violator; was sentenced in the Superior Court of the District of Columbia; and prefers to have his claims heard in the District of Columbia. Moreover, the other two defendants in this case reside in the District of Columbia, and they routinely litigate prisoners' rights cases in this forum. See, e.g., Jasperson v. Fed. Bureau of Prisons, 460 F.Supp.2d 76 (D.D.C. 2006); Tanner v. Fed. Bureau of Prisons, 433 F.Supp.2d 117 (D.D.C. 2006).

### 3.   Whether the Claim Arose Elsewhere

Defendant GEO incorrectly asserts that the facts giving rise to this action occurred only in the Eastern District of North Carolina. While Defendants' provision of inadequate medical care included conduct that took place in the Eastern District of North Carolina, the actions giving rise to that unlawful conduct include acts andd omissions that occurred in the District of Columbia. The Complaint contains detailed allegations linking plaintiff's claims to Defendants' conduct that occurred in or was directed at the District of Columbia, including GEO's agreement to provide adequate health care to District of Columbia prisoners, such as plaintiff, transferred to its Rivers facility; improper or inadequate health care and mortality reports that were submitted to the BOP in the District; and the failure of BOP officials in the District to

-16-

provide adequate oversight and supervision of its contractor GEO. Because plaintiff's claims arise out of conduct that occurred both in the District of Columbia and in North Carolina, this factor does not favor transfer.

### 4. The Convenience of the Parties

GEO argues it would make more sense to resolve this dispute in North Carolina based on the fact that all relevant witnesses in this matter reside in the Eastern District of North Carolina. This is simply not true. First, two of the three Defendants--are currently located in the District of Columbia. All of plaintiff's witnesses and much of the evidence is located in the District of Columbia. GEO is represented by D.C. counsel. See Def.'s Mem. at 16 (identifying Deborah J. Israel of Womble Carlyle's D.C. office as counsel for GEO). Second, although it's always burdensome to defend a lawsuit away from home, GEO has not been asked to should a burden so heavy as to violate the Constitution. After all, "it usually will not be unfair" to subject a defendant who engages in economic activity in a state to the burdens of litigating in that same state. Burger King, 471 U.S. at 474, 105 S.Ct. at 2183. GEO is no stranger to the District of Columbia; former "Federal Bureau of Prisons Director, Norman A. Carlson who is employed by GEO and numerous GEO employees have traveled the route to the District of Columbia on GEO business; GEO has dozens of customers and a "Registered Agent" in the District. Third, the District has a definite interest in adjudicating this dispute. See Madison

-17-

<u>Consulting Group</u> v. <u>S.C.</u>, 752 F.2d at 1209 (District of Columbia has a compelling interest in offering its residents legal avenues for enforcing contracts with nonresidents).  The District is a convenient forum for the parties and their counsel.

GEO's only argument in favor of transfer is that "relevant witnesses" to this matter reside in the Eastern District of North Carolina.  Def.'s Mem. at 13.  GEO's argument about inconvenience on behalf of its litigation opponents should be given no weight, and this Circuit has held that this argument can be disregarded if a prisoner chooses the District of Columbia as his preferred forum.  See <u>Starnes</u> v. <u>McGuire</u>, 512 F.2d 918 (D.C. Cir. 1974)(en banc).  This factor also weighs against transfer.

### 5.  The Convenience of the Witnesses

GEO does **not** dispute that the District is a convenient forum for witnesses who are parties, employees of parties, or experts.  See Def.'s Mem. at 14.  It argues for transfer, however, on the theory that this Court might not be able to compel GEO's **former** employees to appear at trial, and asserts that such former employees are "more likely" to reside within the subpoena power of North Carolina.

This argument ignores that if the case were transferred to North Carolina, the same issue wold then arise with respect to the **BOP's** former employees, thereby eliminating any hypothetical benefit of transfer.  Moreover, GEO has not even asserted (much less submitted evidence) that it will need to

-18-

call any former GEO employees at trial.  In addition, the ability
to subpoena distant witnesses and to preserve testimony for
trial by conducting depositions (irrespective of actual
attendance) is the same here as it would be in the Eastern
district of North Carolina.  Finally, GEO's explicit concession
that "there should be little need to compel witnesses" at
trial is all but fatal to its argument.  See Def.'s Mem. at
14.  This factor also does not weigh in favor of transfer.

### 6.   The Ease of Access to Sources of Proof

The allegations in the Complaint that the principal sources
of proof will be (i) medical providers in the District of
Columbia that treated plaintiff before being transferred to
Rivers; (ii) records and witnesses located within the BOP
in the District; (iii) records and witnesses in the Federal
REserve Board , the Social Security Administration and the
Veterans Adminiistration in the District of Columbia; (iv)
records located at the Rivers facility in North Carolina; and
(v) records and witnesses located at GEO's headquarters in
Florida.

GEO argues that it would be burdensome for members of
the administration, medical staff and current inmates at Rivers
are called as witnesses.  Of course, it would be equally
burdenssome if plaintiff's witnesses who reside in the District
of Columbia, and even the federal defendants who reside in the
District of Columbia were all required to travel to North

-19-

Carolina. Moreover, it is noteworthy that, while the distances may be shorter in absolute terms, similar transportation arrangements would also need to be made were prisoners to be transported from the facility in Winton, North Carolina to the federal courthouse in Elizabeth City, Fayetteville, Greenville, New Bern, Raleigh, or Wilmington, North Carolina, where the Eastern District sits.

### B. Public Interest Factors

#### 1. The Transferee's Familiarity with Governing Laws

Plaintiff's constitutional and Americans with Disabilities Act (ADA) claims predominate the legal questions raised by this case. See Compl. ¶¶ 16-28. As GEO concedes, all federal courts are presumed equally capable of deciding issues of federal law. See Def.'s Mem. at 15; see also Devaughn v. Inphonic, Inc., 403 F.supp.2d 68 (D.D.C. 2005). The presence of federal claims therefore does not weigh in favor of transfer.

#### 2. The Relative Congestion of the Courts

GEO has presented a misleading analysis of this factor. GEO notes that as of 2006, there were more cases pending in federal district court in the District of Columbia (3,276) than in the Eastern District of North Carolina (1,391). See Def.'s Mem. at 15. From this fact GEO then leaps to the erroneous conclusion that courts in this judicial district are more congested than courts in North Carolina's Eastern District. Quite the contrary!

-20-

What GEO's analysis ignores, of course, is that there are more than four times as many active federal district court judges in the District of Columbia than there are in the Eastern District of North Carolina. See Plaintiff's Exhibit C-3 (comparing the dockets for the 16 active district court judges in the D.C. district court with the dockets for the 3 active district court judges in the Eastern District of North Carolina). As a result, in 2006, the D.C. District court had 197 case filings per judge, compared with 469 filings per judge in the Eastern District of North Carolina. During that same period, the D.C. District Court had an average of 274 pending cases per judge, versus 459 pending cases per judge in the Eastern District of North Carolina, a 68 percent difference. GEO's flawed "congestion" argument, when properly analyzed, plainly weighs against --not for-- transfer.

### 3. The Local Interest of the District of Columbia and the D.C. District Court

Both this Court and the District of Columbia have a strong local interest in the treatment of D.C. citizens who are sentenced by D.C. cocurts for violations of D.C. law. See See Jackson, 89 F.Supp.2d at 53 (recognizing that the D.C. District Courts have a significant interest in the "treatment of prisoners sentenced within its borders, many of whom undoubtedly are its citizens"). In **Jackson, the Court analyzed the "local interest"** factor in the context of D.C. Department of Corrections and the Commonwealth of Virginia. In denying the defendants' motion to transfer the case to the Eastern

-21-

District of Virginia, the Court held that a D.C. Court's local interest in alleged harm to D.C. inmates incarcerated at Lorton was no less significant than a Virginia court's interest in alleged harm to prisoners in Virginia. The fact that the D.C. offenders were physically incarcerated in Virginia did not diminish that interest.

Moreover, plaintiff-- and probably most of the D.C. citizens who have been subjected  to unconstitutionally substandard medical care while incarcerated at Rivers will one day return to the District of Columbia. The harms inflicted on plaintiff at Rivers will likely impact this community through increased health care expenditures, a greater demand for social services, and perhaps in other untoward ways that cannot be anticipated. The District of Columbia plainly has a substantial interest in ensuring that its citizens receive appropriate care while incarcerated at Rivers.

Because the District of Columbia and the D.C. Courts have a paramount interest in ensuring that D.C. offenders are not subjected to unconstitutional or other unlawful treatment by GEO, and because North Carolina has no comparable "local interest" in D.C. offenders or its residents, this factor weighs heavily against transfer.

-22-

II.   **PLAINTIFF HAS STATED A CLAIM FOR WHICH RELIEF MAY BE GRANTED, AND THE COURT SHOULD NOT DISMISS PLAINTIFF'S COMPLAINT**

A.   **The Court should Deny GEO's Motion To Dismiss pursuant to Fed.R.Civ.P. 12(b)(6)**

A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) will not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also Haynesworth v. Miller, 820 F.2d 1245, 1254 (D.C. Cir. 1987). All that the Federal Rules Civil Procedure require of a complaint is that it contain 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the the grounds upon which it rests. Conley, 355 U.S. at 47. Given the Federal rules simplified standard for pleading, '[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 514 (2002)(quoting Hishon v. King Spalding, 467 U.S. 69, 73 (1984). Under Rule 12(b)(6), the plaintiff's factual allegations must be presumed true and should be liberally construed in his or her favor. Leatherman v. Tarrant Cty. Narcotics and Coordination Unit, 507 U.S. 163, 164 (1993); Phillips v. Bureau of Prisons, 591 F.2d 966, 968 (D.D.C. Cir. 1979). The plaintiff must be given every favorable inference that may be drawn from the allegations of fact.

