UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FREDERICK HINES,                    :
                                    :
        Plaintiff (Pro Se)          :
                                    :
                                    :
                                    :
        v.                          :
                                    :
                                    :
                                    :
GEO GROUP, INC., UNITED STATES      :
OF AMERICA, through its             :
department, the FEDERAL BUREAU      :
OF PRISONS, and HARLEY LAPPIN,      : Civil Action No. 07-1664(JDB)
in his official capacity as         :
Director of the Federal             :
Bureau of Prisons,                  :
                                    :
        Defendants.                 :
                                    :
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . :

### PLAINTIFF'S MOTION IN OPPOSITION TO FEDERAL DEFENDANT'S MOTION TO DISMISS, AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND AFFIDAVIT IN SUPPORT

**PLEASE TAKE NOTICE,** that plaintiff, Frederick Hines, pro se, hereby files his "Opposition" to the "Federal Defendants Motion To Dismiss," and moves pursuant to Rule 56 of the Federal Rules of Civil Procedure, for "Summary Judgment" to be entered in his favor, and attaches his affidavit in support thereof.

Plaintiff has sued the GEO Group, Inc. ("GEO"), the United States of America, through its department, the Federal Bureau of Prisons ("BOP"), and BOP Director, Harley, Lappin, for failing to provide plaintiff with adequate health care at the Rivers Correctional Institution in Winton, North Carolina. Defendant Federal Bureau of Prisons is responsible for the "custody,

care, subsistence, education, treatment and training of all
D.C. Code offenders. See D.C. Code § 24-101(b). Incorporated
in these responsiblities mandated in D.C. Code § 24-101(b)
is the responsibility of the Federal Bureau of Prisons to make
certain that plaintiff is provided with adequate "health care,"
something the federal defendants have failed to provide
plainitiff currently with. Although the federal defendants
have contracted with defendant GEO to house plaintiff, this
does not relieve it of its responsibility to provide adequate
"health care" to plaintiff. There is nothing in the
"Revitalization Act, Pub. L. No. 105-33, § 11201, 111 Stat.
712, 734-37, that states that Congress relieved the Federal
Bureau of Prisons from this responsibility. Pursuant to the
contract entered into agreement by defendants GEO and Federal
Bureau of Prisons, on page 33, it sets the standard that
defendant GEO is to follow, by stating:

> The provision of medical services commensurate to the
> level of care available in the community is an essential
> component of successful performance under the contract.
> The contractor is referred to the following list of P.S.'s
> and TRM's as guides to the BOP's standard of health care
> delivery:

| P.S. 6000.05 | "Health Services Manual (HSM)" |
|---|---|
| P.S. 6010.01 | "Psychiatric Treatment and Medication, Administration Safeguards For" |
| P.S. 6080.01 | "Autopsies, Authority to Order" |
| P.S. 6100.01 | "Health Promotion and Disease Prevention for Inmates" |
| P.S. 6190.02 | "Infectious Disease Management" |
| TRM  011-01 | "Pharmacy Technical Reference Manual" |
| TRM  008.02 | "Sentry Medical SMD/MDS Technical Reference Manual" |
| P.S. 5310.12 | "Psychology Services Manual" |
| P.S. 5324.03 | "Suicide Prevention Program Statement" |

P.S.  5310.13    "Management of Mentally Ill Inmates"
P.S.  5324.04    "Sexual Assault Prevention/Intervention
                  Program"

Plaintiff asserts that although the contract requires defendant GEO to comply with defendant Bureau of Prisons Health care policies, defendant GEO has yet to comply with the strictness setforth in the above listed policies, and the federal defendants have failed to make defendant GEO comply with these BOP policies, even though section G.1 of the contract (See Plaintiff's Exhibit D) states that the "Contracting Officer's Representative is responsible for **the technical direction of the performance of all work under this contract."** Stated in Section G.1(b) the following definition is given for the term "technical direction:"

1. **Directions to the contractor which re-direct the contract effort, shift work emphasis between areas or tasks, require pursuit of certain lines of inquiry, fill in details or otherwise serve to accomplish the contractual scope of work.**

2. **Supply information to the Contractor which assists in the interpretation of technical portions of the Statement of Work.**

3. **Review, inspect, and accept reports and information to be provided by the Contractor to the Government under the contract.**

4. **Evaluate the performance and certify all invoices for payment.**

The Federal defendants have admitted on page 5 of their response that defendant GEO is to comply with and provide a standard of health care delivery that is "commensurate to the level of care available in the community," in accord with

-3-

various BOP directives and manuals, but the federal defendants
have failed to enforce and make defendant GEO comply with
the terms of the contract as the contract directs the federal
defendants.  On page 25, ¶3 of the contract it states:

> The BOP anticipates a nominal number of BOP staff will
> be on-site to monitor contract performance and manage
> other BOP interests associated with operation of the
> private facility.

Plaintiff asserts that the federal defendants are responsible
for enforcing this contract and all of the terms therein, which
involve providing "a standard of health care delivery that
is commensurate to the level of care available in the community."
The Federal defendants have failed miserably in enforcing
terms of "health care delivery that is commensurate with the
community."  The federal defendants have admittedd and conceded
in their reply on pages 4, 5, and 6 that defendant GEO is not
in compliance with the terms of the contract in providing
plaintiff with "the standard of health care delivery that is
commensurate to the level of care available in the community.
The federal defendants have taken a "blind eye" to the vio-
lation of the terms of the contract that mandates that
defendant GEO provide "a standard of health care deliver that
is commensurate to the level of care available in the community.
The federal defendants have three (3) on-site representatives
at Rivers Correctional Institution and none of these representatives
have made defendant GEO employees at Rivers comply with the
agreed upon contract between the Bureau of Prisons and GEO,
therefore, the federal defendants have failed to uphold their

responsibilities as outlined in the "Revitalization Act, Pub. L. No. 105-33, § 11201, 111 Stat. 712, 734-37, D.C. Code § 24-101(b), that Congress mandated to the federal defendants to perform. See <u>Crawford</u> v. <u>Jackson</u>, 323 F.3d 123 (D.C. Cir. 2003). Based on the "Revitalization Act, and D.C. Code § 24-101(b), the federal defendants cannot claim that they are not responsible for providing the level of health care delivery that is commensurate with community standards to plaintiff, and to which both defendants GEO & Bureau of Prisons had agreed to provide to plaintiff.

## ARGUMENT

It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment. As the United States Supreme Court stated in <u>DeShaney</u> v. <u>Winnebago Dept. of Social Services</u>, 489 U.S. 189, 199-200 (1989):

> "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being . . . The rationale for this principle is simple enough: when the State by the affaffirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs--e.g., it transgresses the substantive limits on state action set by the Eighth Amendment. . ."

Contemporary standards of decency require no less. <u>Estelle</u> v. <u>Gamble</u>, 429 U.S. at 103.

Plaintiff alleges that the defendants have denied him any medical treatment for his "lung cancer," any form of physical therapy" which will help improve plaintiff's medical condition from the "stroke" that plaintiff suffered in 2002; nor have the defendants been forth-coming in making any medical decisions regarding plaintiff's many medical ailments. Defendants inactions towards plaintiff's medcial condition constitutes a "deliberate indifference" based on the fact that the defendants have sufficient evidence and documentation which has alerted them and made them aware of plaintiff's serious medical needs, and the substantial risk to plaintiff's future health if his medical condition is not addressed immediately to avoid further complication and deterioration; but for the defendants to do absolutely nothing medically sound to help abate the seriousness of plaintiff's serious medical and life threatening condition, is the equivalent of recklessly disregarding that risk and a violation of the Eighth Amendment to the constitution.

The constitution "does not mandate comfortable prisons, Rhodes v. Chapman, 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981), but neither does it permit inhumane ones, and it is now settled that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment. Helling v. McKinney, 509 U.S. 25, 113 S.Ct. 2475. In its prohibition

-6-

of "cruel and unusual punishments," the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners.

With deliberate indifference lying somewhere between the poles of neglience at one end and purpose or knowledge at the other, the U.S. Courts of Appeals have routinely equated deliberate indifference with recklessness.  See, e.g., LaMarca v. Turner, 995 F.2d 1526, 1535 (CA11 1993); Manarite v. Springfield, (CA1 1992); Redman v. County of San Diego, 942 F.2d 1435, 1443 (CA9 1991); McGill v. Duckworth, 944 F.2d at 347; Miltier v. Beorn, 896 F.2d 848, 851-852 (CA4 1990).  It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.  The civil law generally calls a person reckless who acts (IF THE PERSON HAS A DUTY TO ACT) fails to act in the face of an unjustifiably high risk of marm that is either known or so obvious that it known.  See Proser and Keeton § 34, pp. 213-214; Restatement (Second) of Torts § 500 (1965).  Deliberate indifference describes a state of mind  more blameworthy than negligence.  Deliberate indifference entails something more than mere negligence, the cases are also clear that omissions for the very purpose of causing harm or with knowledge that harm with result.

Plaintiff asserts that defendant GEO's deliberate

-7-

indifference stems from the fact that as a private corporation, they seek to maximize profits, they have acted in part, out of a desire to maintain the profitability of the corporation for the company shareholders; if spending money for surgeries, medicaiton, etc., puts a dent into profits, then, defendant GEO will not authorize spending the money to save a life. Accordingly, private corporations running correctional facilities have a greater incentive to cut costs by infringing upon the constitutional rights of prisoners in order to ensure the profitabiity of the enterprise.

Plaintiff asserts that defendant GEO is maximizing their profitability by their deliberate indifference in not giving plaintiff **"physical therapy;"** allowing plaintiff to see a **"Podiatrist;"** in denying Dr. Stewart of Roanoke Chowan Hospital to perform a **"biopsy"** to determine just how far plaintiff's **"lung cancer" has spread; not giving plaintiff any medication for his lung cancer,"** knowing perfectly well, if the cancer is not treated in the early stages it has been detected, by giving plaintiff **"curative treatment"** which attempts to terminate or slow the cancerous growth from spreading with either a combination of surgery, radiation therapy, chemotherapy, and possibly hormone therapy or immunotherapy, plaintiff's chances of survival are slim to none. Defendant GEO refuses to give plaintiff a good pair of "orthopedic shoes."

The federal defendants have been deliberate indifference to plaintiff's medical condition because they are aware of

defendant GEO's constitutionally deficient "health care delivery" which is being provided to plaintiff does not comply with the terms of the contract as setforth on page 32 thru 36, which outline the guides to the BOP's standards of health care delivery which is an "essential component of successful performance under the contract, and the federal defendants have done nothing to correct these "health care delivery" deficiencies.

The federal defendants are attempting to separate themselves from what they know to be atrocious acts by defendant GEO by claiming in their response on page 18, ¶2, that:

> "Plaintiff cannot state a viable Eighth Amendment claim against federal defendants simply by virtue of the fact that the BOP has complied with D.C. law, as enacted by Congress, requiring the use of private contract facilities to house a certain number of D.C. inmates, nor that the BOP granted a contract to GEO Group to conduct this activity.  Nor can plaintiff plausibly allege that the contract between the BOP and Group, which places obligations on GEO Group with respect to its provision of health services to inmates, qualifies as a BOP policy or custom that might have caused GEO Group's failure to provide adequate health care."