-23-

_Scheuer_ v. _Rhodes_, 416 U.S. 232, 236 (1974); _Sparrow_ v. _United Air Lines, Inc._, 216 F.3d 1111, 1113 (D.C. Cir. 2000); _Krieger_ v. _Fadely_, 211 F.3d 134 (D.C. Cir. 2000).  Factual detail is unnecessary under the rule requiring that a complaint contain only a short and plain statement of the claim for relief. Fed.Rules Civ.Proc.Rule 8(a)(2).

Plaintiff's complaint readily meets Federal Rule of Civil Procedure 8(a)(2) by stating in his complaint, a short and plain statement of the claim for relief, and therefore, plaintiff's complaint can survive GEO's motion to dismiss under Rule 12(b)(6).

**B.   GEO, AS A PRIVATE CORPORATION CAN BE HELD LIABLE FOR A CONSTITUTIONAL VIOLATION PURSUANT TO THE SUPREME COURT'S HOLDING IN LUGAR v. EDMONDSON OIL CO, 457 U.S. 922**

GEO can be considered a federal actor under the two-pronged analysis articulated by the Supreme Court in **Lugar**. Under this analysis, first, the deprivation must be caused by the exercise of a right or privilege created by the government or by rule of conduct imposed by the government or by a person for whom the government is responssible. _Lugar_, 457 U.S. at 936, 102 S.Ct. at 2753.  Second, the party charged with the deprivation must be a person who may fairly be said to be a government actor, because he is in fact a government official, because he has acted together with,  or has obtained significant aid from, government officials, or

-24-

because his conduct is otherwise chargeable to the government. In <u>Lugar</u> v. <u>Edmondson Oil Co., Inc.</u>, 102 S.Ct. at 2756, the Court stated:

> "Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of the statute. To act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in a joint activity with the State or its agents." <u>United States</u> v. <u>Price</u>, 383 U.S., at 794 (1966).

Plaintiff asserts that counsel in this case has conceded in a pending case in this Court, Civil Action No. 1:07-cv-01155-RMU, "Reply Memorandum, at 4 (See Exhibit C-4) that GEO is a federal actor, by stating the following:

> "However, in this case, GEO's contacts with a federal agency touch a uniquely government function: the housing of prisoners."

GEO cannot have its "cake and eat it too," by admitting in one case in this Court that it is a "federal actor,' to suit its purpose, and turn right around in another case in the same Court and argue that GEO cannot be sued under a <u>Bivens</u> claim because GEO is not a "federal actor."

In the present case, plaintiff has satisfied the two-pronged analysis articulated by the Supreme Court in <u>Lugar</u>. Plaintiff has alleged that the denial of medical care to him was caused by a joint decision of defendants GEO and the Federal Bureau of Prisons; that GEO's actions can be ascribed

-25-

decision.

The issue currently before the Court is, in every material sense, the same as the issue which confronted the Supreme Court in **Lugar**.  Holding that "private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of the statute, and counsel for defendant GEO has conceded to the fact that GEO is "jointly" engaged with federal officials in a uniquely government function: the housing of prisoners, and because of these facts, GEO is amendable to suit under a _Bivens_ claim.

## III.  PLAINTIFF HAS STATED A CLAIM AGAINST GEO FOR VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990.

Defendant GEO alleges that plaintiff has not stated the specific benefits which he believes he is entitled.  Contrary to what defendant GEO alleges, plaintiff has stated in his complaint, page 13, paragraph 2, that plaintiff has not received any of the entitled benefits to which the "Act" mandates a person who has been declared "totally disabled" is to receive.

### 1.  PLAINTIFF CAN DEMONSTRATE THAT HE IS DISABLED

Defendant GEO alleges that plaintiff cannot demonstrate that he is "disabled" within the meaning of the ADA.  Contrary to this allegation, plaintiff states had defendant GEO contacted the "Federal Reserve Board, Human Resources, and the Social Security Administration" in the District of Columbia, they

-26-

would have learned from both of these agencies that plaintiff
is "totally disabled." Furthermore, had defendant GEO contacted
plaintiff's private doctor, and requested plaintiff's medical
record from his private doctor (Dr. Pudshod), they also would
have been informed that plaintiff was "totally disabled."
Defendant GEO failed to contact any of these agencies or plaintiff's
private physician, and because of their deliberate indifference
to plaintiff's "disability", have violated the "Americans With
Disabilities Act of 1990.

## CONCLUSION

Accordingly, GEO's "Motin To Dismiss Or To Transfer" this
case to the Eastern District of North Carolina should be denied
in its entirety.

## REQUEST FOR HEARING

Plaintiff respectfully requests that this honorable court
grants a hearing on GEO's "Motion To Dismiss Or Transfer" this
case.

Respectfully Submitted,

*Frederick Hines*

Frederick Hines
Reg. No. 33592-007
Rivers Correctional Institution
P.O. Box 630
Winton, NC 27986

Subscribed to and Sworn

Before me on this 28th day

of **November** 2007.

*Rita C. Williams*

Notary Public

Rita C. Williams
Notary Public
Pasquotank County, NC
My Commission Expires _____

-27-

RITA C. WILLIAMS
NOTARY
PUBLIC
PASQUOTANK COUNTY, NC

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing "Motion In Opposition" has been mailed to the following:

1. Deborah J. Israel, Esq.
   Womble Carlyle Sandridge & Rice , PLLC
   1401 Eye Street, N.W., 7th Floor
   Washington, D.C. 20005
   Counsel for defendant GEO Group, Inc.

2. Karen L. Melnik
   U.S. Attorney's Office
   555 Fourth Street, Room E4112
   Washington, D.C. 20530
   Counsel for Defendants Federal Bureau of Prisons and Harley Lappin

-28-

**E X H I B I T  C**

# CONTRACT AWARD

| PAGE | OF | PAGES |
|---|---|---|
| 1 | | 181 |

| 1. CONTRACT NUMBER | 2. EFFECTIVE DATE | 3. SOLICITATION NUMBER | 4. REQUISITION/PROJECT NUMBER |
|---|---|---|---|
| J-005 | See Block 15c | RFP PCC-0004 | N/A |

| 5. ISSUED BY | CODE | N/A | 6. ADMINISTERED BY (if other than Item 5) | CODE | N/A |
|---|---|---|---|---|---|

Federal Bureau of Prisons
320 First Street NW Room 500-6
Washington, DC 20534
Scott P. Stermer, Contracting Officer
(OMB #1103-0018 EXP 02/28/01)

Same Block 5

**ORIGINAL**

| 7. NAME AND ADDRESS OF CONTRACTOR | CODE | |
|---|---|---|

Wackenhut Corrections Corporation
4200 Wackenhut Drive
Palm Beach Gardens, FL 33410

**8. PAYMENT WILL BE MADE BY**

Federal Bureau of Prisons
Mid-Atlantic Region
Junction Business Park
10010 Junction Drive, Suite 100-N
Annapolis Junction, MD 20701
Regional Comptroller

| 9A. DUNS NUMBER | 9B. TAXPAYER'S IDENTIFICATION NO. | 10. SUBMIT INVOICES (4 copies unless otherwise specified) TO |
|---|---|---|
| | (b)(4) | ☒ ITEM 5  ☐ ITEM 6  ☐ ITEM 8  ☐ OTHER (Specify) |

**11. TABLE OF CONTENTS**

| (X) | SEC. | DESCRIPTION | PAGE(S) | (X) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | **PART I - THE SCHEDULE** | | | | **PART II - CONTRACT CLAUSES** | |
| x | A | SOLICITATION/CONTRACT FORM | | x | I | CONTRACT CLAUSES | 11 |
| x | B | SUPPLIES OR SERVICES AND PRICES/COSTS | 3 | | | **PART III - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH.** | |
| x | C | DESCRIPTION/SPECS./WORK STATEMENT | 4 | x | J | LIST OF ATTACHMENTS | 95 |
| x | D | PACKAGING AND MARKING | 40 | | | **PART IV - REPRESENTATIONS AND INSTRUCTIONS** | |
| x | E | INSPECTION AND ACCEPTANCE | 1 | | | | |
| x | F | DELIVERIES OR PERFORMANCE | 4 | x | K | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | 14 |
| x | G | CONTRACT ADMINISTRATION DATA | 2 | | L | INSTRS., CONDS., AND NOTICES TO OFFERORS | |
| | H | SPECIAL CONTRACT REQUIREMENTS | 3 | | M | EVALUATION FACTORS FOR AWARD | |
| | | REF DESCRIPTION | 3 | | | | |

Contractor-Owned and Contractor-Operated correctional facility for an estimated population of 1,200 low security male District of Columbia (D.C.) sentenced felons.

| 13. TOTAL AMOUNT OF CONTRACT ▶ | $91,890,622.95 (FP01009T120M) |
|---|---|

**14. CONTRACTOR'S AGREEMENT.** Contractor agrees to furnish and deliver the items or perform services to the extent stated in this document for the consideration stated. The rights and obligations of the parties to this contract shall be subject to and governed by this document and any documents attached or incorporated by reference.