This statement is an admission by the federal defendants that defendant GEO Group has failed to provide adequate health care to plaintiff, but contrary to what the federal defendants state that they have complied with D.C. law, they haven't, because D.C. Code § 24-101(b) states that the BOP, not the GEO Group is responsible for plaintiff's care, subsistence, etc., and on pages 32 thru 36 (See Plaintiff's Exhibit C) of the contract, it set-forths BOP guidelines for "health care delivery," and on page

-9-

25, line 18 of the contract states the following:

> "The BOP anticipates a nominal number of BOP staff will
> be on-site to monitor contract performance and manage
> other BOP interests associated with operation of the
> private facility."

This portion of the  contract leaves no doubt that the federal
defendants were responsible for enforcing defendant GEO into
compliance with the contract in delivering "health care services"
that were commensurate to the level of care available in the
community.  Based on the portion of the contract stated on page
25, line 18, the federal defendants cannot state that they
were not and are not responsible for the actions of defendant
GEO in not providing plaintiff with adequate "health care,"
especially since the federal defendants were well aware of
the deficient "health care" being provided by defendant GEO
employees at the Rivers Correctional Institution for over
five (5) years, but only took a "blind eye" to the problem
and did absolutely nothing to even attempt to bring defendant
GEO in compliance with the contract in providing adequate health
care , even though it was the federal defendants "Congressionally
mandated responsibility" pursuant to the "D.C. Revitalization
Act, and D.C. Code § 24-101(b) to step in and make defendant
GEO comply with the terms of the contract, which stated
the type of "health care delivery" that was expected to be
delivered to D.C. Code offenders such as plaintiff.

The Supreme Court has held that the government has an

-10-

obligation to provide medical treatment to prisoners and that
"deliberate indifference to the serious medical needs of
prisoners constitutes the unnecessary and wanton infliction
of pain proscribed by the Eight Amendment." Estelle v. Gamble,
429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).  Such
deliberate indifference may be manifest in the denial of, delay
of, or interference with needed medical care.  Id. at 104-05;
Rouse v. Plantier, 182 F.3d 192, 3d Cir. 1999).

Courts use the Eighth Amendment to scrutinize conditions
of a prisoner's confinement.  See Youngberg v. Romeo, 457 U.S.
307, 315-316, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)(noting that
it is cruel and unusual punishment to hold convicted criminals
[in] unsafe conditions.  In Helling v. McKinney, 509 U.S. 25,
113 s.Ct. 2475, 125 L.Ed.2d 22 (1993), the Supreme Court of
the United States concluded that an inmate can state a cause
of action under the Eighth Amendment for present injuries as
well as future damages resulting from exposure to **ETS. Helling**
509 U.S. at 33, 113 S.Ct. 2475 (declaring that "[i]t would
be odd to deny [relief] to inmates who plainly prove unsafe,
life-threatening conditions in their prison on the ground that
nothing yet had happened to them.)"; Estelle v. Gamble, 429
U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)(analyzing claims
of present harms for potential Eighth Amendment violations).
Thus, the eighth Amendment not only protects inmates suffering
from current unconstitutional prison conditions, but also

-11-

protects inmates against prison conditions which threaten to cause future health problems.

In regards to future injuries, an inmate "states a cause of action under the Eighth Amendment by alleging that [prison officials] have, with deliberate indifference, denied him medical treatment which poses an unreasonable risk of serious damage to his future health.

Similar to present injury claims, courts require inmates to prove both objective and subjective components to an "Eighth Amendment" violation. Under the objective component, an inmate must demonstrate that he has been denied medical treatment. Relevant to an objective determination to denial of medical treatment is the present circumstances surrounding plaintiff's incarceration, and whether the prison policy is **"administered"** in a way that will minimize the risk to [plaintiff] and make it impossible for him to prove that he has been denied medical treatment which presents an unreasonable risk to his health. Id., at 35-36, 113 S.Ct. 2475. In addition, courts "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk. The subjective component of the test requires courts to determine whether defendants were deliberately indifference to plaintiff's medical needs. Courts consider the facts surrounding the claims of indifference "in light of the prison authorities current

-12-

attitudes and conduct, which may have changed considerably since the filing of any given case. The subjective test is consistent with the principle that "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. <u>Pennsylvania</u> v. <u>West Virginia</u>, 262 U.S. 553, 43 S.Ct. 658. In a suit for prospective relief, the subjective factor, deliberate indifference, "should be determined in light of the prison authorities current attitudes.

Plaintiff asserts that defendant GEO is not in compliance with the contract which outlines the type of "health care delivery" that they are required to deliver, nor are they in compliance with all applicable laws which govern what form of "health care delivery" that should be afforded to plaintiff, and one of the reasons why defendant GEO is not in compliance with the contract, the constitution and the required "health care delivery" that is "commensurate to the level of care available in the community" is because the federal defendants have failed to enforce "contract compliance" on defendant GEO, and have violated themselves, the District of Columbia's Revitalization Act, Pub. L. No. 105-33, § 11201, 111 Stat. 712, 734-37 and D.C. Code § 24-101(b).

A prison official may be held liable under the "Eighth Amendment" for acting with deliberate indifference" to inmate health and safety only if he knows that the inmate faces a substantial risk of serious harm and disregards that risk

-13-

[as the herein named defendants have done in the present case]
by failing to take reasonable measures to abate it.  Prison
officials have a duty under the Eighth Amendment to provide
humane conditions of confinement, and in the present case,
the herein named defendants have failed miserably with providing
plaintiff with adequate medical treatment and care.  Johnson
v. Pearson, 316 F.Supp.2d 307 (E.D. Va. 2004).


II.  THE FEDERAL BUREAU OF PRISONS MAY BE HELD LIABLE FOR CAUSING
     A CONSTITUTIONAL DEPRIVATION THROUGH AN OFFICIALLY ADOPTED
     POLICY STATEMENT.

     Defendant Federal Bureau of Prisons may be held liable
for causing a "constitutional deprivation" through an officially
adopted "policy statement," Monell v. Department of Social
Services of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d
611 (1978) or through a custom or usage that, though never
formally approved through "official decisionmaking channels,
id. at 690-91, 98 S.Ct. at 2035-36, may nonetheless "be said
to represent offical policy."  Id. at 694, 98 s.Ct. at 2037-
38.  In either case, the essential requirement is that the
policy or custom be sanctioned by the "final policymaking
authority" in that area of the city's business.  See St. Louis
v. Praprotnik, 485 U.S. 112, 123, 108 S.ct. 915, 924, 99 L.Ed.2d
107 (1988)(plurality opinion) (citing Pembaur v. Cincinnati,
475 U.S. 469, 482-83 & n. 12, 106 S.Ct. 1292, 1299-1300 & n.
12, 89 L.Ed.2d 452 (1986).  Whether a particular official has
"final policy making authority" is a question of federal law.

-14-

Praprotnik, 485 U.S. at 123, 108 S.Ct. at 924; See D.C. Code
§ 24-101.  This occurs not only when a suborddinate casts a
decision in the form of a policy statement that the supervising
policymaker "expressly approve[s]," but also when the subordinate
makes a "series of decisions" that "manifested a 'custom or
usage' off which the supervisor must have been aware.  Id.,
at 130, 108 S.Ct. at 927.

   Applying these standards, there is no trouble concluding
that the 'policy for "health care delivery" was sanctioned
by the Director of the Federal Bureau of Prisons, and therefore,
represents a policy, custom, or usage attributable to the
federal government itself.  At all relevant times, the Director
of the Federal Bureau of Prisons was the Federal Bureau of
Prisons **"final policymaking authority."**  See Praprotnik, 485
U.S. at 123 (plurality opinion).  Under applicable regulations,
the Director was the "Chief Executive Officer," and as such
had "authority to plan and prescribe departmental policy,"
including the coordination, direction and control of all "health
care delivery policies, services and operations.  D.C. Code
§ 24-101(b).  Furthermore, he was empowered "to delegate
authority" to subordinates "in such a degree as in his . . .
judgment [was] necessary to establish and maintain efficiency
and good administration.

   Plaintiff asserts that the Federal Bureau of Prisons has

-15-

established a "health care policy" with defendant GEO that denies plaintiff "health care delivery" commensurate to the level of care available in the community that is contrary to the District of Columbia Revitalization Act, Pub. L. No. 105-33, § 11201, 111 Stat. 712, 734-37, and D.C. Code § 24-101(b).

The power of an administrative agency to administer a "Congressionally created right" necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress. In the area of the Federal Bureau of Prisons, the Director has long been empowered to promulgate the rules and policies which govern the everyday operations of the Bureau of Prisons. This agency power to make rules that affect substantial individuals rights and obligations carries with it the responsibility not not only to remain consistent with the governing legislation, Federal Maritime Comm'n v. Seatrain Lines, Inc., 411 U.S. 726 93 S.Ct. 1773 (1973), but also to employ procedures that conform to the law. See NLRB v. Wyman-Gordon Co.m 394 U.S. 759, 764 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969).

In O'Callaghan v. District of Columbia, 741 F.Supp. 273, the Court ruled that the District of Columbia may be sued for the intentional torts of its employees performing ministerial acts within the scope of their employment. DL v. District of Columbia, 450 F.Supp.2d 21 (D.D.C. 2006); Dellums v. Powell, 566 F.2d 216, 223 (D.D.C. 1977) cert. denied, 438 U.S. 916

-16-

)1978); <u>Wade</u> v. <u>District of Columbia</u>, 310 A.2d 857, 863 (D.D.C. 1973); <u>Best</u> v. <u>District of Columbia</u>, 743 F.supp. 44 (D.D.C. 1990).  The federal defendants have delegated to defendant GEO through the contract between both parties, a policy, and custom that constitutionally denies plaintiff adequate "health care delivery" as promulgated in the D.C. Revitalization Act, and D.C. Code § 24-101(b).  "[T]he word 'policy' generally implies a course of action consciously chosen from among various alternatives."  <u>Oklahoma City</u> v. <u>Tuttle</u>, 471 U.S. 808, 105 S.Ct. 2427 (1985).

In <u>Parratt</u> v. <u>Taylor</u>, 451 U.S. 527, the Supreme Court based its decision, in part, on the fact that: "the deprivation occurred as a result of the unauthorized failure of agents of the State to follow established state procedure."  <u>Parratt</u>, supra, 451 U.S. at 543.  Such occurrences have happened here in plaintiff's case, the defendants have failed to follow District of Columbia law as mandated to them by a "Congressional Act, the "D.C. Revitalization Act, Pub. L. No. 105-33, and D.C. Code § 24-101(b).  The federal defendants have failed to follow proper protocol in plaintiff's case, and thus violated plaintiff's constitutional rights pursuant to the Eighth Amendment to the U.S. Constitution.  The federal defendants were never relieved of their responsibilities to provide plaintiff with  adequate "health care" that is commensurate to the level of care available in the community.