**15. AWARD.** The Government hereby accepts your offer on the solicitation identified in item 3 above as reflected in this award document. The rights and obligations of the parties to this contract shall be subject to and governed by this document and any documents attached or incorporated by reference.

☒ A. CONTRACTOR IS REQUIRED TO SIGN THIS DOCUMENT AND RETURN FOUR COPIES TO THE ISSUING OFFICE. (Check if applicable)

B. SIGNATURE OF PERSON AUTHORIZED TO SIGN

A. UNITED STATES OF AMERICA (Signature of Contracting Officer)

C. NAME OF SIGNER

Wayne H. Calabrese

D. TITLE OF SIGNER

President

E. DATE /22/2000

B. NAME OF CONTRACTING OFFICER

Scott P. Stermer, Contracting Officer

C. DATE 3/7/2000

AUTHORIZED FOR LOCAL REPRODUCTION

**OPTIONAL FORM 307** (9-97)
Prescribed by GSA - FAR (48 CFR) 53.215-1(c)

Contract #J1PCc-005 - Wackenhut Corrections, Corporation.

## A.1    Items Incorporated by Reference

This contract incorporates by reference the following items of documentation:

    a.    Amendments #1 through #4;

    b.    Wackenhut Corrections, Corporation Technical Proposal dated January 28, 1999 as amended and clarified through April 13, 1999;

    c.    Wackenhut Corrections, Corporation Offer and Other Documents dated January 28, 1999, as amended and clarified through the Final Proposal Revision of April 13, 1999; and

    d.    Final Environmental Assessment, Finding of No Significant Impact (including Mitigation Measures) dated February, 2000.

In the event of a conflict between the contract terms (including the Statement of Work) and Wackenhut Corrections, Corporation proposal, the contract terms shall be controlling.

A.2    The base period of the contract shall be for thirty-six (36) months and begin upon issuance of the Notice to Proceed (NTP).

A.3    The total amount of the contract as set forth in Block 13 of the Optional (OF) 307 is the maximum amount available. The total available amount is:

    1.    The fixed price for providing all services for an average daily population up to 1140 inmates during the 36 month base period: **$84,886,379.00**

    2.    The fixed incremental unit price (FIUP) will apply when the average daily population exceeds 1140 inmates during a monthly payment period. The FIUP is applied to a maximum of 262,800 inmate days during the 36 month base period:
        (b)(4)

    3.    The maximum five (5) percent award fee. For the purposes of this document, the amount applied to the maximum price of the above amounts added together. Total 54,375,743.95

Contract #J1PCc-005 - Wackenhut Corrections, Corporation.

A.4  **The total available amount as set forth in Block 13 of the OF 307 does not obligate the Government to pay this amount.  Contract Payment will be in accordance with the following:**

> **Monthly Contract Payment:**                    **$2,357,968.86**
> (See Contract Section G.2, Payment Schedule)

> **Fixed Incremental Unit Price:**                 (b)(4)
> (See Contract Section G.2, Payment Schedule)

> **Award Fee:** Up to a maximum five (5) percent of the total payment received for the period rated. (See Contract Section H.3, Award Fee)

A.5  Wackenhut Corrections Corporation, Small Business Subcontracting Plan, dated January 28 , 1999 is hereby incorporated.

# PART I - THE SCHEDULE

## SECTION B - SUPPLIES OR SERVICES AND PRICES/COSTS

B.1  SERVICES AND PRICES/COSTS

CONTRACTOR-OWNED/CONTRACTOR-OPERATED CORRECTIONAL
FACILITY WITHIN 300 MILES OF THE UNITED STATES CAPITOL
BUILDING, WASHINGTON, D.C.

(a)  Offeror will provide, by the terms and conditions
identified in this Request for Proposal (RFP) and any
resulting contract, all necessary personnel, equipment,
materials, supplies, and services (except as may be
furnished by the Government as specifically identified
within the RFP) and do all things necessary for, or
incident to, the management and operation of
comprehensive corrections services.

These comprehensive corrections services will serve a
population principally consisting of District of
Columbia sentenced felons.

Award resulting from this RFP will be of the Fixed
Price contract type for services incorporating an
Award-Fee provision.  At the sole discretion of the
Government an Award-Fee may be issued to the contractor
in recognition of superior quality performance. (See
Section H.3 for additional information)

The period of performance for any contract which the
Government may award under the terms and conditions of
this RFP will be for a three-year base period, with
seven one-year options to extend.  Potentially, the
contract could have a 10 year contract period.

(b)  PRICING INSTRUCTIONS

The Government will evaluate price according to the
Price evaluation factor in Section M.5 of the
solicitation.

For purposes of this solicitation, offerors must submit
an offer for the total three-year base period
requirement and each option period. Prices submitted on
a single year basis will not be considered for award.

**B.1 (Continued)**

Pursuant to Federal Acquisition Regulation (FAR) 52.217-5, Evaluation of Options, the Government's evaluation of price shall be inclusive of options.

For each performance year of the multiyear base period, the Government will notify the contractor that funds are available for performance no later than the first day of the following program year. If the contractor is not notified funds are available, cancellation of the contract will occur within 60 days of the following program year.

Accordingly, program years two and three of the base period are subject to cancellation in the event funds are not available. The cancellation ceilings for these program years are as follows:

Program Year 2 -    of the Total Base Period Price

Program Year 3 - (b)(4)    of the Total Base Period Price

Offerors should carefully consider and give particular attention to the multiyear features of this solicitation. Any cancellation and related contractor claim for costs will be according to FAR 52.217-2, Cancellation Under Multiyear Contracts (See Section I of the solicitation) and the cancellation ceilings set forth above.

(c)  <u>PRICING SCHEDULE</u>

For purposes of price evaluation and according to the above instructions, offerors must enter their proposed prices on the attached Pricing Schedules as provided below.

<u>Three Year Base Period</u> - For the base period, offerors must submit one fixed price. The price will be for providing all services as required by the RFP for an Average Daily Inmate Population (equivalent to 95 % of designated bed space) as stated in the individual schedules. Monthly payment shall be based upon the contractor's fixed price divided by 36 (the number of months within the performance period).

B.1 (Continued)

- **Fixed Incremental Unit Price** - Offerors must submit an incremental unit price which will apply only when the total number of inmate days, in a monthly payment period, exceeds 95% of the designated bed space. Population will not exceed 115% of the designated bed space. (See Section G.2)

- **Option Periods** - Offerors must follow the directions provided above for each option period. Monthly payment will be based upon the contractor's fixed price divided by 12 (the number of months within the an option performance period).



Wackenhut Corrections - April 13, 1999
BOP RFP #PCC-0004-BAPO
11.B.1          Page 1

## Pricing Schedule

### 1200 Low Security Male Inmates

| | Performance Period | Fixed Price Operation | Incremental Unit Price Per Inmate Per Day |
|---|---|---|---|
| **BASE PERIOD:** | NTP - Month 36 | | |
| **OPTION PERIOD 1:** | Month 37 - Month 48 | | |
| **OPTION PERIOD 2:** | Month 49 - Month 60 | | |
| **OPTION PERIOD 3:** | Month 61 - Month 72 | | |
| **OPTION PERIOD 4:** | Month 73 - Month 84 | (b)(4) | |
| **OPTION PERIOD 5:** | Month 85 - Month 96 | | |
| **OPTION PERIOD 6:** | Month 97 - Month 108 | | |
| **OPTION PERIOD 7:** | Month 109 - Month 120 | | |

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   EXPLANATION OF STATEMENT OF WORK TERMS . . . . . . . . . . 2

III.  OBJECTIVE  . . . . . . . . . . . . . . . . . . . . . . . . . 5
      A.    Performance Requirements . . . . . . . . . . . . . . . 5
      B.    Contract Compliance  . . . . . . . . . . . . . . . . . 6
      C.    General Administration . . . . . . . . . . . . . . . . 7
      D.    Fiscal Management . . . . . . . . . . . . . . . . . . . 9
      E.    Personnel  . . . . . . . . . . . . . . . . . . . . . . 10
      F.    Training and Staff Development . . . . . . . . . . . . 17
      G.    Case Records . . . . . . . . . . . . . . . . . . . . . 19
      H.    Information Systems and Research . . . . . . . . . . . 19
      I.    Physical Plant . . . . . . . . . . . . . . . . . . . . 22
      J.    Security and Control . . . . . . . . . . . . . . . . . 25
      K.    Safety and Emergency Procedures  . . . . . . . . . . . 29
      L.    Discipline . . . . . . . . . . . . . . . . . . . . . . 30
      M.    Inmate Rights  . . . . . . . . . . . . . . . . . . . . 30
      N.    Reception and Orientation  . . . . . . . . . . . . . . 31
      O.    Classification . . . . . . . . . . . . . . . . . . . . 32
      P.    Health/Mental Health Care  . . . . . . . . . . . . . . 32
      Q.    Social Services  . . . . . . . . . . . . . . . . . . . 36
      R.    Work and Correctional Industries . . . . . . . . . . . 36
      S.    Academic and Vocational Education  . . . . . . . . . . 37
      T.    Recreation and Activities  . . . . . . . . . . . . . . 38
      U.    Telephone  . . . . . . . . . . . . . . . . . . . . . . 38

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1    I.    INTRODUCTION

2    The National Capital Revitalization and Self-Government
3    Improvement Act of 1997 mandates that the Bureau of Prisons house
4    a portion of the District of Columbia sentenced felon population
5    in private contract facilities.