-17-

The inadequate systems, policies, and practices that are condoned or affirmatively authorized by GEO are crafted and maintained in consultation with, and approved by, the Bureau of Prisons in the District of Columbia. The GEO contract expressly requires GEO to comply with District of Columbia law, [See GEO Contract, Statement of Work at 6 & 7] including all laws and regulations "governing the delivery of health care services." That contract also requires GEO to have written plans and procedures for medical, mental health, and dental services, and to submit those plans and procedures to the BOP in the District of Columbia for "review and concurrence" in order to facilitate the proper care and treatment of District of Columbia sentenced prisoners housed at Rivers Correctional Institution. [See GEO Contract, Statement of Works at 5-6, & 34].

The facts alleged in plaintiff's complaint, the deprivation of "health care services" was neither "random nor unauthorized" and, as such, the defendant, Federal Bureau of Prisons, through its officers, agents and employees was obligated to provide plaintiff with "adequate health care that was commensurate to the level of care in the community" in accordance with the "D.C. Revitalization Act, Pub. L. No. 105-33, and D.C. Code § 24-101(b), but the federal defendants have failed to provide plaintiff with this "congressionally mandated health care service" by establishing a "unconstitutional policy" with

-18-

defendant GEO, which denies plaintiff of his Eighth Amendment Right to the United States Constitution and applicable laws of the District of Columbia, pursuant to the "D.C. Revitalization Act, and D.C. Code § 24-101(b).

III.  THE BOP, THROUGH ITS CONTRACT WITH THE GEO GROUP, DOES EXERT "SUPERVISORY CONTROL AND SHARES IN THE PROFITS FROM RIVERS OPERATIONS SUFFICENT TO SUBJECT THE BOP TO BIVENS LIABILITY BASED ON THE SYMBIOTIC RELATIONSHIP TEST

A.  SYMBIOTIC RELATIONSHIP TEST

Plaintiff asserts that under the "Symbiotic Relationship Test," the acts ofa [private party] are attributable to the government only if the government "has so far insinuated itself into a position of interdependence with the [private party] that it must be recognized as a joint participant in the challenged activity . . . "Burton v. Wilmington Parking Authority, 365 U.S. 715, 725, 81 S.Ct. 856 (1961).  In essence, the test can be considered as a determination of whether the private entity is an "alter ego" of the government.  For example, in the present case, the "Symbiotic Relationship Test" between the defendants was established by the terms of the contract, where the federal defendnts share in the profits of defendant GEO.  See Statement of Work page 39, lines 27-41, where the following is stated:

"Any income received by the contractor from collect calls which is in excess of expenses incurred, to include refunds/ rebates from carriers, shall "OFFSET THE COST OF THIS CONTRACT."  The contractor shall provide the CO with copies of any contracts between the contractor and the inmate telephone system provider(s).  The contractor . . . . shall provide the CO with all documentation in support of any agreement that the contractor has . . . . . . .

-19-

regarding income, refunds, rebates and other monetary or nonmonetary reimbursements involving the inmate telephone system.  The contractor shall also provide the CO with copies of all invoices and other documentation of expenses incurred and income received in regards to the inmate telephone system with its monthly request for contract payment and apply the credit against the monthly payment.  The CO shall also have total access to all telephone operation records.

This portion of the contract shows that the federal defendant, Federal Bureau of Prisons gets **"all profits"** from any income received from "collect calls," and before the "Bureau of Prison's Contracting Officer" pays defendant GEO, they substract any profit that was received from collect calls that are in excess to expenses incurred.  Another example is found on pages 2-4 of the contract (See Plaintiff's Exhibit C) which gives an "Explanation of the Statement of Work Terms" and identifies what the responsibilities are for: (1) "Contracting Officer (CO); (2) "Contracting Officer's Representative (COR); and (3) "Contracting Officer's Technical Representative (COTR), and they are:

a. CO - Contracting Officer.  The Government employee, by virtue of a Contracting Officer's Warrant, empowered to negotiate, award, administer, cancel or terminate contracts on behalf of the United States Government.

b. COR - Contracting Officer's Representative.  The Government employee designated in writing by the CO authorized to perform certain limited functions on behalf of the CO.  The extent of COR responsibilities are outlined in Section G of the Contract and the COR Designation Letter, a copy of which will be provided to the contractor subsequent to contract award.

c. COTR - Contracting Officer's Technical Representative.  Government staff designated in writing by the CO who assist the COR in the performance of duties.  The extent of COTR responsibilities are delineated in

writing by the CO and will be provided to the contractor
subsequent to award.

d.  SENTRY – The BOP's on--line, real time data system
used primarily for maintaining information about Federal
inmates.  It contains information about sentencing,
work assignments, admission/release status and other
special assignments for monitoring inmate status.
The SENTRY system also includes property management
and other modules which address most aspects of
incarceration.

On pages 19 & 20, ¶H explains just how the BOP's SENTRY is

being used to exert control over defendant GEO.

H.  Information Systems and Research

The BOP's Information system environment includes
mainframe, local area network (LAN) and wide area
network (WAN) components.  The BOP's mainframe software
environment exists in an internally-developed applic-
ation named SENTRY which is used to support institution
operations.  The contractor shall provide and maintain
hardware and software to access SENTRY, in the manner
referenced in this SOW, to operate the institution.

The technical hardware environment in which computer
services are to be performed consists of IBM--compatible
Personal Computers (PCS) operating on a LAN.  In
addition to providing for the inter-connection of PC
workstations, the LAN also provides connections to
a BOP centralized gateway which connects to an IBM-
compatible mainframe computer located in a DOJ data
center.

All network operating system hardware not furnished
by the Government must remain compatible with BOP
equipment throughout the life of the contract.

Contractor provided hardware and software necessary
to participate in the BOP's information system enviro-
ment is provided at Section J, Attachment 15.

All network operating system software, applications
software and configuration currently specified by the
CO throughout the life of the contract.  The contractor
shall adhere to P.S. 1237.10, Network Standards and
it s associated Technical Reference Manual (TRM).

-21-

> The contractor shall ensure that the inmate "automated system of records" is compatible with standard BOP facility and operational requirements.
>
> Examples of the procedures for which the contractor shall use SENTRY include, but are not limited to: admissions and releases; inmate counts; medical data; inmate classification and programming; education data; discipline data; the victim/witness program; and, as directed by the BOP, sentence computations including good time and United States Parole Commission actions.

On page 21, line 23-25 of the contract, it states:

> The contractor is required to participate in any research task pursued by the BOP and shall gather and provide any information requested. Contractor participation is anticipated to be primarily in the area of gathering and submitting statistical information. Research data shall be provided to the Government through SENTRY and/or through the automated data entry facilities of the BOP's General Retrieval System (GRS) or other means as specified by the BOP. The BOP will provide software for the GRS.

Plaintiff asserts that this entire contract outlines just how far the federal defendants have insinuated themselves into the position of interdependence with defendant GEO, the [private party], that it must be recognized as a joint participant in the challenged activity, especially because the federal defendants share in the profits of GEO. GEO's everyday operation hinges upon the use of SENTRY, the BOP mainframe located in the District of Columbia and under the auspices of the Federal Bureau of Prisons. Thus, there does exist "interdependence" between the federal defendants and defendant GEO in this case. Accordingly, a "symbiotic relationship" exists for purposes of Lugar, which holds the federal defendants just as culpable for the wrongs inflicted against

-22-

plaintiff. Defendant GEO can do absolutely nothing before contacting the federal defendants to get their okay as is outlined in the terms of the contract. Hypothetically, they [GEO] cannot even **"sneeze"** without the federal defendants knowing about it and giving them authorization to do so! All of the Bureau of Prisons policy statements govern what GEO may or may not do regarding the treatment of the prisoners confined at Rivers Correctional Institution, and if the "Contracting Officer, or Contracting Officer's Representative wants to change any (See attachment G, page 1 of the contract) terms of the contract, have a GEO employee fired who works at the Rivers Correctional Institution, they may freely do so as long as it is done legally. The Contracting Officer or his representative need not obtain approval from GEO, for such actions regarding the terms of the contract, and because of this wide range of authority, the federal defendants are responsible for establishing an unconstitutional policy which has denied plaintiff adequate "HEALTH CARE SERVICES" that are commensurate to the level of care in the community. The federal defendants have failed to enforce the terms of the contract that comply with the "D.C. Revitalization Act, and D.C. Code § 24-101(b), which they were mandated by Congress to comply with. The sole wrongful conduct alleged in this Complaint relates to the acts of the named defendants, where there is an interdependence between the federal government and GEO.

-23-

IV.    **THIS ACTION SHOULD NOT BE TRANSFERRED TO THE EASTERN DISTRICT OF NORTH CAROLINA WHERE THE INTEREST OF JUSTICE WILL NOT BE SERVED, AND WHERE THE PUBLIC AND PRIVATE INTERESTS WEIGH HEAVILY IN FAVOR OF THIS ACTION REMAINING IN THE DISTRICT OF COLUMBIA.**

Plaintiff asserts that in the "interest of justice," and because the public and private interests weigh heavily against transferring this action to the Eastern District of North Carolina based on the Fourth Circuit Court of Appeals ruling in Holly v. Scott, 434 F.3d 287 (4th Cir. 2006), where it was held by the court that all "civil actions" filed by any D.C. Code or federal prisoner housed at the Rivers Correctional Institution, in federal district court in the Eastern District of North Carolina, will automatically be dismissed because "Bivens" did not extend to provide right of action to inmates who had adequate state tort remedies.  (See Plaintiff's Exhibit D)

Plaintiff asserts that based on the Holly v. Scott, supra, ruling, plaintiff filed a "Civil Action Complaint" (See Plaintiff's Exhibits E, & E-1) in the "Hertford County Superior Court" in the State of North Carolina, the State court which has jurisdiction over all civil actions complaints filed against Rivers Correctional Institution.  Plaintiff's state "Civil Action" was filed in the Hertford County Superior Court on March 2, (See Plaintiff's Exhibit E) 2007, and was dismissed as being "frivolous" on April 10, 2007 (See Plaintiff's Exhibit E-1). There was no court opinion attached stating why plaintiff's complaint was "frivolous," or Court rules cited to support

-24-

the Hertford County Superior Court's ruling of April 10, 2007
which dismissed plaintiff's "CIVIL ACTION" as being "Frivolous."
All the court did was check a box    (See Plaintiff's Exhibit
E-1) that stated "frivolous."  Because of the actions taken
by both the state and federal courts in the Eastern District
of North Carolina, plaintiff asserts that there are no courts
(state or federal) available to D.C. and federal prisoners in
the Eastern District of North Carolina where they can file
complaints against defendants GEO and the Bureau of Prisons
to complain of the deprivation of their civil and constitutional
rights.  Both the state and federal courts in the State of
North Carolina have outright refused to file or reach the merits
of any "CIVIL ACTION" filed by any D.C. or federal prisoner
at the Rivers Correctional Institution against defendants GEO
and the Bureau of Prisons.