6    The Bureau of Prisons has proceeded to comply with this mandate
7    by identifying the appropriate populations to fulfill the
8    requirement from the overall District of Columbia sentenced felon
9    population.

10   The attached SOW identifies the technical and programmatic
11   details for a low security adult male population.

1

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1    II.   EXPLANATION OF STATEMENT OF WORK TERMS

2    ACA - American Correctional Association.  The private, nonprofit
3    organization that administers the only national accreditation
4    program for all components of adult and juvenile corrections.
5    Its purpose is to promote improvement in the management of
6    correctional agencies through the administration of a voluntary
7    accreditation program and the ongoing development and revision of
8    relevant, useful standards.

9    BOP - Federal Bureau of Prisons.

10   BOPDOCS - The electronic document management system for the BOP
11   containing policy, regulations and directives.

12   CO - Contracting Officer.  The Government employee, by virtue of
13   a Contracting Officer's Warrant, empowered to negotiate, award,
14   administer, cancel or terminate contracts on behalf of the United
15   States Government.

16   Contract Award - The date the CO awards the contract.  For the
17   purposes of the contract, the date the CO signs the Standard Form
18   (SF) 33, Solicitation, Offer and Award or the SF 26, Contract
     Award.

20   COR - Contracting Officer's Representative.  The Government
21   employee designated in writing by the CO authorized to perform
22   certain limited functions on behalf of the CO.  The extent of COR
23   responsibilities are outlined in Section G of the contract and
24   the COR Designation Letter, a copy of which will be provided to
25   the contractor subsequent to contract award.

26   COTR - Contracting Officer's Technical Representative.
27   Government staff designated in writing by the CO who assist the
28   COR in the performance of duties.  The extent of COTR
29   responsibilities are delineated in writing by the CO and will be
30   provided to the contractor subsequent to award.

31   Credentials - Documents providing primary source verification
32   including education, training, licensure, experience, board
33   certification and qualifications of an employee.

34   DC - District of Columbia.

35   DCDOC - District of Columbia Department of Corrections.

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1   DOJ - Department of Justice.

2   DHO - Discipline Hearing Officer.  The Government-trained
3   contractor employee responsible for conducting discipline
4   hearings.

5   Emergency - Any significant disruption of normal institution
6   procedure, policy or activity including but not limited to:
7   inmate disturbances; work or food strike; food borne illness;
8   escape; fire; natural disaster; or other serious incident.

9   FBI - Federal Bureau of Investigation.

10  Former Inmate - A person who has been found guilty of committing
11  a felony or misdemeanor for whom less then one year has elapsed
12  since release from custody or any type of supervision.

13  HSU - Health Services Unit.  The organizational unit providing
14  routine and emergency health care.  The HSU is the designated
15  part of the institution delivering care to inmates on an
16  ambulatory or observation basis.

17  Inmate - An individual confined under the auspices and authority
18  of the BOP or under supervision of a Federal court.

19  Inmate Records - Information concerning an inmate's personal,
20  criminal and medical history, behavior and activities while in
21  custody.  This may include, but is not limited to: detainers;
22  personal property receipts; visitor lists; photographs;
23  fingerprints; disciplinary infractions and actions taken;
24  grievance reports; work assignments; program participation;
25  miscellaneous correspondence; forms prescribed by Government
26  policy, etc.

27  JCAHO - Joint Commission on Accreditation of Health Care
28  Organizations.

29  Lethal Force - The force a person uses with the purpose of
30  causing/or which they know, or should know, would create a
31  substantial risk of causing death or serious bodily harm.

32  NTP - Notice to Proceed.  The written official notice signed by
33  the CO which authorizes the contractor to proceed with the
34  contract.  The contractor shall begin accepting inmates within 30
35  days after issuance of the NTP.

3

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1  OAR - Operational Availability Rate.  The monthly rate for
2  computer services/resource components which is a percentage
3  calculated by dividing the accumulated monthly down time hours by
4  the total number of hours of operation for a given month.

5  Prime Contractor - The entity to which the Government has awarded
6  the contract.

7  Professional Staff - Staff employed in the Medical, Educational,
8  Religious and Psychological disciplines.

9  P.S. - Program Statement.  A BOP written directive that
10 establishes policy in a given area.

11 Safety Equipment - Including but not limited to fire fighting
12 equipment (e.g., chemical extinguishers, hoses, nozzles, water
13 supplies, alarm systems, portable breathing devices, gas masks,
14 fans, first aid kits, stretchers) and alarm systems.

15 Sensitive Information - Any information which could affect the
16 national interest, law enforcement activities, the conduct of
17 Federal programs or the privacy to which individuals are entitled
18 under Section 552a of Title 5, U.S.C.

   SENTRY - The BOP's on-line, real time data base system, used
.J primarily for maintaining information about Federal inmates.  It
21 contains information about sentencing, work assignments,
22 admission/release status and other special assignments for
23 monitoring inmate status.  The SENTRY system also includes
24 property management and other modules which address most aspects
25 of incarceration.

26 Subcontract - Any agreement entered into by the prime contractor
27 with another entity to provide services and supplies to
28 accomplish performance of the contract.

29 USMS - United States Marshals Service.

30 Warden - The contractor's official, regardless of title (e.g.,
31 Chief Executive Officer (CEO) or Facility Administrator) who has
32 ultimate responsibility for the overall management and operation
33 of the institution.

34 Additional definitions are contained in the ACA Standards for
35 Adult Correctional Institutions.

4

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1   III. OBJECTIVE

2   A.  Performance Requirements

3   This SOW sets forth the contract performance requirements for the
4   comprehensive management and operation of a contractor-owned/
5   contractor-operated corrections facility for a low security adult
6   male population.

7   Housing facilities shall be provided to accommodate at least
8   1,200 low security beds at a single site.  In addition, the
9   institution shall include a special housing unit (segregation)
10  with a capacity of at least 10% of the institution's rated
11  capacity.

12  The contractor shall ensure that the institution is operated in a
13  manner consistent with the mission of the BOP.  It is the mission
14  of the BOP to protect society by confining offenders in the
15  controlled environments of prison and community-based facilities
16  that are safe, humane, cost-efficient, and appropriately secure,
17  and that provide work and other self-improvement opportunities to
18  assist offenders in becoming law-abiding citizens.

·   The institution shall be located within a 300 mile radius of the
20  United States Capitol, Washington, D.C.

21  Contract performance shall be for a three-year base period with 7
22  one-year options, exercised unilaterally by the Government, for a
23  potential term of ten years.

24  Within 365 days following contract award, the contractor shall
25  notify the CO it is ready to accept inmates and assume full
26  responsibility for the operation, maintenance and security of the
27  institution.

28  It is essential that the contractor be fully prepared to accept
29  responsibility for performing the requirements of the contract,
30  thus ensuring the safety and security of the community.
31  Therefore, the BOP will perform numerous assessments to ensure
32  contract compliance prior to issuance of the NTP (See Contract
33  F.2).

34  Unless otherwise specified, all plans, policies and procedures,
35  including those identified in the ACA standards, shall be
36  developed by the contractor and submitted in writing to the CO

5

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1  for review and concurrence prior to issuance of the NTP. Once
2  concurrence has been granted, these plans, policies and
3  procedures shall not be modified without the prior written
4  acknowledgment of the CO.

5  If the BOP determines the contractor is capable of accepting
6  inmates, the NTP will be issued. The contractor shall begin
7  accepting inmates within 30 days after issuance of the NTP.

8  It is anticipated that the BOP will predominantly designate
9  individuals committed as DC sentenced felons to the institution.
10 However, the BOP may designate any inmate within its custody
11 utilizing the same designation criteria as used at other BOP
12 facilities. P.S. 5100.06, Security Designation and Custody
13 Classification Manual, outlines the procedures for designating
14 inmates.

15 Designations to the institution are anticipated to occur at an
16 estimated rate of 40 inmates per week. The estimated weekly
17 designation of 40 inmates to the institution will result in the
18 population meeting the 1,200 bed requirement in 30 weeks. The
19 institution designation schedule of 40 inmates per week is an
20 estimate only. Actual designations will depend upon many
21 factors, including but not limited to, the contractor's ability
22 to provide services in accordance with the SOW; the sentencing of
23 offenders by the DC and Federal Courts; the designation of
24 offenders by the BOP.

25 Unless otherwise indicated, the contractor shall furnish all
26 personnel, management, equipment, supplies and services necessary
27 for performance of all aspects of the contract.

28 Unless explicitly stated otherwise, the contractor is responsible
29 for all costs associated with and incurred as part of providing
30 the services outlined in this contract.

31 B.  Contract Compliance

32 All services and programs shall comply with the SOW; the U.S.
33 Constitution; all applicable Federal, state and local laws and
34 regulations; applicable Presidential Executive Orders (E.O.); all
35 applicable case law, consent decrees, and Court Orders. Should a
36 conflict exist between any of the aforementioned standards, the
37 most stringent shall apply. When a conflict exists and a
38 conclusion cannot be made as to which standard is more stringent,

6

DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK
Request for Proposal PCC-0004

1    the CO shall determine the appropriate standard.  The contractor
2    shall comply with and implement any applicable changes to BOP
3    policy, DOJ regulations, Congressional mandate, Federal law, DC
4    law, or E.O.  Should the Government invoke such changes the
5    contractor retains its rights and remedies under the terms and
6    conditions of the contract.