    Plaintiff asserts that if this court were to transfer this
complaint to the U.S. District Court in the Eastern District of
North Carolina, it is for certain that plaintiff's case will
be dismissed by the Hertford County Superior Court as being
"frivolous," and U.S. District Court will dismiss it "with
prejudice," without either court ever reaching the merits of
plaintiff's case.  Plaintiff will then be forced to suffer and
never receive any adequate medical treatment and placed in "imminent
danger" of death, because of the known fact that defendant GEO
has the "highest medical death rate" per prison population, in

-25-

the United States of America.  It should also be noted that
defendant GEO and Bureau of Prisons are aware of fact that
if this court transfers this case to the Eastern District of
North Carolina, that plaintiff's case will be dismissed with
"prejudice."  Therefore, in the interest of justice, plaintiff
moves this honorable court to deny the federal defendants motion
to have this case transferred to the Eastern District of North
Carolina.

Plaintiff asserts that in addressing the convenience of
the federal defendants parties and witnesses, the federal
defendants will not be burdened or any inconvenience in
producing evidence or witnesses, but contrary to what they
allege, this forum is a better forum for them to defend in
them the Eastern District of North Carolina, because they will
have to travel a great distance, and Director Harley Lappin
will be taken away from his leadership role at the Federal
Bureau of Prisons, and making important daily decisions.

In regards to defendant GEO, they also will not be placed
in any undue burden or any inconvenience to them based on the
fact that defendant GEO has two (2) "GREYHOUND" type buses
that daily travel back and forth from the Rivers Correctional
Institution in Winton, North Carolina to D.C. Jail in the
District of Columbia dropping off and picking up D.C. prisoners
who will be serving time in the Rivers Correctional Institution.
Defendant GEO also has contracted with a "Van Service" which

-26-

(See Plaintiff's Exhibit F) provides a "free" 46-seat "family visitation" "Coach Service" Thursday through Sunday of each week.  The bus departs from a "central Washington, D.C. location and returns the same afternoon/evening.  This clearly shows that defendant GEO would in no way be burdened or would it present any inconvenience to them if they (GEO) had to travel to the District of Columbia to bring staff or prisoners to testify in the U.S. District Court, since they already come daily to the District of Columbia, dropping off prisoners at D.C. Jail, at different District of Columbia halfway houses, and providing a "free" 46-seat "family visitation" "Coach Service" Thursday through Sunday of each week.

Plaintiff asserts that the cases cited by the federal defendants, i.e., Stern, Zakiya, Joyner, and Rogers, to support their argument that this case should be transfered to the Eastern District of North Carolina, is inapposite in this case, for example, in the cases of Stern and Zakiya, the defendants named in those cases all resided outside the District of Columbia, in the Rogers case, the court granted the motion to transfer only after concluding that the District of Columbia had little or no interest in the cases because plaintiff was neither incarcerated nor sentenced in the District of Columbia.  Two of the named defendants in this case reside in the District of Columbia, and they routinely litigate prisoners' rights cases in this forum.  See, e.g., Jasperson v. Fed. Bureau of Prisons, 460 F.Supp.2d 76 (D.D.C. 2006); Tanner v. Fed. Bureau

of Prisons, 433 F.Supp.2d 117 (D.D.C. 2006).

The federal defendants like defendant GEO incorrectly
assert that the facts giving rise to this action occurred only
in the Eastern District of North Carolina.  While defendants'
provision of inadequate medical care included conduct that
took place in the Eastern of North Carolina, the actions giving
rise to that unlawful conduct include acts and omissions that
occurred in the District of Columbia.  The complaint contains
detailed allegations linking plaintiff's claims to the federal
defendants' conduct that occurred in or was directed in the
District of Columbia, including GEO's agreement to provide
adequate health care to District of Columbia prisoners, such
as plaintiff, transferred to its Rivers facility; improper
or inadequate health care and mortality reports that were
submitted to the Bureau of Prisons in the District of Columbia;
and failure of the BOP officials in the District of Columbia
to provide adequate oversight and supervision of its contractor
defendant GEO.

The federal defendants' are also incorrect when they allege
that the evidence that will be involved in this case favors
transfer.  The allegations in the complaint state that the
principal sources of proof will be (1) medical providers in
the District of Columbia that treated plaintiff before being
transferred to Rivers; (2) records and witnesses located within
the BOP, which include plaintiff's central file, and records

-28-

accessed through the "SENTRY", federal defendants' "mainframe" which is located in the District of Columbia; (3) records and witnesses in the Federal Reserve Board, the Social Security Administration, and the Veterans Administration all located in the District of Columbia; (4) records located at Rivers Correctional Institution in North Carolina; and (5) records and witnesses located at GEO's headquarters in Florida. The majority of evidence and witnesses reside outside of North Carolina, and therefore, the interests of justice therefore do not favor transferring this action to the Eastern District of North Carolina.

## CONCLUSION

For the foregoing reasons, plaintiff moves this honorable court to deny defendants "Motions To Dismiss or Transfer" in their entirety.

Respectfully Submitted,

*Frederick Hines*

Frederick Hines
Reg. No. 33592-007
Rivers Correctional Institution
P.O. Box 630
Winton, NC 27986

Subscribed to and sworn
before me on this _14th_ day of _January_ 2008.

_Rita C. Williams_
Notary Public

-29-

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing "Motion In Opposition" has been mailed to the following:

1.  Deborah J. Israel, Esq.
    Womble Carlyle Sandridge & Rice, PLLC
    1401 Eye Street, N.W., 7th Floor
    Washington, D.C. 20005
    Counself for defendant GEO Group, Inc.

2.  Kathryn L. Wyer
    U.S. Department of Justice, Civil Division
    20 Massachusetts Ave., NW, Room 7218
    Washington, D.C. 20001
    Attorney for Federal Defendants

this ___7tot___ day of ___January___ 2008.

_Frederick Hines_
Frederick Hines

**E X H I B I T   C**

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1   tracking system which ensures all Congressional/Judicial
2   inquiries and program recommendations are responded to in a
3   timely and accurate manner.  All Judicial/Congressional
4   inquiries and contractor responses, specifically related to an
5   inmate, shall be made part of the inmate's central file.

6   The CO shall be notified when a request is made for inmate or
7   employee interviews or facility visits by any representative of
8   the media as defined by P.S. 1480.03, Contact with News Media.
9   The contractor shall coordinate all public information related
10   issues with the CO and clear, in advance, all press statements
11   and releases.

12   The contractor shall ensure its employees agree to use
13   appropriate disclaimers clearly stating the employees' opinions
14   do not necessarily reflect the position of the BOP or DOJ in any
15   public presentations they make or articles they write that relate
16   to any aspect of contract performance or prison operations.

17   D.  Fiscal Management

18   The commissary shall be operated by the contractor as a privilege
    to inmates.  Any revenues earned in excess of those needed for
    commissary operations shall be used solely to benefit inmates in
21   accordance with P.S. 4500.04, Trust Fund/Warehouse/Laundry
22   Manual, Chapter 4504.  The commissary shall make available gender
23   specific items for purchase that are not required to be furnished
24   by the contractor.  Inmates shall have the opportunity to
25   purchase from the commissary at least once a week.  The
26   contractor shall ensure that inmates spend no more on purchases
27   than the BOP spending limit excluding those items listed in P.S.
28   4500.04, Trust Fund/Warehouse/Laundry Manual, Chapter 4526.  The
29   contractor shall maintain an inventory of items stocked in the
30   commissary and ensure that no prohibited items in accordance with
31   P.S. 4500.04, Trust Fund/Warehouse/Laundry Manual, Chapter 4522
32   are stocked.  The commissary inventory shall be provided to the
33   CO upon request.  The sales price for commissary items shall be
34   computed in accordance with P.S. 4500.04, Trust Fund/Warehouse/
35   Laundry Manual, Chapter 4523.

36   Inmates are permitted to receive funds from outside sources
37   (e.g., from family, friends, bank accounts).  Either outside
38   funds or those generated from work may be used to pay for
39   products and services from the commissary.

·9

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1  shall be submitted to the CO for each applicant offered
2  conditional employment.  The BOP will initiate the National
3  Agency Check which includes the FBI name and fingerprint check.
4  The BOP will ordinarily advise the Warden or designee of the
5  results of name and fingerprint checks within 90 working days of
6  submission to the FBI.

7  The contractor shall complete Steps 1 - 6 on each prospective
8  employee prior to submitting information required by Steps 7 and
9  8 to the CO for completion.

10  The Warden or designee shall be the contractor's liaison for the
11  processing of data required for the BOP to conduct NCIC/NLETS,
12  name and fingerprint checks.  The information listed below shall
13  be provided for each on-site applicant, to include subcontractor
14  personnel and volunteers:  full name (with aliases, maiden name
15  if applicable, or other names used); date of birth; gender; place
16  of birth; social security number and race.  Included with this
17  information, the Warden or designee shall certify Steps 1 - 6
18  above have been accomplished with satisfactory results for each
19  applicant.

   The BOP may require additional information to process NCIC/NLETS
   and name checks, therefore, the contractor's employment
22  application document shall contain information regarding
23  applicant height; weight; eye and hair color; markings, scars and
24.  tattoos; citizenship; driver's license number and State of issue;
25  and current address.

26  The contractor shall keep the BOP apprised of the volume of
27  applicants.  The BOP will ordinarily advise the Warden or
28  designee of the results of applicant NCIC/NLETS checks within
29  seven working days following receipt of accurate and complete
30  NCIC/NLETS data from the contractor.

31  Based upon the Warden's certification and the results of the
32  NCIC/NLETS, the BOP will grant conditional approval for the
33  applicant to work under the terms of this contract.  Upon receipt
34  of this approval, the contractor may grant the applicant a
35  conditional offer of employment.  The contractor shall provide
36  the CO with advance written notification of all employees'
37  scheduled EOD.  Written notification of all on-site employees
38  actual EOD shall be provided to the CO within 24 hours of an
39  employee reporting to work.

12

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1  Acceptability Standards, but the contractor still desires to
2  retain the employee. In such cases, the contractor shall submit
3  a written request for waiver of the Acceptability Standards to
4  the CO which includes the details and circumstances surrounding
5  the employee's behavior and the reason(s) why the employee should
6  be retained.

7  The BOP will be the final approval authority for all contractor
8  staff who work with Federal inmates under the terms of this
9  contract. No individual who is under supervision or jurisdiction
10 of any parole, probation or correctional authority shall be
11 employed under this contract. Persons with previous misdemeanor
12 criminal convictions or a felony conviction, who are not under
13 supervision, may be considered for employment; however, the BOP
14 shall be the approval authority in all such cases. The BOP may
15 give consideration to such factors as criminal history, time
16 elapsed since conviction(s) and subsequent adjustment in the
17 community.

18 The contractor shall ensure all employees are reinvestigated
19 periodically, as prescribed in the Scope and Coverage of a
20 Periodic Reinvestigation in Section J, Attachment 8 of the
21 contract. Employees will be required to complete required
   investigative forms and fingerprint cards for submission to the
   BOP. The BOP will initiate the National Agency Check, which
24 includes the name and fingerprint checks. Upon receipt, review,
25 and resolution of any derogatory information contained in the
26 reinvestigation report, the Warden shall forward to the CO a
27 written determination regarding the employee's continued
28 employment under this contract. A copy of the reinvestigation
29 report shall be attached to the Warden's written request.