7    The BOP reserves its rights to conduct announced and unannounced
8    inspections of any aspect of contract performance at any time and
9    by any method in order to assess contract compliance.

10   C.  General Administration

11   Unless otherwise specified by the CO, the contractor is required
12   to perform in accordance with the most current edition of the ACA
13   Standards for Adult Correctional Institutions and Standards
14   Supplement.

15   The contractor shall obtain ACA accreditation within 24 months of
16   NTP and shall maintain continual compliance with the above
17   referenced ACA standards and supplements during performance of
18   the contract, unless otherwise specified by the BOP.  Once full
     accreditation has been obtained, the contractor shall maintain
     this accreditation throughout the life of the contract, inclusive
21   of any option year exercised.  Failure to perform in accordance
22   with contract requirements and to obtain ACA accreditation within
23   24 months of NTP will, at a minimum, result in a reduction of the
24   contract price.

25   Accomplishment of some ACA standards is augmented by BOP policy
26   and/or procedure.  In these instances, the SOW identifies and
27   provides direction for the enhanced requirements.

28   The contractor is responsible for a Quality Control Program (QCP)
29   which ensures all requirements of this SOW are achieved.  The
30   specific requirements for the QCP are detailed in Section J,
31   Attachments 2, 3, and 4 of the contract.

32   Several sections of this SOW require the contractor to maintain a
33   system of records identical to the BOP's.  The contractor shall
34   not establish a separate system of records without prior written
35   concurrence by the CO.  This requirement is necessary to maintain
36   consistency of inmate records as inmates transfer throughout the
37   BOP.

7

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1  All records related to contract performance shall be retained in
2  a retrievable format for the duration of the contract. Except as
3  otherwise expressly provided in this SOW, the contractor shall,
4  upon request of the CO or upon completion or termination of the
5  resulting contract, transmit to the Government any records
6  related to the performance of the contract.

7  The contractor shall protect, defend, indemnify, save and hold
8  harmless the United States Government, the BOP and its employees
9  or agents, from and against any and all claims, demands,
10  expenses, causes of action, judgments and liability arising out
11  of, or in connection with, any negligent or intentional acts or
12  omissions of the contractor, its agents, subcontractors,
13  employees, assignees or any one for whom the contractor may be
14  responsible. The contractor shall also be liable for any and all
15  costs, expenses and attorneys fees incurred as a result of any
16  such claim, demand, cause of action, judgment or liability,
17  including those costs, expenses and attorneys fees incurred by
18  the United States Government, the BOP and its employees or
19  agents. The contractor's liability shall not be limited by any
20  clause or limits of insurance set forth in the resulting
21  contract.

22  In awarding the contract, the Government does not assume any
23  liability to third parties, nor will the Government reimburse the
24  contractor for its liabilities to third parties, with respect to
25  loss due to death, bodily injury, or damage to property resulting
26  in any way from the performance of the contract or any
27  subcontract under this contract.

28  The contractor shall be responsible for all litigation, including
29  the cost of litigation, brought against it, its employees or
30  agents for alleged acts or omissions.

31  The CO shall be notified in writing by the contractor of all
32  litigation pertaining to this contract and provided copies of
33  said litigation within five working days of the filing. The
34  contractor shall cooperate with Government legal staff and/or the
35  United States Attorney regarding any requests pertaining to
36  Federal or contractor litigation.

37  Policies and procedures shall be developed which ensure a
38  positive relationship is maintained with all levels of Federal,
39  state, and local governments. Procedures shall include a

8

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1  tracking system which ensures all Congressional/Judicial
2  inquiries and program recommendations are responded to in a
3  timely and accurate manner.  All Judicial/Congressional
4  inquiries and contractor responses, specifically related to an
5  inmate, shall be made part of the inmate's central file.

6  The CO shall be notified when a request is made for inmate or
7  employee interviews or facility visits by any representative of
8  the media as defined by P.S. 1480.03, Contact with News Media.
9  The contractor shall coordinate all public information related
10 issues with the CO and clear, in advance, all press statements
11 and releases.

12 The contractor shall ensure its employees agree to use
13 appropriate disclaimers clearly stating the employees' opinions
14 do not necessarily reflect the position of the BOP or DOJ in any
15 public presentations they make or articles they write that relate
16 to any aspect of contract performance or prison operations.

17 D.  Fiscal Management

18 The commissary shall be operated by the contractor as a privilege
   to inmates.  Any revenues earned in excess of those needed for
   commissary operations shall be used solely to benefit inmates in
21 accordance with P.S. 4500.04, Trust Fund/Warehouse/Laundry
22 Manual, Chapter 4504.  The commissary shall make available gender
23 specific items for purchase that are not required to be furnished
24 by the contractor.  Inmates shall have the opportunity to
25 purchase from the commissary at least once a weak.  The
26 contractor shall ensure that inmates spend no more on purchases
27 than the BOP spending limit excluding those items listed in P.S.
28 4500.04, Trust Fund/Warehouse/Laundry Manual, Chapter 4526.  The
29 contractor shall maintain an inventory of items stocked in the
30 commissary and ensure that no prohibited items in accordance with
31 P.S. 4500.04, Trust Fund/Warehouse/Laundry Manual, Chapter 4522
32 are stocked.  The commissary inventory shall be provided to the
33 CO upon request.  The sales price for commissary items shall be
34 computed in accordance with P.S. 4500.04, Trust Fund/Warehouse/
35 Laundry Manual, Chapter 4523.

36 Inmates are permitted to receive funds from outside sources
37 (e.g., from family, friends, bank accounts).  Either outside
38 funds or those generated from work may be used to pay for
39 products and services from the commissary.

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1  Procedures shall be established for transfer of inmate funds upon
2  release from the institution, transfer to another institution or
3  when an inmate requests a funds transfer to an outside source.
4  Transfer of inmate funds shall occur within five working days
5  upon release from the institution, transfer to another
6  institution or when an inmate requests a funds transfer to an
7  outside source.  The contractor shall be responsible for
8  maintenance of inmate accounts including, but not limited to,
9  posting inmate pay, Financial Responsibility Program (in
10 accordance with P.S. 2011.06, Financial Responsibility Program,
11 Inmate, Processing Payments, and P.S. 5380.05, Financial
12 Responsibility Program, Inmate) Cost of Incarceration Fee (in
13 accordance with P.S. 2011.07, Cost of Incarceration Fee,
14 Accounting For, and P.S. 5380.03, Cost of Incarceration Fee).

15  E.  Personnel

16  It is essential that all contractor personnel meet the highest
17  standards of professionalism and personal integrity.

18  The contractor shall make a *bona fide* offer of employment, on a
19  right of first refusal basis, to qualified DCDOC employees who
20  apply as a result of being impacted by an agency-wide reduction-
21  in-force (RIF) as a result of The National Capital Revitalization
22  and Self-Government Improvement Act of 1997.  The only conditions
23  for employment are that applicants meet the minimum requirements
24  identified within the contract.  All such employees hired by the
25  contractor shall be offered positions at salaries and benefits
26  comparable to their latest DCDOC position.

27  The contractor shall develop written standards of conduct, to
28  include those standards outlined in Section J, Attachment 6.
29  These standards shall be maintained as a part of the contractor's
30  Personnel Policy Manual.  The contractor, its employees and
31  volunteers are expected to adhere to standards of employee
32  conduct and integrity while both on and off duty.  The contractor
33  shall follow procedures in Section J, Attachment 6 in the
34  reporting and investigation of standards of conduct violation(s).

35  Prior to employees entering on duty (EOD) at the institution, the
36  contractor shall ensure the following steps are completed for
37  each applicant as noted below:

38      1.  A pre-employment interview.

1       2. Law enforcement agency checks covering the past five
2         years.
3       3. Employment vouchering for the last five years.
4       4. Employment Eligibility Verification (DOJ-INS Form I-9).
5       5. Credit check. (For employment purposes as described in
6         the Fair Credit Reporting Act).
7       6. FBI Name and Fingerprint forms completed.
8       7. National Crime Information Center (NCIC) check.
9       8. National Law Enforcement Telecommunications (NLETS)
10        check.
11      9. Conditional Offer of Employment.
12     10. Urinalysis.
13     11. Questionnaire for Public Trust Positions (SF-85P or
14        approved equivalent) - all applicants receiving
15        conditional offer.
16     12. Supplemental Questionnaire for Selected Positions (OPM
17        Form 85P-S or approved equivalent).
18     13. Notify CO of scheduled EOD and Limited Background
19        Investigation (LBI) initiation.

20 Contractor responsibilities subsequent to EOD:

       14. Notification to CO of actual EOD within 24 hours.
22     15. Receipt and review of LBI report.
23     16. Notification to CO of decision regarding employment.

24 The contractor shall utilize the Pre-employment Interview
25 Questionnaire and Guidelines of Acceptability (Guidelines) for
26 job applicants as noted in Step 1 above (Guidelines will be made
27 available to the contractor after contract award). There may be
28 occasions where a job applicant's past behavior is unacceptable
29 as defined by the Guidelines, but the contractor still desires to
30 select the applicant. In this case, the contractor shall request
31 the Guidelines be waived. This waiver request shall be submitted
32 to the CO in writing and include: 1) the details and
33 circumstances surrounding the applicant's behavior which is
34 outside the Guidelines; 2) the reason(s) why the applicant should
35 receive further consideration; and, 3) the availability of other
36 suitable applicants.