30 Should the institution staff turnover rate exceed an acceptable
31 level, as determined by the CO, or repetitive NCIC/NLETS or
32 fingerprint checks are necessary due to contractor error, the
33 actual cost of processing the NCIC/NLETS, name and fingerprint
34 checks shall be withheld from amounts due the contractor.

35 The contractor shall ensure all employment practices are in
36 compliance with U.S. Department of Labor requirements in addition
37 to applicable state and local requirements.

38 In the absence of a collective bargaining agreement, the
39 contractor shall enter into a written employment agreement with

14

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1   G.   Case Records

2   All inmate files (e.g., central files, medical files and judgment
3   and commitment files) are to be prepared, maintained, retired and
4   disposed of in accordance with the BOP format.   Policy and
5   procedures shall be developed to ensure the confidentiality and
6   security of all inmate files (e.g., judgment and commitment
7   files, central files, U.S. Parole Commission mini-files) in
8   accordance with P.S. 5800.07, Inmate Systems Management Manual,
9   P.S. 5800.11, Central File, Privacy Folder and Parole Mini-Files)
10  and in accordance with all applicable Federal provisions (e.g., 5
11  U.S.C. 552 and 552a).

12  The contractor shall interact with other agencies to satisfy
13  outstanding inmate obligations including, but not limited to:   1)
14  processing of Federal and state writs; 2) administration of the
15  Interstate Agreement on detainers; 3) detainer inquiries; 4)
16  lodging and removal of detainers; and 5) coordination of
17  transfer/inmate movement in and out of the institution in
18  accordance with P.S. 5800.07, Inmate Systems Management Manual,
19  Chapter 8; P.S. 5130.05, Detainers and the Interstate Agreement
20  on Detainers; P.S. 5875.08, Transfers of Inmates to State Agents
21  for Production on State Writs; and, P.S. 5800.08, Receiving and
:   Discharge Manual.

23  The contractor shall:  1) maintain inmate judgment and commitment
24  files; 2) maintain file accountability and security; 3) respond
25  to inmate inquiries; 4) respond to outside requests for
26  information; 5) verify release methods and dates prior to an
27  inmate's release; and other related functions.

28  The contractor shall comply with the Privacy Act of 1974,
29  (5 U.S.C. 552a) and 28 CFR, Parts 16 and 513.

30  No inmate shall be admitted to, or released from, institution
31  custody without prior BOP approval.

32  H.   Information Systems and Research

33  The BOP's Information System environment includes mainframe,
34  local area network (LAN) and wide area network (WAN) components.

35  The BOP's mainframe software environment exists in an internally-

19

1   developed application named SENTRY which is used to support
2   institution operations.  The contractor shall provide and
3   maintain hardware and software to access SENTRY, in the manner
4   referenced in this SOW, to operate the institution.

5   The technical hardware environment in which computer services are
6   to be performed consists of IBM-compatible Personal Computers
7   (PCS) operating on a LAN.  In addition to providing for the
8   inter-connection of PC workstations, the LAN also provides
9   connections to a BOP centralized gateway which connects to an
10  IBM-compatible mainframe computer located in a DOJ data center.

11  All network operating system hardware not furnished by the
12  Government must remain compatible with BOP equipment throughout
13  the life of the contract.

14  Contractor provided hardware and software necessary to
15  participate in the BOP's information system environment is
16  provided at Section J, Attachment 15.

17  All network operating system software, applications software and
18  configurations not furnished by the Government shall be the same
    release, version and configuration currently specified by the CO
    throughout the life of the contract.. The contractor shall adhere
21  to P.S. 1237.10, Network Standards and its associated Technical
22  Reference Manual (TRM).

23  The contractor shall ensure that the inmate "automated system of
24  records" is compatible with standard BOP facility and operational
25  requirements.

26  Examples of the procedures for which the contractor shall use
27  SENTRY include, but are not limited to: admissions and releases;
28  inmate counts; medical data; inmate classification and
29  programming; education data; discipline data; the victim/witness
30  program; and, as directed by the BOP, sentence computations
31  including good time and United States Parole Commission actions.
32  The contractor has the option to use SENTRY for any other
33  procedures as approved by the CO.

34  The contractor shall adhere to P.S. 1237.11, Information Security
35  Programs which governs such areas as: security for and access to
36  sensitive information and systems; minimum personnel security
37  pre-requisites for computer system users and administrators; and

20

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1   security and access to computer rooms, etc.  The contractor shall
2   monitor all security procedures to ensure compliance.

3   The contractor shall ensure fundamental information technology
4   resources (e.g., computer hardware, network and operating system
5   software and telecommunications facilities) used in performance
6   of this contract function properly and are maintained in good
7   operating condition.  A minimum OAR of 97% is required for all
8   such resource components.  The contractor shall ensure that such
9   resources shall be compatible with existing and planned BOP
10  equipment, systems and data exchange functions.

11  GroupWise shall be configured as a secondary domain to the BOP
12  primary domain and shall have no physical or logical connections
13  to any external mail system.  The contractor's network shall have
14  no physical or logical connectivity to any external systems
15  except the BOP WAN, unless specifically approved in advance by
16  the CO.

17  Advance approval from the CO shall be obtained for all proposed
18  research projects.  These include projects conducted by the
19  contractor, subcontractors, or any other party.  The CO shall be
    kept advised of the progress of all research projects, have total
    access to all documents, and be provided a copy of the final
22  report prior to any publication.

23  The contractor is required to participate in any research task
24  pursued by the BOP and shall gather and provide any information
25  requested.  Contractor participation is anticipated to be
26  primarily in the area of gathering and submitting statistical
27  information.  Research data shall be provided to the Government
28  through SENTRY and/or through the automated data entry facilities
29  of the BOP's General Retrieval System (GRS) or other means as
30  specified by the BOP.  The BOP will provide software for the GRS.

31
32  At the discretion and request of the CO, the contractor shall
33  distribute the Staff Prison Social Climate Survey to a sampling
34  of staff (ranging from 35 to 100 percent).  The Government shall
35  determine the survey sample.  The contractor shall allow staff to
36  complete the survey (generally 45 minutes) while in a paid
37  status, collect the surveys and provide them to the CO.

38  At the discretion of, and compensated by, the Government, an
39  independent evaluator, may interview and/or administer surveys to

21

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1  construction and contract performance.  These updates shall be
2  provided to the CO within 30 days of any changes made.  Site
3  utilities include, but are not limited to: water and sewer lines;
4  gas lines; tunnels; steam lines; chilled water lines; recording
5  layouts; elevations; modifications; additions; etc.  Two copies
6  of the As-built drawings shall be provided to the CO in AUTOCAD
7  release 14.0 on a CD-ROM no later than 180 days after issuance of
8  the NTP.

9  Promptly after the occurrence of any physical damage to the
10 institution (including disturbances), the contractor shall report
11 such damage to the CO.  It shall be the responsibility of the
12 contractor to repair such damage, to rebuild or restore the
13 institution consistent with the master design and construction
14 specifications for the facility at no cost to the Federal
15 Government.  Any deviation from the original design and
16 construction specifications shall require the prior concurrence
17 of the CO.

18 The BOP anticipates a nominal number of BOP staff will be
19 on-site to monitor contract performance and manage other BOP
20 interests associated with operation of the private facility.
21 With BOP concurrence, the contractor shall designate
   approximately 2,500 square footage of administrative office space
   for BOP staff operations.  BOP office space shall be climate
24 controlled and located consistent with the administrative office
25 space for contractor staff.  The contractor shall be responsible
26 for all maintenance and costs associated with space designated
27 for BOP staff.

28 The contractor shall provide no less than 10 parking spaces
29 reserved for Government use.

30 J.  Security and Control

31 At least one inmate count every 24 hours shall be a stand-up
32 count. SENTRY shall be used for reporting all counts.  All counts
33 shall be documented in separate logs and maintained in the inmate
34 housing unit, control center and shift supervisor's office for a
35 minimum of 30 days.

36 Policy and procedures for the maintenance and security of keys
37 and locking mechanisms shall be developed.  The procedures shall
38 include, but are not limited to: method of inspection to expose

25

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1   injuries requiring medical attention (does not include routine
2   medical evaluation after the incident); fights resulting in
3   injuries requiring medical attention; fires; full or partial
4   lockdown of the institution; escape; weapons discharge; suicide
5   attempts; deaths; hunger strikes; adverse incidents that attract
6   unusual interest or significant publicity; adverse weather
7   impacting security of the institution (e.g., fence damage, power
8   outages, severe flooding); bomb threats; central inmate
9   monitoring cases admitted to a community hospital; witness
10  security cases taken outside the institution; significant
11  environmental problems that impact institution operations;
12  transportation accidents (airlift, bus, etc.) resulting in
13  injuries, death or property damage; and sexual assaults.

14  Immediately following CO notification, the contractor shall
15  report any serious incident using WAN Form 583, Report of
16  Incident completed in accordance with P.S. 5500.09, Correctional
17  Services Manual.

18  The BOP may investigate any incident pertaining to performance of
19  this contract.  The contractor shall cooperate with the
20  Government on all such investigations.

·   The contractor shall maintain a urine surveillance program which
22  complies with P.S. 6060.05, Urine Surveillance to Detect and
23  Deter Illegal Drug Use.  A laboratory certified by the National
24  Institute of Drug Abuse of the Department of Health and Human
25  Services shall be utilized to test urine samples.

26  The contractor's contraband control procedures shall include
27  frequent pat searches of inmates and the use of supervised walk-
28  through and hand-held metal detectors at all compound gates and
29  entrances to housing units.

30  K.  Safety and Emergency Procedures

31  The contractor shall submit an institution emergency plan to be
32  fully operational prior to issuance of the NTP.  The plan shall
33  receive the concurrence of the CO prior to implementation and
34  shall not be modified without the written concurrence of the CO.

35  The contractor shall have written agreements with appropriate
36  state and local authorities that provide for notification and

29

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1   requests for assistance in the event of incidents that may have
2   an adverse impact on the community.

3   The emergency plan shall include provisions for two or more
4   disturbance control teams. Protective clothing and equipment for
5   each team member and 30% of all additional institution staff,
6   shall be provided by the contractor and maintained in a secure
7   location outside the secure perimeter of the low security
8   institution.

9   Any decision by the BOP or other Federal agencies to provide
10  and/or direct emergency assistance at the institution will be at
11  the discretion of the Federal agencies. The contractor shall
12  reimburse the Federal agency(ies) for any and all expenses
13  incurred as a result of providing such assistance.

14  The CO shall be notified immediately in the event of an escape.
15  Attempts to apprehend the escapee(s) shall be in accordance with
16  the Emergency Plan. The contractor shall follow notification
17  practices and procedures as set forth in P.S. 5553.05,
18  Escapes/Deaths Notification and WAN Form 583, Report of Incident,
19  shall be submitted.