37 The contractor shall fingerprint all applicants using BOP
38 supplied forms. Completed fingerprint forms and the SF 85P and
39 SF 85P-S (or equivalents) with original signatures and dates

11

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1  shall be submitted to the CO for each applicant offered
2  conditional employment.  The BOP will initiate the National
3  Agency Check which includes the FBI name and fingerprint check.
4  The BOP will ordinarily advise the Warden or designee of the
5  results of name and fingerprint checks within 90 working days of
6  submission to the FBI.

7  The contractor shall complete Steps 1 - 6 on each prospective
8  employee prior to submitting information required by Steps 7 and
9  8 to the CO for completion.

10  The Warden or designee shall be the contractor's liaison for the
11  processing of data required for the BOP to conduct NCIC/NLETS,
12  name and fingerprint checks.  The information listed below shall
13  be provided for each on-site applicant, to include subcontractor
14  personnel and volunteers:  full name (with aliases, maiden name
15  if applicable, or other names used); date of birth; gender; place
16  of birth; social security number and race.  Included with this
17  information, the Warden or designee shall certify Steps 1 - 6
18  above have been accomplished with satisfactory results for each
19  applicant.

22  The BOP may require additional information to process NCIC/NLETS
   and name checks, therefore, the contractor's employment
   application document shall contain information regarding
23  applicant height; weight; eye and hair color; markings, scars and
24.  tattoos; citizenship; driver's license number and State of issue;
25  and current address.

26  The contractor shall keep the BOP apprised of the volume of
27  applicants.  The BOP will ordinarily advise the Warden or
28  designee of the results of applicant NCIC/NLETS checks within
29  seven working days following receipt of accurate and complete
30  NCIC/NLETS data from the contractor.

31  Based upon the Warden's certification and the results of the
32  NCIC/NLETS, the BOP will grant conditional approval for the
33  applicant to work under the terms of this contract.  Upon receipt
34  of this approval, the contractor may grant the applicant a
35  conditional offer of employment.  The contractor shall provide
36  the CO with advance written notification of all employees'
37  scheduled EOD.  Written notification of all on-site employees
38  actual EOD shall be provided to the CO within 24 hours of an
39  employee reporting to work.

12

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1 All applicants who are offered conditional employment by the
2 contractor shall be subject to urinalysis testing in accordance
3 with P.S. 3735.02, <u>Drug free Workplace</u>, Section 13. If the test
4 result is positive, the applicant shall be prohibited from
5 working with Federal inmates. All applicants who have been
6 offered conditional employment by the contractor shall complete
7 the SF 85P or approved equivalent. Additionally, those employees
8 who will be authorized to carry weapons in the course of their
9 employment under this contract shall complete the SF 85P-S or
10 approved equivalent. The contractor shall ensure that all
11 employees who will be issued or authorized to carry firearms meet
12 all requisite requirements for possessing a firearm.
13 Accordingly, pursuant to 18 U.S.C. 922(g)(9), employees who have
14 been convicted of a misdemeanor crime of domestic violence are
15 not authorized to carry or use a firearm under performance of
16 this contract. The information contained on the contractor
17 developed form will become part of the background investigation
18 for these selected positions.

19 The contractor shall ensure a LBI check, as prescribed in the
20 Scope and Coverage of a Limited Background Investigation (Section
21 J, Attachment 7) is requested and all appropriate information
22 received, by the contractor-designated entity responsible for
    completing the LBI, prior to an employee's EOD.

24 Within one year of each on-site employee's EOD, the contractor
25 shall receive, review, identify and resolve derogatory
26 information contained on the LBI results using the Adjudication
27 Standards for Resolving Limited Background Investigations and
28 Periodic Reinvestigations, outlined in Section J, Attachment 8 of
29 the contract. The contractor shall make a determination
30 regarding the employee's suitability for employment under this
31 contract. Investigations with little or no derogatory information
32 will be reviewed and forwarded to the CO within 90 days of the
33 investigation completion date. Investigations requiring
34 resolution of derogatory information will be forwarded within 180
35 days of the investigation completion date. Extended adjudication
36 time frames may be requested from the CO on a case-by-case basis.

37 In the event the LBI identifies derogatory information, the
38 contractor's determination regarding the retention of an employee
39 shall be in writing and forwarded by the Warden to the CO with
40 copies of the information obtained in Steps 1 - 5, 12 and 15.
41 There may be occasions where derogatory information contained in
42 the employee's LBI is unacceptable as defined by the

13

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1  Acceptability Standards, but the contractor still desires to
2  retain the employee. In such cases, the contractor shall submit
3  a written request for waiver of the Acceptability Standards to
4  the CO which includes the details and circumstances surrounding
5  the employee's behavior and the reason(s) why the employee should
6  be retained.

7  The BOP will be the final approval authority for all contractor
8  staff who work with Federal inmates under the terms of this
9  contract. No individual who is under supervision or jurisdiction
10  of any parole, probation or correctional authority shall be
11  employed under this contract. Persons with previous misdemeanor
12  criminal convictions or a felony conviction, who are not under
13  supervision, may be considered for employment; however, the BOP
14  shall be the approval authority in all such cases. The BOP may
15  give consideration to such factors as criminal history, time
16  elapsed since conviction(s) and subsequent adjustment in the
17  community.

18  The contractor shall ensure all employees are reinvestigated
19  periodically, as prescribed in the Scope and Coverage of a
20  Periodic Reinvestigation in Section J, Attachment 8 of the
21  contract. Employees will be required to complete required
    investigative forms and fingerprint cards for submission to the
    BOP. The BOP will initiate the National Agency Check, which
24  includes the name and fingerprint checks. Upon receipt, review,
25  and resolution of any derogatory information contained in the
26  reinvestigation report, the Warden shall forward to the CO a
27  written determination regarding the employee's continued
28  employment under this contract. A copy of the reinvestigation
29  report shall be attached to the Warden's written request.

30  Should the institution staff turnover rate exceed an acceptable
31  level, as determined by the CO, or repetitive NCIC/NLETS or
32  fingerprint checks are necessary due to contractor error, the
33  actual cost of processing the NCIC/NLETS, name and fingerprint
34  checks shall be withheld from amounts due the contractor.

35  The contractor shall ensure all employment practices are in
36  compliance with U.S. Department of Labor requirements in addition
37  to applicable state and local requirements.

38  In the absence of a collective bargaining agreement, the
39  contractor shall enter into a written employment agreement with

14

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1  each employee assigned to work within the institution.  This
2  agreement shall provide that, in recognition of the public safety
3  requirements for uninterrupted services in the institution and in
4  return for adequate consideration, including an employee
5  grievance procedure, the employee agrees not to strike or
6  otherwise interrupt normal operations at the institution without
7  giving 10 days advance written notice.

8  The contractor shall ensure that a contingency plan covering work
9  actions or strikes is included as a part of its Personnel Policy
10 Manual.

11 In the event the contractor negotiates collective bargaining
12 agreements applicable to the work force under the contract, the
13 contractor shall use its best efforts to ensure such agreements
14 contain provisions designed to assure continuity of services.
15 All such agreements entered into during the contract period of
16 performance should provide that grievances and disputes involving
17 the interpretation or application of the agreement will be
18 settled without resorting to strike, lockout or other
19 interruption of normal operations.

    For this purpose, each collective bargaining agreement should
    provide an effective grievance procedure with arbitration as its
1
22 final step, unless the parties mutually agree upon some other
23 method of assuring continuity of operations.  As part of such
24 agreements, management and labor should agree to cooperate fully
25 with the Federal Mediation and Conciliation Service.  The
26 contractor shall include the substance of this requirement in any
27 subcontracts for protective services.

28 All personnel files shall be available to the CO upon request.
29 Personnel files (e.g., background checks, verification of
30 training, experience, and professional credentials) shall be kept
31 current and maintained for the duration of the contract.

32 Personnel requirements of this contract shall apply to all
33 on-site subcontractor personnel and volunteers.

34 The following essential personnel and respective minimum
35 qualification requirements are considered critical for
36 performance of this contract.

15

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1  Project Coordinator - Knowledge and experience within the
2  last five years in planning and executing large, complex,
3  projects similar in nature to the requirements of this
4  contract.

5  Warden(s) - Knowledge of program objectives, policies,
6  procedures and requirements for managing a secure
7  correctional facility. A minimum of 10 years experience in
8  corrections or related field with experience in the
9  management of a correctional facility at the Associate
10 Warden level or above.

11 Associate Warden(s) - Knowledge of program objectives,
12 policies, procedures and requirements for managing a
13 correctional facility. A minimum of 10 years experience in
14 corrections or related field with experience in the field of
15 corrections at the level of mid-management.

16 Within 15 days of contract award, the contractor shall submit a
17 written request to the CO for conditional employment approval of
18 the Project Coordinator. Within 180 days of contract award, the
19 contractor shall submit a written request to the CO for
   conditional employment approval of the Warden(s) and Associate
   Warden(s).

22 The essential personnel listed below are commonly referred to as
23 department heads. Minimum qualification requirements for the
24 following essential personnel are: knowledge of program
25 objectives, policies, procedures and duties specific to the
26 position; a minimum of five years of supervisory/management
27 experience in a field directly related to the specific duties of
28 the position.