    L.  Discipline

21  The contractor shall comply with the policy and procedures for
22  inmate discipline as contained in 28 CFR 541 and P.S. 5270.07,
23  Discipline and Special Housing Units. The contractor's DHO and
24  alternate shall be trained and certified by the BOP prior to
25  acceptance of inmates. All data regarding the discipline
26  incident report process shall be entered into SENTRY.

27  M.  Inmate Rights

28  The contractor shall stock and provide inmates with BOP
29  administrative remedy forms to accommodate any claims directly
30  related to BOP matters (e.g. sentence computation; designation
31  and transfer issues; prior custody).

32  The contractor shall ensure religious services program standards
33  as established by the Religious Freedom Restoration Act are
34  maintained.

30

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK
Request for Proposal PCC-0004*

1  N.  Reception and Orientation

2  The contractor shall comply with P.S. 5800.08, <u>Receiving and</u>
3  <u>Discharge Manual.</u> when entering inmate admission and release
4  data.

5  The search of inmates admitted to, or released from, low or
6  higher security institutions shall include a strip search
7  performed by contractor staff.  The search shall be conducted by
8  persons of the same gender, except in exigent circumstances.

9   Inmates shall be fingerprinted using Government supplied forms
10  and submitted to the FBI in accordance with P.S. 5040.04, <u>FBI</u>
11  <u>Forms, Submission to the FBI,</u> and P.S. 5800.08 <u>Receiving and</u>
12  <u>Discharge Manual</u>.

13  The intake process shall include, at a minimum, medical and
14  social screening prior to inmate release to the general
15  population.  Psychological screening shall be provided for each
16  inmate within 24 hours of arrival at the institution.

17  The contractor shall ensure all requirements related to P.S.
18  5180.04, <u>Central Inmate Monitoring Manual</u> are maintained.

19  In the event an inmate is transferred to or from a foreign
20  country,  28 CFR 527 and 18 U.S.C. 4100, et seq. shall be
21  followed.

22  The contractor is advised that P.S. 5580.05, <u>Personal Property,</u>
23  <u>Inmate,</u> provides procedures related to inmate property.  Property
24  of inmates transferred to other correctional facilities from the
25  institution shall meet the requirements of P.S. 5580.05, <u>Personal</u>
26  <u>Property</u>.  Property accompanying an inmate transferred from the
27  institution that is outside the scope of P.S. 5580.05 shall be
28  returned to the institution at the contractor's expense for
29  appropriate disposition (also at the contractor's expense).  All
30  inmate personal property shall be inventoried and a BOP Form 383,
31  <u>Inmate Personal Property Form</u> completed upon inmate admission and
32  discharge.

31

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1    O.  Classification

2    The contractor shall ensure classification and program review of
3    inmates in accordance with the requirements contained in P.S.
4    5322.10, Classification and Program Review of Inmates, P.S.
5    5100.06, Security Designation and Custody Classification Manual
6    and 28 CFR 524 are accomplished.  In addition, the contractor
7    shall enter and keep current all required BOP SENTRY transactions
8    and written documentation related to the classification and
9    program review of inmates, progress reports and central inmate
10   monitoring system.  A system of records and review to ensure
11   compliance with P.S. 5100.06, Security Designation and Custody
12   Classification Manual, and related transactions shall be
13   developed and maintained.

14   The contractor shall follow all applicable provisions related to
15   the Violent Crime Control and Law Enforcement Act of 1994 (P.L.
16   103-322), ensuring all notification requirements are
17   accomplished.

18   A financial responsibility system mandating inmates establish a
19   financial plan to meet legitimate financial obligations in
     accordance with 28 CFR 505 (P.L. 102-395) and 545.10 shall be
     developed and maintained.

22   The contractor shall develop policy and procedures concerning
23   victim and/or witness notification which meet the requirements
24   outlined in 28 CFR 551 and the Victim and Witness Protection Act
25   of 1982.

26   P.  Health/Mental Health Care

27   The contractor shall provide all essential health services while
28   meeting the applicable standards and levels of quality
29   established by the ACA and the designated BOP ambulatory health
30   care accreditation provider, JCAHO.  In addition, the contractor
31   shall adhere to all applicable Federal, state and local laws and
32   regulations governing the delivery of health services and
33   establish the necessary quality controls to ensure all policies
34   and procedures are designed and implemented in a manner to
35   promote orderly and efficient delivery and management of health
36   services to the inmate population.

32

1    The contractor shall obtain full accreditation by JCAHO for the
2    institution within 24 months of NTP and shall maintain continual
3    compliance with applicable JCAHO standards during performance of
4    the contract. Once full accreditation has been obtained, the
5    contractor shall maintain this accreditation throughout the life
6    of the contract, inclusive of any option year exercised. The
7    contractor shall be responsible for all costs associated with
8    obtaining and maintaining full accreditation by JCAHO.

9    The provision of medical services commensurate to the level of
10   care available in the community is an essential component of
11   successful performance under the contract. The contractor is
12   referred to the following list of P.S's and TRM's as guides to
13   the BOP's standard of health care delivery:

| | | |
|---|---|---|
| 14 | P.S. 6000.05 | "Health Services Manual (HSM)" |
| 15 | P.S. 6010.01 | "Psychiatric Treatment and Medication, |
| 16 | | Administration Safeguards For" |
| 17 | P.S. 6080.01 | "Autopsies, Authority to Order" |
| 18 | P.S. 6100.01 | "Health Promotion and Disease Prevention |
| 19 | | for Inmates" |
| 20 | P.S. 6190.02 | "Infectious Disease Management" |
| | TRM 011-01 | "Pharmacy Technical Reference Manual" |
| 22 | TRM 008.02 | "Sentry Medical SMD/MDS Technical |
| 23 | | Reference Manual" |
| 24 | P.S. 5310.12 | "Psychology Services Manual" |
| 25 | P.S. 5324.03 | "Suicide Prevention Program Statement" |
| 26 | P.S. 5310.13 | "Management of Mentally Ill inmates" |
| 27 | P.S. 5324.04 | "Sexual Assault Prevention/Intervention |
| 28 | | Program" |

29   Administration - Prior to issuance of NTP, the contractor shall
30   designate a health services Point of Contact (POC) who shall be
31   responsible for the delivery of health services under the
32   contract. The POC shall have full authority to act on behalf of
33   the contractor on all matters relating to the operation of the
34   health services portion of the contract. An alternate may be
35   designated; however, the contractor shall identify those times
36   when the alternate shall be the primary POC.

37   All health care services shall be provided within the HSU. For
38   cases of emergency and other medically necessary situations,
39   arrangements (i.e., subcontracts) shall be made with local health

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1  care providers to obtain essential health services.

2  Services - The contractor shall have written plans and procedures
3  for providing urgent medical, health, mental health and dental
4  services.  The plan shall include, but is not limited to, the
5  following: (1) 24 hour a day, seven day a week emergency medical,
6  health, mental health and dental care; (2) initial health
7  screening; (3) health appraisal examination; (4) daily triaging
8  of complaints; (5) sick call procedures; (6) special medical
9  programs and services for, but not limited to, inmates with
10  chronic needs or requiring convalescent care; (7) mental health
11  and substance abuse services; (8) staffing/health care
12  specialists; (9) ancillary services - radiology, laboratory,
13  etc.; (10) dental services - routine and emergency; (11)
14  pharmaceutical services and supplies; (12) optometric services;
15  (13) health education; (14) medical diets; (15) infectious
16  diseases; and (16) quality control/peer reviews.

17  Infectious Disease - The contractor shall comply with all OSHA
18  regulations and BOP infectious disease requirements in the
19  delivery of health care services.  All inmates shall be screened
20  for Tuberculosis within 48 hours of intake and annually
21  thereafter.  Screening shall consist of either a PPD (Mantoux
?  method) or PA chest x-ray as clinically indicated.

23  Inmate Death - In the event an inmate death occurs, the
24  contractor shall immediately notify the CO and submit a written
25  report within 24 hours.  The contractor shall fingerprint (right
26  thumb or right index) the deceased and staff performing the
27  fingerprinting shall date and sign the fingerprint card to ensure
28  that positive identification has been made.  The fingerprint card
29  shall then be hand delivered to the CO.

30  Personal property of a deceased inmate shall be inventoried and
31  forwarded to the designated family member, the nearest of kin or
32  the Consular Officer of the inmate's country of birth.

33  If death is due to violence, an accident surrounded by unusual or
34  questionable circumstances, or is sudden and the deceased has not
35  been under immediate medical supervision, the contractor shall
36  notify the coroner of the local jurisdiction to request review of
37  the case, and if necessary, examination of the body.  The
38  contractor shall establish coroner notification procedures
39  outlining such issues as performance of an autopsy, who will

34

1  perform the autopsy, obtaining state-approved death certificates
2  and local transportation of the body.  In the event an autopsy is
3  conducted, the contractor shall ensure the body is turned over to
4  the designated family member, the nearest of kin or the Consular
5  Officer of the offender's country of birth.

6  In the event the deceased inmate is indigent, the Government will
7  reimburse the contractor for reasonable burial costs as approved
8  in advance by the CO.

9  Medical Records - Consistency in content and format of medical
10 records of inmates transferring between the institution and other
11 Government facilities is a critical component of care for
12 inmates.

13 The contractor shall adhere to the HSM, Chapter 5, Sections 1
14 through 17 -  Health Records, in preparing, formatting,
15 documenting, maintaining, releasing and all medicolegal aspects
16 of an inmate's medical record.  The contractor is responsible for
17 supplying medical record folders, consistent with the
18 specification provided by the BOP, only for those inmates who are
19 new designations into the institution or in cases where
   transferred medical records cannot be located.  The Government
   shall provide to the contractor all applicable Government forms
22 necessary to document an inmate's medical record.

23 The contractor shall adhere to HSM, Chapter 2, Section 3 -
24 Sensitive Medical Data\Medical Duty Status Reporting for the
25 reporting and accountability of medical data on all inmates
26 assigned to the institution.  This includes utilizing the SMD/MDS
27 TRM on BOPDOCS.

28 Medical Transfers - Prior to admitting an inmate to an outside
29 medical facility for inpatient care, with the exception of
30 emergency cases, the contractor shall obtain pre-certification
31 approval of the BOP's Office of Medical Designations and
32 Transportation (OMDT).  The contractor shall submit this request
33 for approval to OMDT via the BOP's SENTRY computer system using
34 the request procedures established in accordance with HSM,
35 Chapter 7.  A copy shall also be sent to the CO.

36 In emergency cases, the contractor shall submit the above
37 mentioned request to OMDT within 24 hours of the inmate's
38 admission for inpatient care to an outside medical facility.

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1  posters and pamphlets to the inmate population.

2  A comprehensive parenting education program to promote and build
3  family relationships shall be made available for voluntary
4  attendance by the inmate population.

5  The contractor shall provide General Education Development (GED)
6  testing by becoming a GED testing center through the GED Testing
7  Service or by securing GED testing services through a local
8  provider.