29
30      Case Management Coordinator
31      Chief Correctional Supervisor
32      Administrator, Religious Services
33      Correctional Shift Supervisors
34      Computer Services Manager
35      Facility Manager/Administrator
36      Food Service Administrator
37      Inmate Systems/Records Office Manager
38      Medical Services Administrator
39      Quality Control Specialist

16

●                              ●

1          Safety/Environmental Specialist

2      The Administrator, Religious Services shall be certified by the
3      American Correctional Chaplains Association (ACCA) or meet
4      certification standards established by ACCA.

5      Daily correctional staff assignment rosters which reflect both
6      scheduled and actual assignments, by shift and for each post,
7      shall be maintained.

8      The number and type of staff described in the contractor's
9      staffing plan accepted in the resulting contract shall be
10     maintained as the minimally acceptable staff compliment
11     throughout the term of the contract.  Any and all requests to
12     reduce staffing levels or staff utilization shall be submitted in
13     writing to the CO for approval prior to implementation.

14     F.  Training and Staff Development

15     Upon the contractor's written request to the CO, the Government
16     will provide the following initial specialized training at the
17     contractor's facility, on a one-time basis, at no cost to the
       contractor:

19     1.  Records Office Training (Records Office Staff)
20         a.  Movement Coordination Training - 8 hours
21         b.  Maintenance, Retirement and Disposal of Inmate Files -
22             8 hours

23     2.  Correctional Programs (Affected Staff)
24         a.  Case Management/Central Inmate Monitoring - 40 hours
25         b.  Disciplinary Procedures - 24 hours
26         c.  Disciplinary Hearing Officer Training - 80 hours
27             (mandatory, as described in Section J of the SOW)

28     3.  Other
29         a.  SENTRY Training - Inmate Systems; Education;
30             Correctional Services; Financial Management;
31             Correctional Programs, Health Services; Other staff -
32             (40 hours)

17

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1       b.   Human Resource Management (24 hours) - For contractor's
2          human resource management staff. To include background
3          investigation issues.

4       c.   Self-Study Courses
5          1.   Judgment and Commitment File Training
6          2.   Detainer/Writs/Interstate Agreement on Detainers
7             Training
8          3.   SENTRY General Use Technical Reference Manual
9          4.   Receiving and Discharge Training
10         5.   Inmate Funds Management Training
11         6.   Mail Management Training
12         7.   Population Accountability Training
13         8.   New Mail Room Officer's Self Study Course and
14            Survival Skills Training
15         9.   New Receiving and Discharge Officer's Self Study
16            Course and Survival Skills Training
17        10.   Central Inmate Monitoring Certification
18            Correspondence Course

19   The contractor may request, at its expense, additional training
20   to supplement the initial BOP provided training.

21   The contractor shall develop and implement a comprehensive staff
22   training program addressing the institution's sexual
23   abuse/assault prevention and intervention program. Written
24   policy, procedure, and practice shall provide that all staff
25   receive such training prior to entry on duty and on an annual
26   basis as part of the institution's in-service training plan.
27   Pre-service and in-service training shall be augmented with
28   specialized training for appropriate staff (e.g., case managers,
29   counselors, psychology services, chaplaincy, correctional
30   officers, investigatory officials, health/mental health care,
31   etc.)

32

33   The contractor shall provide disturbance control training to the
34   appropriate staff. Certified disturbance control instructors
35   shall be used to conduct training in disturbance control
36   procedures. Certification shall be from a CO-approved Federal,
37   state or county training academy or program. The use and
38   carrying of weapons for training shall meet all Federal, state
39   and local laws and regulations.

18

1  G.  Case Records

2  All inmate files (e.g., central files, medical files and judgment
3  and commitment files) are to be prepared, maintained, retired and
4  disposed of in accordance with the BOP format.  Policy and
5  procedures shall be developed to ensure the confidentiality and
6  security of all inmate files (e.g., judgment and commitment
7  files, central files, U.S. Parole Commission mini-files) in
8  accordance with P.S. 5800.07, Inmate Systems Management Manual,
9  P.S. 5800.11, Central File, Privacy Folder and Parole Mini-Files)
10  and in accordance with all applicable Federal provisions (e.g., 5
11  U.S.C. 552 and 552a).

12  The contractor shall interact with other agencies to satisfy
13  outstanding inmate obligations including, but not limited to:  1)
14  processing of Federal and state writs; 2) administration of the
15  Interstate Agreement on detainers; 3) detainer inquiries; 4)
16  lodging and removal of detainers; and 5) coordination of
17  transfer/inmate movement in and out of the institution in
18  accordance with P.S. 5800.07, Inmate Systems Management Manual,
19  Chapter 8; P.S. 5130.05, Detainers and the Interstate Agreement
20  on Detainers; P.S. 5875.08, Transfers of Inmates to State Agents
21  for Production on State Writs; and, P.S. 5800.08, Receiving and
   Discharge Manual.

23  The contractor shall: 1) maintain inmate judgment and commitment
24  files; 2) maintain file accountability and security; 3) respond
25  to inmate inquiries; 4) respond to outside requests for
26  information; 5) verify release methods and dates prior to an
27  inmate's release; and other related functions.

28  The contractor shall comply with the Privacy Act of 1974,
29  (5 U.S.C. 552a) and 28 CFR, Parts 16 and 513.

30  No inmate shall be admitted to, or released from, institution
31  custody without prior BOP approval.

32  H.  Information Systems and Research

33  The BOP's Information System environment includes mainframe,
34  local area network (LAN) and wide area network (WAN) components.

35  The BOP's mainframe software environment exists in an internally-

1   developed application named SENTRY which is used to support
2   institution operations.  The contractor shall provide and
3   maintain hardware and software to access SENTRY, in the manner
4   referenced in this SOW, to operate the institution.

5   The technical hardware environment in which computer services are
6   to be performed consists of IBM-compatible Personal Computers
7   (PCS) operating on a LAN.  In addition to providing for the
8   inter-connection of PC workstations, the LAN also provides
9   connections to a BOP centralized gateway which connects to an
10  IBM-compatible mainframe computer located in a DOJ data center.

11  All network operating system hardware not furnished by the
12  Government must remain compatible with BOP equipment throughout
13  the life of the contract.

14  Contractor provided hardware and software necessary to
15  participate in the BOP's information system environment is
16  provided at Section J, Attachment 15.

17  All network operating system software, applications software and
18  configurations not furnished by the Government shall be the same
    release, version and configuration currently specified by the CO
    throughout the life of the contract.. The contractor shall adhere
21  to P.S. 1237.10, Network Standards and its associated Technical
22  Reference Manual (TRM).

23  The contractor shall ensure that the inmate "automated system of
24  records" is compatible with standard BOP facility and operational
25  requirements.

26  Examples of the procedures for which the contractor shall use
27  SENTRY include, but are not limited to: admissions and releases;
28  inmate counts; medical data; inmate classification and
29  programming; education data; discipline data; the victim/witness
30  program; and, as directed by the BOP, sentence computations
31  including good time and United States Parole Commission actions.
32  The contractor has the option to use SENTRY for any other
33  procedures as approved by the CO.

34  The contractor shall adhere to P.S. 1237.11, Information Security
35  Programs which governs such areas as: security for and access to
36  sensitive information and systems; minimum personnel security
37  pre-requisites for computer system users and administrators; and

20

E X H I B I T   C-1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| KEITH MATHIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-cv-01155-RMU |
| | ) | |
| GEO GROUP, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

DECLARATION OF AMBER MARTIN

I, Amber Martin, under penalty of perjury, hereby declare as follows:

1.    I am over 18 years of age, competent to testify, and give this declaration of my own personal knowledge for use in the above captioned matter.

2.    I am employed as a Vice President – Contract Administration by The GEO Group, Inc.

3.    As Vice President – Contract Administration I am responsible for contract administration including negotiations, drafting, and compliance.

4.    On February 22, 2000, Wayne H. Calabrese, the President of Wackenhut Corrections Corporation ("WCC"), now The GEO Group, Inc. ("GEO"), executed contract number PCc-005 ("Rivers Contract") on behalf of WCC. Mr. Calabrese executed the contract at WCC's corporate headquarters in Palm Beach Gardens, Florida. The contract was then returned to the Federal Bureau of Prisons in Washington, D.C..

E X H I B I T   C-2

Case 1:07-cv-01664-JDB   Document 12-2   Filed 12/03/2007   Page 33 of 38

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KEITH MATHIS, et al.,          )
                               )
              Plaintiffs,      )
                               )
v.                             )    Case No. 1:07-cv-01155-RMU
                               )
GEO GROUP, INC., et al.,       )
                               )
              Defendants.      )
                               )

## DECLARATION OF LOUIS CARRILLO

I, Louis Carrillo, under penalty of perjury, hereby declare as follows:

1.    I am over 18 years of age, competent to testify, and give this declaration of my own personal knowledge for use in the above captioned matter.

2.    I am employed as Vice President Corporate Counsel by The GEO Group, Inc. ("GEO").

3.    GEO does not maintain a business presence in Washington, D.C.  GEO does not maintain a physical office in Washington, D.C..