9   The contractor shall utilize the SENTRY Education Data System
10  (EDS) to enter the required information pertaining to individual
11  inmate participation and progress in the institution education
12  program.  The contractor is referred to the SENTRY Education TRM
13  as a guide to the use of the SENTRY EDS.

14  T.  Recreation and Activities

15  The contractor shall comply with Section 611 of P.L. 104-208,
16  Title I, Section 101(a) (the Zimmer Amendment), which addresses
    use of recreational equipment and materials by Federal inmates.

18  The contractor shall ensure that correctional staff are assigned
19  in sufficient numbers to supervise all inmate recreation
20  activities.

21  U.  Telephone

22  The contractor shall provide a telephone system for inmates
23  capable of accommodating both debit and collect phone calls.  The
24  contractor shall establish procedures that permit inmates to make
25  telephone calls, including in cases of emergency or inmate
26  indigence.

27  All inmates, with the exception of inmates in the Special Housing
28  Unit or Control Unit, shall be allowed a minimum of 120 minutes
29  of collect calling per month unless telephone privileges have
30  been suspended as part of a disciplinary sanction.

31  Inmates in the Special Housing Unit or Control Unit are entitled
32  to a minimum of one social call per month.

38

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1   The system shall prevent inmates from calling any telephone
2   number not included on the inmate's official telephone list.
3   This list shall be generated within five working days of the
4   inmate's arrival and contain up to 30 telephone numbers that the
5   inmate is authorized to call via debit or collect procedures,
6   except as otherwise authorized by the Warden for good cause.

7   The contractor shall ensure and document that any individual
8   placed on an inmate's telephone list receives notice that they
9   have been placed on such list. The notice shall advise the
10  individual of the procedures for removal from the inmate's
11  telephone list. The contractor shall ensure that the telephone
12  numbers of an inmate's crime victim or victims are not included
13  on the inmate's official telephone list. The contractor shall
14  allow each inmate the opportunity to update their telephone list
15  up to three times per month, except as otherwise authorized by
16  the Warden for good cause.

17  If authorized to do so under applicable law, the contractor shall
18  monitor and record inmate telephone conversations. If inmate
19  telephone conversations can be monitored under applicable law,
20  the contractor shall provide notice to inmates of the potential
21  for monitoring. However, the contractor shall also provide
22  procedures for inmates to be able to place unmonitored telephone
23  calls to their attorneys of record.

24  Telephone rates shall not exceed the dominant carrier tariff rate
25  and shall conform to all applicable Federal, state and local
26  telephone regulations.

27  Any income received by the contractor from collect calls which is
28  in excess of expenses incurred, to include refunds/rebates from
29  carriers, shall offset the cost of this contract. The contractor
30  shall provide the CO with copies of any contracts between the
31  contractor and the inmate telephone system provider(s). The
32  contractor shall provide the CO with all documentation in support
33  of any agreement that the contractor has regarding income,
34  refunds, rebates and other monetary or nonmonetary reimbursements
35  involving the inmate telephone system. The contractor shall also
36  provide the CO with copies of all invoices and other
37  documentation of expenses incurred and income received in regards
38  to the inmate telephone system with its monthly request for
39  contract payment and apply the credit against the monthly
40  payment. The CO shall also have total access to all telephone
41  operation records.

39

## SECTION G - CONTRACT ADMINISTRATION DATA

### G.1  CONTRACTING OFFICER'S REPRESENTATIVE

(a)  An individual shall be named after contract award and designated as the Contracting Officer's Representative(COR) to act as contract monitor. Numerous individuals will also be named after contract award and designated as Contracting Officer's Technical Representatives (COTR).  The COTRs will assist the COR in the performance of monitoring

(b)  The contract monitor is responsible for the technical direction of the performance of all work under this contract.  The term "technical direction" is defined to include, without limitation, the following:

    1.  Directions to the contractor which re-direct the contract effort, shift work emphasis between areas or tasks, require pursuit of certain lines of inquiry, fill in details or otherwise serve to accomplish the contractual scope of work.

    2.  Supply information to the Contractor which assists in the interpretation of technical portions of the Statement of Work.

    3.  Review, inspect, and accept reports and information to be provided by the Contractor to the Government under the contract.

    4.  Evaluate the performance and certify all invoices for payment.

(c)  Technical direction must be within the general scope of work stated in the contract.  The contract monitor does not have authority to, and may not issue, any direction which:

    1.  Constitutes an assignment of additional work outside the general scope of the contract.

    2.  Constitutes a change as defined in the contract clause entitled "Changes".

    3.  Change any of the expressed terms, conditions, fixed price, or time for contract performance. Any such revisions shall be authorized in writing only by the Contracting Officer.

## SECTION H - SPECIAL CONTRACT REQUIREMENTS

### H.1    CHANGE IN KEY PERSONNEL

Following contract award, any change in key personnel during
contract performance, is subject to the review and approval
of the COR.   The Contractor shall submit evidence that the
qualifications of the prospective replacement personnel are
equal to or greater than personnel vacating the positions.
Such requests for review and approval shall be in writing.

### H.2    AWARD-FEE DETERMINATION PLAN

The Award-Fee Determination Plan (AFDP) upon which the
determination of award fee is based is contained as an
attachment in Part III, Section J.

The AFDP may be revised unilaterally by the Government at
any time during the period of performance of the contract;
however, any such revision will be subject to timely
contractor notification and will not become effective until
the subsequent evaluation period.

### H.3    AWARD-FEE

The award-fee provided for in this clause shall be in
addition to the base price.  Beginning on the effective date
of this contract, the Government shall evaluate the
contractor's performance on a semi-annual basis to determine
if the contractor is eligible for an award-fee.

During the base period and each succeeding option period,
the contractor may earn a minimum award-fee of zero dollars
to a maximum award-fee of five percent of the total payment
received for the period rated (excluding reimbursable
costs).   The balance of any unearned award-fee for the
evaluation period is not carried over to any subsequent
evaluation period.

The contractor agrees that the evaluation of performance and
the determination as to the amount of award-fee earned will
be made by the BOP Fee Determination Official (FDO), in
accordance with the attachment in Part III, Section J and
that said determination shall be final and not subject to
the terms of the "Disputes" clause or any appeal.   The
contractor shall be advised in writing of the determination
and of the reasons why the award-fee was earned or why it
was not earned in order that the contractor may improve its
performance, if the latter is applicable.

Sanctions for Misconduct (cont)

    b.    The CO may direct the contractor to remove any employee from the contract for failure to comply with the standards of employee conduct.

    c.    If an office of Inspector General (OIG), BOP Office of Internal Affairs (OIA), or local investigation reveals a violation of a standard of conduct, the Warden, shall ensure the sanction imposed is consistent with the schedule of penalties.

B.  **Reporting Misconduct**

    a.    Employees shall report all violations, or apparent violations, of the standards of conduct immediately to the Warden or designee.  Employees shall not be prohibited from referring matters directly to the OIG or OIA.

    b.    The Warden or designee shall immediately report all allegations and appearances of misconduct or impropriety to the CO.

9. **Investigations of Misconduct**

The OIG is responsible for investigating violations of laws and regulations committed by Department of Justice employees and its contractors for appropriate criminal prosecution, civil litigation and administrative action.  The OIA is responsible for ensuring allegations and appearances of misconduct and impropriety, including criminal matters, are referred immediately to OIG.  OIA's investigative authority is delegated by OIG.

    a.    The contractor is prohibited from conducting internal investigations of employee misconduct or apparent misconduct, without the expressed authority from the OIG, OIA, or the CO.

    b.    The BOP employee liaison on issues related to employee misconduct shall have access to records pertaining to allegations and instances of employee misconduct.  The liaison may conduct investigations of misconduct and review the contractor's enforcement of the standards of conduct.

    c.    The contractor and all employees shall fully cooperate in any internal or external investigations.  The BOP shall have access to all personnel, operational and corporate records for the purpose of conducting investigations, inspections and audits.

### Investigations of Misconduct (cont)

d. The contractor will not conduct preliminary investigations without approval from the CO. Any preliminary investigation is limited to gathering statements from victims and witnesses and collecting relevant documents. All information and documents gathered during a preliminary investigation shall be provided to the CO.

e. With the approval of the CO, a confidential medical examination of any inmate(s) who allege physical abuse shall be conducted.

f. If the contractor is authorized by the CO to conduct a local investigation, a report shall be prepared and submitted no later than 45 days after the investigation is authorized. The report shall contain findings of fact, conclusions based on evidence documents and affidavits. The contractor shall provide periodic updates to the CO concerning all on-going local investigations.

g. Polygraph examinations, body wires, electronic listening devices and/or consensual telephone monitoring during any local investigation shall be approved by OIA.

h. The contractor shall maintain and preserve all documents compiled during an internal investigation. No investigative records shall be destroyed without the expressed permission of the CO.

### 10. Employee Training

a. Employees and volunteers shall be provided a copy of the standards of conduct and the contractor shall maintain documentation verifying receipt.

b. A procedure through which employees and volunteers receive training regarding the standards of conduct, as part of their institutional familiarization and annual training, shall be established which defines the minimum number of hours received each year.

c. To deter misconduct, employees shall be provided advice regarding the standards of conduct.

**E X H I B I T  D**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:05-CT-32-BO

FILED
JUN 1 5 2006
US DISTRICT COURT, EDNC
BY_____ DEP CLK
CLERK

DONALD POSTELL,　　　　　　 )
　　　　Plaintiff,　　　　　　　　 )
　　　　　　　　　　　　　　　　 )
　　　v.　　　　　　　　　　　　 )　　　　O R D E R
　　　　　　　　　　　　　　　　 )
GEORGE E. SNYDER, et al.,　　　 )
　　　　Defendants.　　　　　　　 )

　　　This matter now comes before the undersigned on Plaintiff's Motion to Lift the Stay and Defendants' Motion to Dismiss. The Plaintiff was given notice of the Motion to Dismiss and has responded with numerous motions, including a Motion for an Extension of Time which was allowed, a Motion to Amend, Motion to Strike, Motion for Discovery, and a Response. The matter is ripe for determination.

　　　On January 10, 2005, the complaint in this case was filed as one arising out of *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). The Plaintiff alleged violations of his Eighth Amendment rights while incarcerated at Rivers Correctional Institution. On June 14, 2005, the matter was stayed pending the Fourth Circuit's decision in *Holly v. Scott,* 434 F.3d 287 (4th Cir. 2006). On January 12, 2006, the Fourth Circuit held that a *Bivens* action may not be brought against individual officers in the privately run federal correctional facility, i.e. Rivers Correctional Institution. Therefore, the STAY is LIFTED. Furthermore, based upon the holding in *Holly,* the matter is DISMISSED in its entirety. Lastly, if the Plaintiff is an attempting to argue that he also filed this action under 42 U.S.C. § 1983, the argument is not persuasive. The actors named as Defendants have been

defined as private actors, not state actors, and are not amenable to suit under 42 U.S.C. § 1983.

42 U.S.C. § 1983. Lastly, the motion to amend the matter is DENIED, and the motion for

discovery is also DENIED.