4.    When necessary, representatives of GEO will travel to Washington, D.C. to meet with members of Congress and representatives of administrative agencies to discuss issues relevant to GEO.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ____8·20·07____

_____
Louis Carrillo

**E X H I B I T   C-3**

# JUDGES
# OF THE
# UNITED STATES
# DISTRICT COURTS

## With Date of Appointment

---

## DISTRICT OF COLUMBIA CIRCUIT
### DISTRICT JUDGES

Thomas F. Hogan, C.J. ................10-4-82........................Washington
Royce C. Lamberth ...................11-16-87.......................Washington
Paul L. Friedman ......................6-16-94........................Washington
Ricardo M. Urbina .....................6-16-94........................Washington
Emmet G. Sullivan .....................6-16-94........................Washington
James Robertson ......................10-11-94.......................Washington
Colleen Kollar–Kotelly ................5-12-97........................Washington
Henry H. Kennedy, Jr. ................10-20-97.......................Washington
Richard W. Roberts ...................7-31-98........................Washington
Ellen Segal Huvelle ...................1-12-00.........................Washington
Reggie B. Walton ......................10-29-01.......................Washington
John D. Bates .........................12-20-01.......................Washington
Richard J. Leon .......................3-20-02........................Washington
Rosemary M. Collyer ..................1-2-03.........................Washington

### SENIOR DISTRICT JUDGES

Louis F. Oberdorfer ...................11-1-77........................Washington
Gladys Kessler ........................6-16-94........................Washington

## FIRST CIRCUIT
### DISTRICT JUDGES

George Z. Singal, C.J. ..............7-17-00.....Me..........................Portland
D. Brock Hornby .................4-30-90.....Me..........................Portland
John A. Woodcock, Jr. ...........6-27-03.....Me...........................Bangor
Mark L. Wolf, C.J. ...............4-4-85.....Mass..........................Boston
Joseph L. Tauro .................10-17-72.....Mass..........................Boston
Rya W. Zobel ....................3-23-79.....Mass..........................Boston
William G. Young ................4-4-85.....Mass..........................Boston
Douglas P. Woodlock .............6-16-86.....Mass..........................Boston
Nathaniel M. Gorton .............9-24-92.....Mass..........................Boston
Patti B. Saris ...................11-24-93.....Mass..........................Boston
Richard G. Stearns ..............11-24-93.....Mass..........................Boston
Reginald C. Lindsay .............11-24-93.....Mass..........................Boston
Nancy Gertner ...................2-14-94.....Mass..........................Boston
Michael A. Ponsor ...............2-14-94.....Mass.......................Springfield
George A. O'Toole ...............7-10-95.....Mass..........................Boston

VII

## JUDGES OF THE COURTS

| | | | |
|---|---|---|---|
| Dickinson R. Debevoise | 11-2-79 | | Newark, N.J. |
| Harold A. Ackerman | 11-2-79 | | Newark, N.J. |
| Anne E. Thompson | 11-2-79 | | Trenton, N.J. |
| Alan N. Bloch | 11-2-79 | | Pittsburgh, Pa. |
| William W. Caldwell | 4-27-82 | | Harrisburg, Pa. |
| Thomas N. O'Neill, Jr. | 8-5-83 | | Philadelphia, Pa. |
| Marvin Katz | 8-26-83 | | Philadelphia, Pa. |
| Joseph J. Longobardi | 5-3-84 | | Wilmington, Del. |
| Joseph H. Rodriguez | 5-10-85 | | Camden, N.J. |
| Edmund V. Ludwig | 10-17-85 | | Philadelphia, Pa. |
| Edwin M. Kosik | 6-16-86 | | Scranton, Pa. |
| Robert F. Kelly | 7-17-87 | | Philadelphia, Pa. |
| William L. Standish | 11-6-87 | | Pittsburgh, Pa. |
| Alfred M. Wolin | 12-9-87 | | Newark, N.J. |
| Lowell A. Reed, Jr. | 5-6-88 | | Philadelphia, Pa. |
| Jan E. DuBois | 9-6-88 | | Philadelphia, Pa. |
| James Focht McClure, Jr. | 4-30-90 | | Williamsport, Pa. |
| William H. Yohn, Jr. | 9-23-91 | | Philadelphia, Pa. |
| Joseph E. Irenas | 4-13-92 | | Camden, N.J. |
| William H. Walls | 10-11-94 | | Newark, N.J. |

# FOURTH CIRCUIT
## DISTRICT JUDGES

| | | | |
|---|---|---|---|
| Benson Everett Legg, C.J. | 9-16-91 | Md. | Baltimore |
| J. Frederick Motz | 7-12-85 | Md. | Baltimore |
| Peter J. Messitte | 10-20-93 | Md. | Baltimore |
| Deborah K. Chasanow | 10-20-93 | Md. | Greenbelt |
| Alexander Williams, Jr. | 9-2-94 | Md. | Greenbelt |
| Catherine C. Blake | 8-14-95 | Md. | Greenbelt |
| Andre M. Davis | 8-14-95 | Md. | Baltimore |
| William D. Quarles | 3-24-03 | Md. | Baltimore |
| Richard D. Bennett | 4-29-03 | Md. | Baltimore |
| Roger W. Titus | 11-17-03 | Md. | Baltimore |
| Louise W. Flanagan, C.J. | 7-21-03 | E.D.N.C. | Greenbelt |
| Terrence William Boyle | 5-3-84 | E.D.N.C. | New Bern |
| James C. Dever, III | 5-2-05 | E.D.N.C. | Elizabeth City |
| James A. Beaty, Jr., C.J. | 10-11-94 | M.D.N.C. | Raleigh |
| N. Carlton Tilley, Jr. | 10-17-88 | M.D.N.C. | Winston–Salem |
| William l. Osteen, Jr. | 9-19-07 | M.D.N.C. | Greensboro |
| Robert James Conrad, Jr., C.J. | 6-2-05 | M.D.N.C. | Greensboro |
| Richard L. Voorhees | 10-17-88 | W.D.N.C. | Charlotte |
| Lacy H. Thornburg | 3-17-95 | W.D.N.C. | Statesville |
| Frank D. Whitney | 7-5-06 | W.D.N.C. | Asheville |
| Martin K. Reidinger | 9-12-07 | W.D.N.C. | Charlotte |
| David C. Norton, C.J. | 7-12-90 | S.C. | Asheville |
| C. Weston Houck | 9-26-79 | S.C. | Charleston |
| George Ross Anderson, Jr. | 5-23-80 | S.C. | Charleston |
| Joseph F. Anderson, Jr. | 10-14-86 | S.C. | Columbia |
| Henry M. Herlong, Jr. | 5-14-91 | S.C. | Columbia |
| Cameron McGowan Currie | 3-11-94 | S.C. | Greenville |
| Patrick Michael Duffy | 12-26-95 | S.C. | Columbia |
| Terry L. Wooten | 12-3-01 | S.C. | Charleston |
| Margaret B. Seymour | 10-30-98 | S.C. | Charleston |
| | | | Florence |

Henry F. Floyd
R. Bryan Harwell
James R. Spencer
Rebecca Beach
Leonie M. Brin
Raymond Alvin
Jerome B. Friedman
Gerald Bruce Lee
Dennis W. Dohnal
Henry E. Hudson
Walter D. Kelley
Liam O'Grady
James P. Jones
Samuel Grayson
Norman K. Moon
Glen E. Conrad
Irene M. Keeley
John Preston Bailey
Joseph R. Goodwin
John T. Copenhaver
David A. Faber
Robert C. Chambers
Thomas E. Johnston

Robert Earl Maxwell
Solomon Blatt
Albert V. Bryan
James C. Turk
Glen M. Williams
Matthew J. Perry
W. Earl Britt
Richard L. Williams
James C. Cacheris
Robert G. Doumar
Jackson L. Kiser
James C. Fox
Claude M. Hilton
Frederic Nelson
Thomas Selby
Malcolm J. Howard
Marvin J. Garbis
William M. Nickerson
Frederick P. Stamp
Graham Calder
Henry Coke Morgan
Robert E. Payne

Helen G. Berrigan
Martin L. C. Feldman

E X H I B I T   C-4

court excludes from consideration meetings with governmental officials in the District of Columbia, and the signing of the bi-lateral agreement on uranium. However, the alleged meetings at the Republic of Kazakhstan Embassy will be considered."); *Dooley*, 786 F. Supp. at 75 & n.9 ("In addition, many of the individual defendants' contacts with the District do not fall under the government contacts exception because they involve meetings either with Ambassador Bandar, defendant Basil, or with the British Embassy or Chancery."). In this case, there are no allegations that Plaintiffs' alleged injuries arose out of meetings held by GEO with foreign representatives or conducted meetings at foreign embassies. Thus, these cases are irrelevant to the matter currently before the court.

Similarly, *Ramamurti v. Rolls-Royce, Ltd.*, 454 F. Supp. 407 (D.D.C. 1978), is inapplicable to the analysis of this matter. In *Ramamurti*, the District Court's determination of the applicability of the government contacts exception was based upon "the government acting in a proprietary, rather than governmental capacity." *Id.* at 412. *See Hughes v. A.H. Robins Co.*, 6190 A.2d 1140, 1150 n.17 (D.C. 1985). As Rolls-Royce's "contacts with federal agencies [did not] touch uniquely governmental functions of the United States" the governmental contacts exception did not apply to those contacts. *Id.* However, in this case, GEO's contacts with a federal agency touch a uniquely government function: the housing of prisoners. *District of Columbia v. Totten*, 5 F.2d 374, 376 (D.C. Cir. 1925) ("Unquestionably the authorities agree that the conduct of a prison for the retention of criminals who prey upon society generally is the performance of a governmental function, in which the public generally is concerned, and in which the police power of the state is exercised."). Thus, *Ramamurti* does not control in this matter.