Accordingly, the matter is DISMISSED with prejudice in its entirety. The motions to

amend and discovery are DENIED. Having so determined, all other pending motions are likewise

DENIED as MOOT. SO ORDERED, this the _15_ day of June 2006.


TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE

2

**E X H I B I T   E**

7CV500095

STATE OF NORTH CAROLINA
IN THE GENERAL COURT OF JUSTICE FILED
SUPERIOR COURT OF HERTFORD COUNTY
HERTFORD COUNTY, NORTH CAROLINA JAN -2 AM 9:53

FREDERICK HINES,                              HERTFORD COURT, S.S.C.

        Plaintiff,                           BY_____

        v.


THE GEO GROUP, INC.
621 NW 53rd Street, Suite 700
Boca Raton, Florida 33487, as the
governing body of Rivers Correctional
Institution and its employees,
145 Parker's Fishery Road,
Winton, North Carolina 27986,

        Defendant


GEORGE E. SYNDER, WARDEN
Rivers Correctional Institution,
145 Paker's Fishery Road
Winton, North Carolina 27986,

        Defendant


JEANNE KEEL, HOSPITAL ADMINISTRATOR,
working at the Rivers Correctional Institution,
145 Parker's Fishery Road,
Winton, North Carolina 27986,

        Defendant


GADDY MATHESON LASSITER, MEDICAL DOCTOR
working at the Rivers Correctional Institution,
145 Paker's Fishery Road,
Winton, North Carolina 27986,

        Defendant


## COMPLAINT FOR NEGLIGENCE & MEDICAL MALPRACTICE

    This is a Civil Action authorized by N.C. General Statutes

§ 1A-1, § 1A-2 and §1D-1, for punitive and compensatory damages

suffered by plaintiff for past and future causes; to redress deprivation

,      ;

E X H I B I T   E-1

| **STATE OF NORTH CAROLINA** | | *File No.* 07- CVS-95 |
|---|---|---|
| **Hertford** County | | In The General Court Of Justice |
| | | ☐ District  **XX** Superior Court Division |

*Name Of Plaintiff*
**Frederick Hines**

VERSUS

*Name Of Defendant*
**The GEO Group, Inc., et. al.**

**PETITION TO SUE/APPEAL
AS AN INDIGENT**

G.S. 1-110; 7A-228

**AFFIDAVIT**

*(check one of the two boxes below)*

**XX Petition To Sue** - As the individual plaintiff in the above entitled action, I affirm that I am financially unable to advance the required costs for the prosecution of this action. Therefore, I now petition the Court for an order allowing me to bring suit in this action as an indigent.

   ☐ I am an inmate in the custody of the Department of Correction.
   **(Note To Clerk:** *If this block is checked, this Petition must be submitted to a Superior Court Judge for disposition provided on the reverse.)*

☐ **Petition To Appeal** - As the individual appellant in the above entitled small claims action, I affirm that I am financially unable to pay the cost for the appeal of this action from small claims to district court. Therefore, I now petition the Court for an order allowing me to appeal this action to district court as an indigent.

*(check one or more of the boxes below as applicable)*
☐ I am presently a recipient of
   ☐ food stamps.   ☐ Aid to Families With Dependent Children (AFDC).   ☐ Supplemental Security Income (SSI).

☐ I am represented by a legal services organization that has as its primary purpose the furnishing of legal services to indigent persons, or I am represented by private counsel working on behalf of such a legal services organization. (Attach a letter from your legal services attorney or have your attorney sign the certificate below.)

☐ Although I am not a recipient of food stamps, AFDC, or SSI, nor am I represented by legal services, I am financially unable to advance the costs of filing this action or appeal.

| SWORN AND SUBSCRIBED TO BEFORE ME | *Date* **February 16, 2007** |
|---|---|
| *Date* 2/16/07  *Signature* Rita C. Williams | *Signature Of Petitioner* Frederick Hines |
| *Title Of Person Authorized To Administer Oaths* Notary | *Name And Address Of Petitioner (Type Or Print)* |
| *Date Commission Expires* 4/1/09    **SEAL** | **Rivers Correctional Institution P.O. Box 630 Winton, NC 27986** |

**CERTIFICATE OF LEGAL SERVICES/PRO BONO REPRESENTATION**

I certify that the above named petitioner is represented by a legal services organization that has as its primary purpose the furnishing of legal services to indigent persons or is represented by private counsel working on behalf of or under the auspices of such legal services organization.

| *Date* | *Signature* |
|---|---|
| *Name And Address (Type Or Print)* | |

**ORDER**

Based on the Affidavit appearing above, it is ORDERED that:
   ☐ the petitioner is authorized to bring suit or to appeal in this action as an indigent.
   ☐ the petition is denied.

| *Date* | *Signature* | ☐ Assistant CSC   ☐ Clerk Of Superior Court |
|---|---|---|
| | | ☐ Judge   ☐ Magistrate (for appeal only) |

**NOTE TO CLERK:** *If the petitioner is NOT a recipient of food stamps, AFDC, SSI or is NOT represented by legal services or a private attorney on behalf of legal services, you may ask for additional financial information to determine whether the petitioner is unable to pay the costs.*

AOC-G-106, Rev. 9/95
© 1997 Administrative Office of the Courts

(Over)

| ORDER - DOC INMATES |

The undersigned superior court judge of this district finds that the petitioner is an inmate in the custody of the Department of Correction and that the complaint

☐ is not frivolous.

☒ is frivolous.

It is ORDERED that

☐ the petitioner is authorized to sue in this action as an indigent.

☐ the petitioner is not authorized to sue as an indigent.

☒ the action is dismissed.

| Date 9/4/07 | Name Of Superior Court Judge (Type Or Print) Greal | Signature Of Superior Court Judge |

| CERTIFICATION |

I certify that this Petition has been served on the party named by depositing a copy in a post-paid properly addressed envelope in a post office or official depository under the exclusive care and custody of the United States Postal Service.

| Date 4-13-07 | Signature | ☒ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court |

NOTE: G.S. 1-110(b) provides: "The Clerk of Superior Court shall serve a copy of the order of dismissal upon the prison inmate."

AOC-G-106, Side Two, Rev. 9/95
© 1997 Administrative Office of the Courts

**E X H I B I T   F**

It is expected you will handle your calls in such a manner that will allow equal use of the phones by all inmates. Telephones will not be used to conduct a business. Conducting a business by telephone is a prohibited act.

Inmates in Disciplinary Detention and Administrative Segregation may make calls by submitting an Inmate Request to Staff form to SHU staff.

## CORRECTIONAL SERVICES

### Quarters Rules

• Pictures will not be posted on walls or outside of lockers. Unit Officers will inspect cells daily. If a cell is not acceptable, corrective action including incident reports may be expected. You are responsible for the cleanliness and sanitation of your cell/bunk area. Visiting in cells / units / pods other than the inmate's assigned section is not permitted at any time. It is a prohibited act to be in a pod or cell which you are not assigned. You will remain in your assigned pod unless officially scheduled for work, recreation, education, appointments or official authorization is obtained from a staff member. Orderlies are responsible for unit / pod cleanliness and sanitation. However, everyone is responsible for cleaning up after himself.

• Trash and wastebaskets are to be emptied prior to work call each day. Paper bags, plastic bags or boxes are not to be used as waste receptacles.
• Beds will be made each day prior to leaving the cell and no later than 8:00 a.m. including weekends and Federal Holidays. Beds will be made each day prior to leaving for work call, including work call on weekends and Federal Holidays. At no time will a mattress be removed from a bunk and placed on the floor or on other beds.
• Showers are available every day. Inmates may not shower during an official count. Food Service workers and others with irregular work shifts may shower upon the completion of their work assignment when it does not interfere with the cleaning of the unit/dorm or interfere with a count.
• Appropriate personal protection equipment safety clothes and equipment must be worn to work. These items will be furnished by the institution work detail supervisor.
• Special Purchase items will be authorized only in amounts which can be contained in the storage area provided for personal property.
• Legal materials and supplies (not to exceed one cubic foot in volume) may be maintained on active cases only and may be stored in your unit locker.
• In no way can we anticipate all rules and discuss them in this handbook. You are responsible for checking the bulletin boards frequently for notifications, changes and updated information. All reasonable, lawful orders given by staff shall be followed.

## VISITING

Failure to follow rules will result in termination of visit during visitation. It is the intention of the RCI to promote inmate visitation by providing transportation at no cost for the immediate family members of inmates assigned to RCI. RCI will provide a 46-seat "family visitation" coach service Thursday through Sunday of each week. The bus will depart from a central

*18*

Washington, D.C. location and return the same afternoon / evening. The service will be provided on a prescheduled / appointment basis at no charge to the individual inmate or his immediate family members. The inmates immediate family member must call the bus company to reserve transportation: Ed & Son Bus Company 1-888-539-1233. **RCI defines family, for the purpose of this policy as: wife, father, mother, stepfather, stepmother, son, daughter, stepson, stepdaughter, grandfather, grandmother, and the inmates legal guardian.**

All visitors traveling with Contract Bus Service must have satisfied the following requirements before boarding the bus:

- All visitors' names must appear on the approved inmate visitors' list. If an individual's name does not appear on the approval list, he/she will not be allowed to utilize this service.
- All visitors must present a current photo ID to the coach service.
- All visitors must call and reserve a seat with Contract Bus Service who will assign them a confirmation number. All reservations must be made 48 hours in advance. All cancellations must also be made 24 hours in advance of the scheduled departure time. He or she will have last priority when making reservations to ride the bus for a period of one month. Seats will be routinely assigned on a first come first serve basis until the bus capacity is reached.
- The bus will leave the prearranged, central Washington, D.C. location at 4:30am, Thursday through Sunday.
- Visitors who do not abide by the rules may be prohibited from using this service.
- Visitors who do not board the bus for the return trip to Washington, D.C. on the same day they arrived will not be guaranteed a return trip on a subsequent day.
- All visitors must comply with visitation policy and all other facility rules and regulation.

If during the Admission/Orientation process, you anticipate a visit(s) from immediate family (spouse, children, parents, brothers, sisters), you must submit their names to your Counselor. They will be allowed to visit unless there are circumstances which preclude their presence in the institution. Only immediate family will be allowed to visit during this time. Upon the completion of the orientation program, a permanent visiting list including other relatives or friends may be approved. Your counselor will provide you with a visiting questionnaire form (BP-IS-139) for each requested visitor. You are responsible for mailing them out and assuring they are returned for review by the Unit Team. It is the Unit Team's discretion, based on constructive and security factors, as to who will be placed on an inmate's visiting list. You are responsible for notifying the proposed visitor of the Unit Team's decision and for sending approved visitors a copy of the institution's visiting rules. Visitors who have not been approved by the Unit Team will not be allowed to visit. All visitors must possess an identification card with a photo, such as a state driver's license. Children under 16 years of age are not required to possess a picture id, but, some form of ID such as social security card, school id, etc.

## Dress Requirements for Visitors
**Shirts and shoes are mandatory and the following types of clothing will not be allowed:**
- Low-cut or revealing blouses, sheer or see through clothing is prohibited.
- Female undergarments should be free of any metal (Underwire brassier)



*19*